## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| LISSETTE LARIOS ROOHBAKHSH, as personal representative of the ESTATE OF FATIMA LISSETTE LARIOS and on behalf of next of kin,<br><br>and<br><br>NELSON LARIOS, as next of kin<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE NEBRASKA STATE COLLEGES<br><br>and<br><br>CHADRON STATE COLLEGE,<br><br>Defendants. | Case No. _____ |

### COMPLAINT

Plaintiffs, LISSETTE LARIOS ROOHBAKHSH, as personal representative of the ESTATE OF FATIMA LISSETTE LARIOS and on behalf of Fatima Lissette Larios's next of kin, including herself, and NELSON LARIOS, as Fatima Lissette Larios's next of kin, through their attorneys, for their Complaint against Defendants, BOARD OF TRUSTEES OF THE NEBRASKA STATE COLLEGES and CHADRON STATE COLLEGE, allege as follows:

### Introduction

1.      This is a death case arising from gender-based dating violence that Fatima Larios suffered while attending Chadron State College ("Chadron"), and Chadron's failure to take appropriate steps to: investigate reports by Fatima's softball teammates and an assistant coach that Fatima was being beaten by her boyfriend, another Chadron student-athlete; stop the dating

violence; protect Fatima as her physical and emotional well-being were visibly deteriorating; or obtain the help Fatima needed after numerous Chadron staff and students observed her being subjected to dating violence in her dorm. As a result, Fatima was found dead, hanging in the closet of her boyfriend's dorm room. Her death was ruled a suicide.

2.      For nearly three months before Fatima's death, Chadron staff knew that she was being physically and emotionally abused by her boyfriend, a Chadron football player named Brandon Finona. Fatima had told some of her softball teammates that Finona was beating her, after they expressed concern about large bruises and emotional changes they had observed. Those teammates immediately reported the dating violence to an assistant coach, who similarly noticed Fatima's suspicious bruises and behavioral changes. The assistant coach then shared her observations and the teammates' reports with the head softball coach. The head coach shared these reports with Chadron's Athletic Director, who passed the information on to Chadron's Human Resources Director/Title IX Coordinator. In addition, Resident Advisors in the dorm where Fatima and Finona resided frequently heard loud, violent arguments where Finona was screaming at Fatima.

3.      Chadron staff knew that Fatima was suffering physically, psychologically and emotionally from the dating violence she was experiencing at school. Rather than taking steps to investigate, prevent and stop such misconduct from continuing, as required by Title IX of the Education Amendments of 1972 and Chadron's policies and procedures on sexual violence and sex-based harassment, Chadron disregarded this information, took steps that put Fatima at greater risk for further abuse, and failed to take meaningful action to protect Fatima.

4.      When Chadron informed Fatima's family of her death, the family was devastated and searched for answers. Fatima's family questioned Chadron about what happened, but

Chadron kept secret from them the fact that Chadron staff and students knew, and reported to Chadron administrators, that Fatima was suffering dating violence at the hands of Finona prior to her death.

5.   Plaintiffs bring this action pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), to recover damages for Fatima's injuries and death, needlessly caused by Defendants' deliberate indifference to the dating violence Fatima experienced at Chadron.

### Parties, Jurisdiction and Venue

6.   Plaintiff Lissette Larios Roohbakhsh is Fatima's biological mother and a resident of California.

7.   The Superior Court of California, County of Monterey, appointed Plaintiff Roohbakhsh as the administrator of the Estate of Fatima Lissette Larios ("the Estate") by an order issued on February 17, 2016.

8.   The probate letters appointing Plaintiff Roohbakhsh as personal representative of the Estate were issued by the Superior Court of California, County of Monterey, on Feburary 20, 2016.

9.   As personal representative, Plaintiff Roohbakhsh has the right to bring survival claims on behalf of the Estate and claims on behalf of Fatima's surviving next of kin, her biological parents, Roohbakhsh and Nelson Larios.

10.   Plaintiff Nelson Larios is Fatima's biological father and a resident of California. He is asserting claims as Fatima's next of kin.

11.   Defendant Chadron State College is an educational institution and public college in the Nebraska State College System, with its principal place of business in Chadron, Nebraska.

12.     Defendant Board of Trustees of the Nebraska State Colleges is a public entity and instrumentality of the State of Nebraska charged by law with governing Chadron and two other colleges in the Nebraska State College System.

13.     Defendants receive federal financial assistance within the meaning of 20 U.S.C. § 1681(a) and are subject to Title IX.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in the United States District Court for the District of Nebraska pursuant to 28 U.S.C. § 1391, because both Defendants reside in the State of Nebraska, and the actions and omissions giving rise to the claims occurred in the State of Nebraska.

## General Allegations

### *Fatima's Background*

16.     Fatima was a talented student-athlete. She was a four-sport standout at California's Santa Catalina High School, who twice earned all-county honors in softball and helped her team win three consecutive titles.

17.     Fatima was viewed by friends and family as an energetic person who lived life to the fullest, and was well known for her vibrant personality and contagious smile.

18.     Fatima graduated from high school in 2013 with a scholarship to play Division I softball at Austin Peay State University in Tennessee.

19.     After her freshman year at Austin Peay, Fatima transferred to Chadron to be with her high school sweetheart, Finona, who had a scholarship to play football at Chadron beginning in August 2014.

4

20.     Chadron, a relatively small college with approximately 3,000 students, emphasized how its students are treated like family, and Fatima joined Chadron's Division II softball team at the beginning of her sophomore year, in August 2014.

### *The Dating Violence Experienced by Fatima and Defendants' Knowledge of It*

21.     While attending Chadron, Fatima lived at the High Rise Dormitory ("the dorm") on Chadron's campus, located at 1000 Main Street, Chadron, Nebraska.

22.     At all relevant times, Finona also lived at the dorm, on a different floor than Fatima.

23.     It was well known to student-residents, Resident Advisors ("RAs") and the Resident Director ("RD") in the dorm that the relationship between Fatima and Finona was toxic and abusive.

24.     Some students who lived in the dorm said that "everyone" knew Fatima and Finona were in a "crazy, emotionally draining relationship."

25.     Upon information and belief, some students in the dorm complained to the RAs and RD that they could not sleep well at night because Fatima and Finona were so loud during their fights.

26.     RAs and student residents in the dorm witnessed numerous arguments between Fatima and Finona that were loud and violent.

27.     On information and belief, these arguments began in October 2014 and became progressively worse in the months preceding Fatima's death.

28.     On information and belief, many of these abusive arguments took place in the dorm rooms where Fatima and Finona resided.

29.     On information and belief, the arguments periodically involved Finona screaming at Fatima for talking with other male students and allegedly having sex with other men.

30.     On information and belief, some of the arguments were so loud and frightening that RAs in the dorm threatened to call the police.

31.     The dorm's RAs and student-residents were not the only people at Chadron who observed some of the abuse Fatima was suffering.

32.     By November 2014, at least two of Fatima's softball teammates became concerned about Fatima's physical and emotional well-being and suspected that she was a victim of dating violence.

33.     These teammates had observed Finona being aggressive with Fatima at parties, saw large bruises on Fatima that were inconsistent with their sport, and noticed that Fatima had become increasingly emotional and socially withdrawn. They asked Fatima about the bruises and whether she was all right.

34.     Fatima told them that Finona was beating her, but that she did not want to talk about it.

35.     Concerned for Fatima's safety, on November 3, 2014, these two teammates met with the softball team's Assistant Coach, Aryn Grywusiewicz, and reported that Fatima admitted Finona was beating her.

36.     On information and belief, one teammate told Assistant Coach Grywusiewicz that Finona was "beating the crap out of Fatima."

37.     On information and belief, one of the teammates also told Grywusiewicz that she had observed Finona being aggressive with Fatima at parties.

38.     On numerous occasions, Grywusiewicz had similarly observed suspicious bruising on Fatima that included handprints on Fatima's upper and lower arms and large bruises on her legs. Grywusiewicz had also notice behavioral changes in Fatima that included inexplicable crying and social and emotional withdrawal from her teammates.

39.     Based on the teammates' reports and her own observations of Fatima, Grywusiewicz reported these concerns to the softball team's Head Coach, Rob Stack, who then informed Chadron's Athletic Director, Joel Smith.

40.     The Athletic Director passed this information on to Chadron's Human Resources Director/Title IX Coordinator, Shelley Dunbar, who met with Grywusiewicz to discuss the reports that Fatima was experiencing dating violence.

41.     On November 5, 2014, Title IX Coordinator Dunbar sent a letter to Fatima.

42.     The letter enclosed Board Policy 3020, the Nebraska State College System's policies and procedures on sexual violence and sex-based harassment. The letter also informed Fatima that, among other things, Dunbar was Chadron's Title IX Coordinator, Fatima had a right to report any violations of Board Policy 3020 to Dunbar, Dunbar had information for services and resources Fatima might need, and Dunbar and Fatima's coaches were available to help if needed. The letter was copied to coaches Grywusiewicz and Stack.

43.     Dunbar also e-mailed the letter and Board Policy 3020 to Fatima on November 6, 2014.

### *Board Policy 3020 and Defendants' Notice that Fatima Was Experiencing Dating Violence*

44.     Board Policy 3020 prohibits "sexual violence and sex harassment" and defines those terms to include "sexual assault; stalking; dating violence; domestic violence;

acquaintance, date or stranger rape; non-consensual sexual intercourse; sexual cyber harassment or sexual bullying."

45.     Board Policy 3020 defines "dating violence" as follows:

Dating violence is violence (*violence includes, but is not limited to sexual or physical abuse or the threat of such abuse*) committed by a person (a) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (b) where the existence of such a relationship shall be determined based on a consideration of the following factors: (i) the length of the relationship, (ii) the type of relationship, (iii) the frequency of interaction between the persons involved in the relationship.

Dating violence can occur when one person purposely hurts or scares someone they are dating.  Dating violence can be physical, emotional, and/or sexual abuse.

46.     Under Board Policy 3020, dating violence is a form of prohibited sex harassment, regardless of whether the abuse is sexual.

47.     Under Board Policy 3020, physical and emotional abuse committed in the context of a romantic relationship between Chadron students is dating violence.

48.     Fatima was a victim of dating violence, as defined under Board Policy 3020.

49.     Pursuant to the reporting provision in Board Policy 3020, Defendants had "notice" that Fatima was experiencing sex harassment in the form of dating violence.

50.     The reporting provision in Board Policy 3020 states as follows:

Reports can be filed by the alleged victim or a third party who is aware of allegations of sexual violence or sex harassment, including other students or College employees. Reports should be filed with one of the designated College administrators and/or employees responsible for student services, as follows:

- President
- Vice Presidents
- Deans
- College Title IX Coordinator (*contact information is listed below*)
- Dean of Students
- Housing/Residence Life Staff to include:
    - Directors
    - Managers

8

- o   Assistant Directors
- o   Senior Residence Hall Advisors
- o   Residence Hall Advisors
- Coaches and Assistant Coaches
- Campus Security Officers

Reports to the above designated administrators or employees will constitute "notice" to the College for the purposes of considering an investigation and institutional response in conjunction with the Title IX Coordinator.

51.     Defendants received "notice" that Fatima was experiencing dating violence through: third-party student reports by Fatima's teammates to Assistant Coach Grywusiewicz; Grywusiewicz's own observations of Fatima's suspicious bruising and behavioral changes; Grywusiewicz's report to Head Coach Stack; Stack's report to Chadron's Athletic Director; reports shared with Title IX Coordinator Dunbar; and RAs' observations of loud altercations between Fatima and Finona in the dorm.

52.     Board Policy 3020 states that Nebraska State Colleges "have a responsibility to respond to reports of sexual violence or sex harassment and attend to the needs of the students who are involved."

53.     Under Board Policy 3020, Defendants had a responsibility to respond to the reports that Fatima was experiencing dating violence and attend to her needs.

54.     This responsibility applied even though Fatima did not report the dating violence to Defendants.

55.     Based on the third-party reports that Fatima was experiencing dating violence, Board Policy 3020 also required Defendants to file a report with Campus Security "to inform them that an act of violence may have occurred."

***Defendants' Response to Reports and Observations of the Dating Violence***

56.     On November 10, 2014, in response to Title IX Coordinator Dunbar's e-mail attaching Board Policy 3020, Fatima sent an e-mail to Dunbar asking why the information was sent to her.

57.     On November 11, 2014, Dunbar responded that Board Policy 3020 may or may not pertain to Fatima, but she was obligated under federal statutes to give the information to Fatima, due to confidential information provided to Dunbar's office raising concerns about possible violations of Policy 3020.

58.     Fatima did not respond further to Dunbar, and Dunbar did not reach out to Fatima again.

59.     On November 12, 2014, Coach Stack and Assistant Coach Grywusiewicz met with Fatima to follow up on the letter that Dunbar sent to Fatima.

60.     On information and belief, during that meeting, neither Coach Stack nor Assistant Coach Grywusiewicz mentioned the suspicious bruising or behavioral changes Grywusiewicz had noticed or that they had heard Fatima was being beaten by Finona; instead, they told Fatima they were available if she needed them or wanted to talk about anything.

61.     On information and belief, Fatima told the coaches during that meeting that she was homesick, but did not mention the abuse by Finona.

62.     Assistant Coach Grywusiewicz informed Dunbar about the November 12 meeting.

63.     Defendants took no further action after the meeting to follow up with Fatima about the reported dating violence.

10

64. Title IX Coordinator Dunbar never interviewed the students who reported to Assistant Coach Grywusiewicz that Fatima was being beaten by Finona.

65. After November 12, 2014, Title IX Coordinator Dunbar did not take any additional action to determine whether Fatima was being beaten by Finona or whether Finona posed a safety risk to other Chadron students.

66. Neither Dunbar nor any other Chadron staff explained to Fatima that they suspected she was a victim of dating violence; that they received reports that Fatima was experiencing dating violence; or that Fatima had a right to speak to confidential sources, such as a mental health counselor or victim's advocate, who would not trigger Chadron's obligations to launch a formal investigation and who could provide Fatima with the support and help she might need.

67. Upon information and belief, neither Dunbar nor any other Chadron staff notified Campus Security of the reports that Fatima was a victim of dating violence.

68. After the November 12, 2014, meeting with her coaches, Fatima continued to suffer abuse by Finona at Chadron.

69. On information and belief, after the November 12 meeting, Assistant Coach Grywusiewicz continued to observe evidence that Fatima was being abused by Finona, including without limitation that Fatima was wearing long-sleeved shirts and long pants to indoor practices, even when it was hot outside, to cover up bruises from beatings by Finona.

70. On information and belief, Assistant Coach Grywusiewicz also heard numerous stories about Fatima and Finona fighting, with Finona "going at [Fatima] all the time," and Grywusiewicz believed that Finona "was kicking the crap out of" Fatima.

71.     In addition, loud altercations with Finona continued in the dorm after November 12, 2014, but neither the RAs nor the RD ever called the police or took any other action to address the abuse, despite complaints from other dorm residents and the RAs' own observations.

72.     Upon information and belief, the only action taken by the RAs and/or the RD was to ask Fatima and/or Brandon to be quiet.

### *Fatima's Death and the Aftermath*

73.     After a loud altercation between Fatima and Finona in the dorm on the evening of January 30, 2015, students found Fatima hanging in the closet of Finona's dorm room the next morning.

74.     An autopsy report done on March 23, 2015, ruled that Fatima's death was a suicide.

75.     Fatima Larios was 19 years old when she died.

76.     Soon after Chadron informed Fatima's family of her death, the family asked Chadron what happened.

77.     In response to the family's inquiries, Defendants did not disclose that, prior to Fatima's death, they had received reports from Chadron students and staff expressing concern that Fatima was being abused by Finona.

78.     Defendants did not inform Fatima's family about these reports of suspected dating violence until October 2015, when Defendant's counsel responded to an inquiry from the family's counsel.

79.     Prior to Fatima's death, Plaintiffs did not know that Finona had been abusive to Fatima.

### CLAIM FOR RELIEF
### Violation of Title IX – 20 U.S.C. § 1681(a)

80.      Plaintiff realleges and incorporates the allegations in Paragraphs 1-79 above as though fully set forth here.

81.      Defendants had actual notice that Fatima was experiencing dating violence at the hands of Finona, while Fatima and Finona were students at Chadron.

82.      Defendants had an obligation to address reports that Fatima was being beaten and emotionally abused by Finona at Chadron, because such dating violence is a form of prohibited sex-based discrimination or harassment under Board Policy 3020 and Title IX.

83.      The discrimination, consisting of Finona's physical beatings and emotional abuse of Fatima on Chadron's campus for months, was so severe, pervasive and objectively offensive that it deprived Fatima of access to educational opportunities or benefits.

84.      At all relevant times, Finona was a Chadron student subject to Defendants' control, and his abuse of Fatima often occurred on Chadron's campus, including in the dorm where both he and Fatima resided.

85.      Defendants were obligated under Title IX and Board Policy 3020 to respond to third-party reports that Fatima was a victim of dating violence, even though Fatima did not report the abuse to her coaches or Dunbar.

86.      Despite their obligations to respond appropriately to reports that Fatima was being abused by Finona, Defendants' acted with deliberate indifference to the reports of dating violence. Their deliberate indifference to the sex-based discrimination suffered by Fatima included, without limitation:

> a.   Defendants' deliberate decisions not to investigate reports by Fatima's softball teammates and assistant coach that Fatima was being beaten and emotionally

abused by Finona, or otherwise take steps to provide Fatima with a safe, nondiscriminatory educational environment;

b.  The deliberate decision of Chadron's Title IX Coordinator—who had authority to take corrective action under Title IX—not to interview the student-athletes who reported that Fatima had admitted Finona was beating her, and who had observed Finona's aggressiveness toward Fatima, as well as Fatima's suspicious bruising and distressing behavioral changes;

c.  The deliberate decisions of Chadron's Title IX Coordinator, Athletics Department, and other Chadron officials not to monitor or check on Fatima's physical and psychological well-being after the coaches' November 12, 2014 meeting with Fatima, despite Defendants' actual notice and observed evidence of Finona's abuse of Fatima.

d.  Defendants' noncompliance with Board Policy 3020's provisions on confidentiality, law enforcement, and investigation procedures, resulting in Defendants' failure to, *inter alia*: "take all reasonable steps to investigate and respond" to the third-party reports that Fatima was a victim of dating violence, in an effort to ensure Fatima's (and others students') safety; explain Board Policy 3020's provisions to Fatima to ensure she understood her rights and options; explain that Fatima had a right to speak to confidential sources who could help her without triggering any formal investigation, and provide contact information for those confidential sources; and notify Campus Security of the reports that Fatima was a victim of dating violence.

e.  The deliberate decision of Chadron's Title IX Coordinator to mail and e-mail Fatima information about a potential violation of Board Policy 3020, despite the risk that Finona would intercept such information and further abuse Fatima, as the control exerted by abusive intimate partners often includes reading victims' mail and e-mail.

f.  The deliberate decision of Chadron's Title IX Coordinator to copy Fatima's softball coaches on her correspondence with Fatima, despite the fact that the coaches are not confidential resources under Board Policy 3020 or Title IX, and that such insensitivity to Fatima's interest in confidentiality could discourage Fatima from addressing the dating violence she was suffering.

87.  As a result of Defendants' deliberate indifference to reports that Fatima was a victim of dating violence on Chadron's campus, Fatima was subjected to further physical and emotional abuse by Finona, thereby suffering a hostile educational environment.

88.    Finona continued to abuse Fatima in the dorm, as witnessed by other dorm residents and the RAs. After yet another loud altercation between Fatima and Finona in the dorm on January 30, 2015, students found Fatima hanging in Finona's dorm room closet on January 31, 2015.

89.    Had Defendants not been deliberately indifferent to the sex-based dating violence Fatima was suffering at Chadron, and instead complied with their own policies and Title IX by properly responding to third-party reports of the abuse and taking appropriate steps to protect Fatima's safety, Finona's abuse of Fatima could have been stopped, and Fatima's tragic death could have been prevented.

90.    Because of Defendants' deliberate indifference, Fatima suffered injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; physical and mental pain and suffering before her death; lost future earnings and earning capacity as a result of her death; hospital, medical and related expenses; and physical loss of chance of survival.

91.    Because of Fatima's death, these injuries, damages and losses are now recoverable by her Estate.

92.    As personal representative of the Estate, Plaintiff Roohbakhsh seeks to recover all injuries, damages and losses suffered by the Estate by reason of Fatima's death, as well as for the physical and mental pain and suffering Fatima experienced before her death.

93.    Because of Defendants' deliberate indifference, Fatima's next of kin, Plaintiffs Roohbakhsh and Larios, have suffered the loss of service, support, society, companionship, love, and affection of their daughter, Fatima.

94.    As personal representative of the Estate, Plaintiff Roohbakhsh seeks damages for these losses on behalf of Fatima's next of kin—herself and Fatima's father, Plaintiff Nelson Larios.

95.    As Fatima's next of kin, Plaintiff Nelson Larios also seeks damages for these losses he has suffered.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants awarding:

a)  Damages in amounts to be established at trial for the injuries suffered by Fatima Larios and recoverable by the Estate of Fatima Lissette Larios, through its personal representative, Plaintiff Lissette Larios Roohbakhsh, including, without limitation: damages for pre-death emotional distress, fear, anxiety and trauma; pre-death physical and mental pain and suffering; lost future earnings and earning capacity; hospital, medical and related expenses; and physical loss of chance of survival.

b)  Damages in amounts to be established at trial for the injuries suffered by Fatima Larios's next of kin, Lissette Larios Roohbakhsh and Nelson Larios, for their loss of service, support, society, companionship, love, and affection of their daughter, Fatima Larios;

c)  Pre- and post-judgment interest;

d)  Costs;

e)  Attorneys' fees, pursuant to 42 U.S.C. § 1988(b); and

f)  Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury as to all matters so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 30, 2017

LISSETTE LARIOS ROOHBAKHSH, as personal representative of the ESTATE OF FATIMA LISSETTE LARIOS and on behalf of next of kin and NELSON LARIOS, as next of kin Plaintiffs,

By:

Christopher P. Welsh, #22279
WELSH & WELSH, P.C., L.L.O.
9290 West Dodge Road
204 The Mark
Omaha, NE 68114
(402) 384-8160
cwelsh@welsh-law.com
ATTORNEYS FOR PLAINTIFFS

and
Antonio M. Romanucci, Esq.
Martin Gould, Esq.
(*Pro Hac Vice Admission Pending*)
ROMANUCCI & BLANDIN, LLC
33 N. LaSalle Street, 20th Floor
Chicago, IL 60602
(312) 458-1000
aromanucci@rblaw.net
mgould@rblaw.net

and
Adele P. Kimmel, Esq.
(*Pro Hac Vice Admission Pending*)
PUBLIC JUSTICE, P.C.
1620 L Street, NW, Suite 630
Washington, DC 20036
(202) 797-8600
akimmel@publicjustice.net

17