**Atkinson-Baker Court Reporters**
www.depo.com

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF NEBRASKA

 3

 4    NELSON LARIOS, ET AL,

 5            Plaintiff,

 6         vs.                        No. 8:17-CV-00031

 7
      CHADRON STATE COLLEGE,
 8
              Defendants.
 9    -------------------------------------

10

11

12
                   VIDEOTAPED DEPOSITION OF
13
                      LISSETTE ROOHBAKHSH
14

15
                       February 8, 2018
16
                         11:46 a.m.
17

18
              350 Calle Principal, Salon 201
19                  Monterey, California

20

21

22    ATKINSON-BAKER, INC.

23    1-800-288-3376

24    COURT REPORTER:   YVETTE GALLARDO, CSR-12889

25    FILE NO.: AC00851
```

**Atkinson-Baker Court Reporters**
www.depo.com

```
            APPEARANCES OF COUNSEL

FOR PLAINTIFFS:
    ROMANUCCI & BLANDIN, LLC
    BY:  Martin D. Gould, Esq.
    321 N. Clark St., Suite 900
    Chicago, Illinois  60654
    888.458.1145
    Email: Mgould@rblaw.net


FOR DEFENDANTS:
    JOHNSON & TABOR, LLP
    BY:  Thomas E. Johnson, Esq.
    11932 Harbor St., Suite 101
    Omaha, Nebraska  68144
    Phone: 402.344.0500

ALSO PRESENT:
    Videographer - Christopher Throm
```

Page 2

```
            INDEX OF EXAMINATION

LISSETTE ROOHBAKHSH
    By Mr. Johnson..............................5
    By Mr. Gould................................74


COURT REPORTER'S CERTIFICATE....................78




                    -oOo-
```

Page 3

```
            INDEX TO EXHIBITS


EXH. 509 -    Residence hall contract...........48
EXH. 510 -    Residence hall contract...........49
EXH. 511 -    Residence hall contract...........51
```

Page 4

```
            VIDEOTAPED DEPOSITION OF                 12:09:19
               LISSETTE ROOHBAKHSH                   12:09:19
                 February 8, 2018                    12:09:19

        THE VIDEOGRAPHER:  Good morning, ladies    12:09:19
and gentlemen.  My name is Christopher Throm, your 12:09:19
videographer.  And I represent Atkinson-Baker in   12:09:19
Glendale, California.                              12:09:19
        I'm not financially interested in this     12:09:19
action, nor am I a relative or an employee of any  12:09:19
of the attorneys or any of the parties.  Today's   12:09:19
date is February 8th, 2018, and the time is        12:09:19
12:08 p.m.                                         12:09:19
        This deposition is taking place at the     12:09:19
Monterey Marriott, 350 Calle Principal, Monterey,  12:09:19
California 93940.                                  12:09:19
        This is case No. 8:17-CV-00031, entitled   12:09:19
Larios versus Chadron State College.  The deponent 12:09:19
is Lissette Roohbakhsh.  This deposition is taken  12:09:19
on behalf of the defendant.  Our court reporter is 12:09:19
Yvette Gallardo, from Atkinson-Baker.              12:09:19
        Counsel, now please introduce yourself,    12:09:19
starting with the questioning attorney.            12:09:19
        MR. JOHNSON: My name is Thomas E. Johnson. 12:09:19
I'm with the firm of Johnson & Tabor, LLC, 11932   12:09:19
```

Page 5

2 (Pages 2 to 5)

**Atkinson-Baker Court Reporters**
www.depo.com

### Page 6

1  Harbor Street, Suite 101, Omaha, Nebraska 68144.
2  I am counsel for the Chadron State College and
3  Nebraska State College System, together with
4  co-counsel Baird Holm, LLP, et al, in Omaha,
5  Nebraska.
6        MR. GOULD: I am Martin Gould from
7  Romanucci & Blandin, on behalf of plaintiffs in
8  this case.
9        THE VIDEOGRAPHER: And would the court
10 reporter please swear in the witness.
11       (The witness is sworn.)
12             LISSETTE ROOHBAKHSH,
13 having been first duly sworn, testified as follows:
14                  EXAMINATION
15 BY MR. JOHNSON:
16  Q.  Good afternoon.
17  A.  Good afternoon.
18  Q.  Would you state your name for the record,
19 please, and spell your name for the court reporter.
20  A.  Yes, Lissette Larios Roohbakhsh. Lissette
21 is L-I-S-S-E-T-T-E; Larios, L-A-R-I-O-S; Roohbakhsh,
22 R-O-O-H-B-A-K-H-S-H.
23  Q.  Thank you very much.
24  A.  You're welcome.
25  Q.  What is your current address?

### Page 7

1   A.  It's P.O. Box 343, Monterey, California
2  93942.
3   Q.  What is the street address of your
4  residence.
5   A.  It's [redacted], Monterey,
6  California 93940.
7   Q.  What was the name of the Avenue?
8   A.  Virgin.
9   Q.  How long have you lived at that address?
10  A.  I don't remember how long. It's been a
11 long, yeah, while.
12  Q.  What was your address -- residential
13 address prior to the current address?
14  A.  Prior to -- you know, I don't remember
15 numbers and address.
16  Q.  All right. How about a street name?
17  A.  Peninsula Point Drive.
18  Q.  And what township or town is Peninsula
19 Point Drive?
20  A.  Seaside, California.
21  Q.  And in what city or township is your
22 current address?
23  A.  Monterey.
24  Q.  How long have you lived in this general
25 area?

### Page 8

1   A.  33 years.
2   Q.  When and where were you born?
3   A.  El Salvador, Central America.
4   Q.  What year and date?
5   A.  [redacted]
6   Q.  Believe it or not, I had just graduated
7  from high school then. You're very young indeed.
8  As you heard in the introductions, my name is Tom
9  Johnson. I'm a lawyer from Omaha, Nebraska. I
10 represent the Nebraska State College System,
11 together with my co-counsel in this case. I am here
12 to ask you questions today that are directly or
13 indirectly relevant to the issues raised in a
14 lawsuit known as Larios versus Chadron State
15 College that's filed in the United States District
16 Court for the District of Nebraska. You're aware
17 of the general purpose of today's deposition?
18  A.  Yes, sir.
19  Q.  And I assume that you are represented
20 today by Mr. Gould as your legal counsel?
21  A.  Yes, sir.
22  Q.  And I assume that he has helped you to
23 prepare for this deposition, and I certainly don't
24 want to hear anything about what you and Mr. Gould
25 have talked about, because it's privileged. But I

### Page 9

1  would like to know whether anyone has shown you any
2  documents to help you prepare for your deposition
3  today?
4   A.  No.
5   Q.  Have you reviewed any e-mails?
6   A.  No, sir. It's -- talking about this
7  matter is very difficult for me, so I will do my
8  best --
9   Q.  All right.
10  A.  -- to my knowledge.
11  Q.  I understand that.
12  A.  Yeah.
13  Q.  And to be honest with you, it's also
14 difficult for me.
15  A.  Uh-hum.
16  Q.  I'm a parent. I'm a grandparent.
17  A.  Uh-hum.
18  Q.  I understand that we are here to talk
19 about what's essentially every parent's nightmare,
20 and I don't mean to be disrespectful, and I don't
21 mean to pry into your life unnecessarily, but
22 there are some questions that I have to ask you.
23 If you want to take a break at any time in this
24 deposition for any reason, you let me know and
25 we'll do that.

3 (Pages 6 to 9)

**Lissette Roohbakhsh**
**February 8, 2018**

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1     A.  No, I'm not.                              12:18:20
 2     Q.  Have you been employed in the past?       12:18:21
 3     A.  Yes.                                      12:18:22
 4     Q.  When was the last time you were employed? 12:18:23
 5     A.  Who?  Merrill Lynch.                      12:18:28
 6     Q.  When was that?                            12:18:29
 7     A.  Again, I -- some years ago.  That was my  12:18:31
 8  last employer.                                   12:18:36
 9     Q.  Did you take a job right after you        12:18:38
10  completed your education?                        12:18:41
11     A.  Yes.                                      12:18:42
12     Q.  Where was that?                           12:18:43
13     A.  I worked for the Hyatt Corporation.       12:18:44
14     Q.  Where was that located?                   12:18:49
15     A.  Carmel, California.                       12:18:51
16     Q.  What kind of work did you do for Hyatt?   12:18:52
17     A.  I did a managing job and server job.      12:18:55
18     Q.  Okay.                                     12:19:03
19     A.  Waitress.                                 12:19:04
20     Q.  All right.  What was your next job after  12:19:04
21  the Hyatt job?                                   12:19:05
22     A.  What was what?  I'm sorry.                12:19:07
23     Q.  Your next job after the Hyatt job?        12:19:08
24     A.  Merrill Lynch.                            12:19:11
25     Q.  What did you do at Merrill Lynch?         12:19:12
```
Page 14

```
 1     A.  I was an executive assistant.             12:19:15
 2     Q.  Okay.                                     12:19:20
 3     A.  Personal assistant.                       12:19:22
 4     Q.  How long did you work at that?            12:19:23
 5     A.  Eight years.                              12:19:25
 6     Q.  And was that then your last job?          12:19:27
 7     A.  Yes, sir.                                 12:19:28
 8     Q.  So when you -- when you retired from      12:19:29
 9  the work force, you were employed as an executive 12:19:31
10  assistant, and you have not been working since   12:19:34
11  that time?                                       12:19:36
12     A.  Correct.                                  12:19:36
13     Q.  All right.  My understanding is that you  12:19:37
14  were previously married to Nelson Larios; is that 12:19:40
15  correct?                                         12:19:43
16     A.  That's correct.                           12:19:43
17     Q.  When were you and Nelson married?         12:19:44
18     A.  When?                                     12:19:47
19     Q.  Uh-hum.                                   12:19:47
20     A.  1988.                                     12:19:49
21     Q.  And where did that marriage occur?        12:19:50
22     A.  Monterey, California.                     12:19:52
23     Q.  All right.  Now, my understanding is that 12:19:53
24  two children were born of that marriage: The elder 12:19:56
25  is Emerson, and the younger was Fatima; is that  12:19:59
```
Page 15

```
 1  correct?                                         12:20:02
 2     A.  Correct.                                  12:20:02
 3     Q.  How old is Emerson today?                 12:20:02
 4     A.  27 years old.                             12:20:04
 5     Q.  Is Emerson employed?                      12:20:06
 6     A.  Yes, he is.                               12:20:08
 7     Q.  Where does he work?                       12:20:08
 8     A.  For the City of Monterey.                 12:20:09
 9     Q.  In what capacity?                         12:20:11
10     A.  He -- I can't give you the exact title.   12:20:13
11     Q.  Can you tell me generally what he does?   12:20:22
12     A.  He works for the parking enforcement.     12:20:24
13     Q.  Okay.  About how long has he held that    12:20:27
14  job?                                             12:20:32
15     A.  I don't know.                             12:20:32
16     Q.  Okay.  It's my understanding that Emerson 12:20:32
17  currently lives with his father.  Is that your   12:20:36
18  understanding?                                   12:20:37
19     A.  Yes, sir.                                 12:20:38
20     Q.  All right.  Has Emerson ever been married? 12:20:39
21     A.  No.                                       12:20:41
22     Q.  All right.  What was Fatima's date of     12:20:42
23  birth?                                           12:20:50
24     A.  ▬▬▬▬▬▬▬▬                                  12:20:50
25     Q.  Were you working when she was born?       12:20:59
```
Page 16

```
 1     A.  Yes, sir.                                 12:21:01
 2     Q.  How long after she was born did you quit  12:21:01
 3  working?                                         12:21:04
 4     A.  I'm sorry.  Repeat that question again.   12:21:11
 5     Q.  Yeah.  At -- at approximately what age of 12:21:13
 6  Fatima's did you quit working?  How old was she  12:21:17
 7  when you stopped working?                        12:21:21
 8     A.  I don't remember.                         12:21:25
 9     Q.  Okay.  Was she in grade school?           12:21:27
10     A.  Yes.                                      12:21:33
11     Q.  So after that, you were a stay-at-home    12:21:34
12  mom?                                             12:21:37
13     A.  Yes.                                      12:21:37
14     Q.  And you were living in the household,     12:21:38
15  Emerson was living there, Nelson was living there, 12:21:41
16  and Fatima was living there?                     12:21:44
17     A.  Correct.                                  12:21:45
18     Q.  All right.  And did that remain the case  12:21:45
19  -- that is, was that the makeup of the household 12:21:49
20  until Fatima left for college?                   12:21:51
21     A.  No.                                       12:21:53
22     Q.  Did Emerson leave home?                   12:21:58
23     A.  He left home for a couple of -- for a     12:22:01
24  semester for college.                            12:22:08
25     Q.  Okay.  And was that right after he        12:22:09
```
Page 17

5 (Pages 14 to 17)

Lissette Roohbakhsh
February 8, 2018

**Atkinson-Baker Court Reporters**
www.depo.com

### Page 18

1  graduated from high school?  12:22:11
2     A.  Yes.  12:22:12
3     Q.  Where did he go to college?  12:22:13
4     A.  Santa Rosa Community College.  12:22:15
5     Q.  And did he then come back after a  12:22:18
6  semester?  12:22:20
7     A.  He did, yes.  12:22:21
8     Q.  Did he live at home after that?  12:22:22
9     A.  Yes.  12:22:23
10    Q.  Okay.  My understanding is that Fatima  12:22:24
11 graduated from Santa Catalina High School in  12:22:32
12 2013; is that correct?  12:22:36
13    A.  Correct.  12:22:38
14    Q.  And I also understand that in the Fall  12:22:43
15 of 2013 she left Monterey to attend Austin Peay  12:22:45
16 University in Clarksville, Tennessee; is that  12:22:50
17 correct?  12:22:52
18    A.  Yes, sir.  12:22:52
19    Q.  All right.  Can you tell me a little bit  12:22:53
20 about the process of deciding that Fatima would  12:22:55
21 attend Austin Peay in Clarksville?  12:22:59
22    A.  It was all because of her sports.  12:23:03
23    Q.  Uh-hum.  12:23:09
24    A.  She always wanted to play for a Division  12:23:10
25 One softball team.  12:23:15

### Page 19

1     Q.  Okay.  Austin Peay is a Division One  12:23:17
2  school.  Obviously they recruited her to play  12:23:20
3  softball?  12:23:23
4     A.  Yes, sir.  12:23:23
5     Q.  Was she recruited by other Division One  12:23:23
6  schools?  12:23:28
7     A.  You know, I don't remember exactly, but  12:23:30
8  -- yeah, I don't remember.  12:23:33
9     Q.  All right.  12:23:35
10    A.  Uh-hum.  12:23:36
11    Q.  What was it about Austin Peay that  12:23:36
12 attracted her, if you know?  12:23:40
13    A.  She had a couple of friends going there  12:23:45
14 from Monterey, from here, not -- not as specific  12:23:50
15 to that University, but close by to the University  12:23:55
16 in Tennessee.  So they were kind of close to each  12:24:00
17 other.  12:24:02
18    Q.  I understand from other depositions that,  12:24:02
19 I believe one of those persons was -- is named  12:24:05
20 Annie?  12:24:08
21    A.  That is correct.  12:24:09
22    Q.  And then Annie attended the University of  12:24:09
23 Tennessee at Knoxville?  12:24:11
24    A.  Yes, sir.  12:24:13
25    Q.  Who is the other one?  You said there were  12:24:13

### Page 20

1  a couple.  12:24:14
2     A.  I don't remember.  It's so many girls, you  12:24:15
3  know, that I -- it's hard for me to keep track of  12:24:17
4  everyone's name.  12:24:20
5     Q.  Okay.  12:24:21
6     A.  Yes.  12:24:21
7     Q.  Other than the fact that she had friends  12:24:23
8  attending school in Tennessee, can you think of any  12:24:25
9  other factors that led to the decision to go to  12:24:27
10 Austin Peay?  12:24:32
11       MR. GOULD:  Other than the ones mentioned  12:24:38
12 earlier?  12:24:39
13    Q.  (By Mr. Johnson)  Well, you mentioned that  12:24:39
14 it was a Division One school and you mentioned that  12:24:40
15 her friends were going to school in Tennessee.  12:24:42
16 Those are the only things I can recall that you  12:24:44
17 mentioned.  12:24:46
18    A.  Uh-hum.  12:24:46
19    Q.  Were there any other factors that you can  12:24:47
20 think of?  12:24:49
21    A.  No, sir.  12:24:49
22    Q.  Okay.  12:24:51
23    A.  Not at this time.  12:24:51
24    Q.  All right.  It's my understanding that some  12:24:52
25 time during her high school career, Fatima started  12:25:04

### Page 21

1  dating a young man by the name of Brandon Finona  12:25:07
2  Gardener.  Is that true to your knowledge?  12:25:10
3     A.  Yes, sir.  12:25:14
4     Q.  All right.  If I just use the name Brandon  12:25:14
5  rather than the full name, can we agree that that's  12:25:17
6  who I'm talking about?  12:25:19
7     A.  Yes, sir.  12:25:20
8     Q.  To your knowledge, when did Fatima first  12:25:22
9  meet Brandon?  12:25:24
10    A.  Senior school -- senior year.  12:25:29
11    Q.  Her senior year?  12:25:32
12    A.  Yeah, her senior year.  12:25:33
13    Q.  How did you become aware that she had met  12:25:35
14 Brandon?  12:25:37
15    A.  Seeing him a couple of times on her games,  12:25:44
16 you know, and one time she introduced him to me,  12:25:50
17 and she told me that she wanted to, you know, be  12:25:57
18 friends with him.  And I guess they just -- yeah,  12:26:05
19 that.  12:26:10
20    Q.  I'm -- I'm not a youngster anymore.  As  12:26:10
21 a matter of fact I'm going to be 70 in about a week  12:26:15
22 and a half.  And, you know, when I was in high  12:26:17
23 school we did what we called dating; we had dates.  12:26:21
24 A guy picked up the girl and they went some place  12:26:25
25 and he brought her home.  I don't know if that  12:26:27

6 (Pages 18 to 21)

**Lissette Roohbakhsh**
**February 8, 2018**

**Atkinson-Baker Court Reporters**
www.depo.com

## Page 38

1  call you back?  Is that generally the process?
2    A.  Yes.
3    Q.  **Did you also talk with her on a nearly**
4  **daily basis when she was at school in Chadron?**
5    A.  **Yes, sir.**
6    Q.  Were there any occasions where she was
7  in Chadron when you attempted to reach her and
8  were unable to contact her for some period of
9  time that caused you concern?
10   A.  Yes, sir.
11   Q.  When did that happen?
12   A.  I can't give you a specific date, but it
13 was just one date, and for the whole day; and at
14 the end of the day she called me back and she had
15 told me that she's been in a tournament all day
16 long.
17   Q.  Okay.  So it would be of concern to you
18 if you called her and she didn't call you back in
19 12 hours, or -- I mean, how long would have to go
20 by before it would be of concern to you?
21   A.  Throughout the day, maybe eight to 12
22 hours.
23   Q.  Fatima ultimately became dissatisfied or
24 unhappy, or something, with Austin Peay University
25 and started looking to transfer; is that correct?

## Page 39

1    MR. GOULD:  Object to form.
2    THE WITNESS:  I can't answer that.
3    Q.  **(By Mr. Johnson)  All right. At some point**
4  **in time, did Fatima inform you she was thinking of**
5  **transferring from Austin Peay to another school?**
6    A.  **That conversation came up when my youngest**
7  **son was born.  She told me that she wanted to come**
8  **home and start looking to different schools close**
9  **by home, because she wanted to be close to her**
10 **little brother, and the oldest brother.**
11   Q.  And the -- what was the date of birth of
12 your youngest son?
13   A.  [redacted].
14   Q.  That's Aran?
15   A.  Arian.
16   Q.  Arian?
17   A.  Yes.
18   Q.  And your older son is Emerson?
19   A.  Correct.
20   Q.  All right.  So, when and how did Fatima
21 find out that you were pregnant with Arian?
22   A.  When?  Right after I found out.
23   Q.  Okay.  You called her?
24   A.  Yes.
25   Q.  She was in Tennessee?

## Page 40

1    A.  Yes.
2    Q.  All right.  So you -- what date did you
3  and Mickey marry?
4    A.  I don't remember when we got married.
5    Q.  Okay.  Was it in November of 2013?
6    A.  Maybe.
7    Q.  I think I was told this morning it was
8  November 12th of 2013?
9    A.  He probably have better memory than I do.
10   Q.  All right.  So when you called Fatima to
11 tell her that you were pregnant, what was her
12 response?
13   A.  She was very happy.
14   Q.  Okay.  And excuse me, but when you made
15 that call to her, were you and Mickey married yet?
16   A.  I don't remember if it was before or
17 after.
18   Q.  Did you tell Fatima that you and Mickey
19 were going to be married?
20   A.  Yes.
21   Q.  Did she ask to attend the wedding?
22   A.  She -- I'm sorry.  Repeat that.
23   Q.  Did she ask to attend the wedding?
24   A.  Yes.
25   Q.  And what was your response?

## Page 41

1    A.  I don't remember what I told her at that
2  time.
3    Q.  She ultimately did not attend?
4    A.  We didn't have -- we -- we didn't have a
5  big wedding.  Yeah.
6    Q.  Okay.
7    A.  We had a private wedding.
8    Q.  Okay.  Did anyone attend the wedding?
9    A.  It was a private wedding.
10   Q.  Okay. I'll let it go at that.  Did Fatima
11 ask to be present when you gave birth to Arian?
12   A.  No.
13   Q.  So Arian was born on March [redacted]. Fatima was
14 aware that Arian was on the way prior to that.  At
15 what point in time did she say, "I'm thinking about
16 transferring to be closer"?
17   A.  When he was born.
18   Q.  So it was after March [redacted]?
19   A.  Yes.
20   Q.  All right.  Did she give you any specific
21 ideas about where she was thinking of transferring
22 to?
23   A.  Yes.  She gave me a list of schools that
24 she would like to attend.
25   Q.  Do you remember what schools were on that

11 (Pages 38 to 41)

Lissette Roohbakhsh
February 8, 2018

**Atkinson-Baker Court Reporters**
www.depo.com

### Page 46

```
 1  it?                                                12:58:05
 2    A.  I've always been in favor of my kids'        12:58:07
 3  education.                                         12:58:11
 4    Q.  I'm not asking you that.  I'm asking you     12:58:13
 5  whether or not you would have preferred that she   12:58:16
 6  would have attended another school other than      12:58:18
 7  Chadron State in the Fall of 2014?                 12:58:20
 8    A.  No, I --                                     12:58:24
 9       MR. GOULD:  Objection.                        12:58:25
10       THE WITNESS:  -- I was happy.                 12:58:25
11       MR. GOULD:  Let me just -- objection,         12:58:29
12  asked and answered.                                12:58:29
13    Q.  (By Mr. Johnson)  Do you know whether or     12:58:31
14  not Nelson was in favor of the transfer to Chadron 12:58:33
15  State College?                                     12:58:37
16    A.  I don't know.                                12:58:38
17    Q.  Did you and he ever discuss it?              12:58:39
18    A.  Yes.                                         12:58:42
19    Q.  What was the nature of the discussion?       12:58:43
20    A.  Just the parents' conversation about         12:58:46
21  sending a kid to a college.                        12:58:52
22    Q.  All right.  And what was said, if you        12:58:55
23  recall?                                            12:58:59
24    A.  We were happy for her to go in there         12:59:00
25  to pursue her dreams.                              12:59:05
```

### Page 47

```
 1    Q.  Did it cause you any concern that she        12:59:07
 2  was going to a college that Brandon was planning   12:59:11
 3  to attend?                                         12:59:14
 4    A.  Not at all.                                  12:59:15
 5    Q.  All right.  Who took her to school to        12:59:20
 6  start Chadron?                                     12:59:22
 7    A.  Nelson --                                    12:59:25
 8       THE COURT REPORTER:  What was that?           12:59:28
 9       THE WITNESS:  Nelson.  Her dad.               12:59:28
10    Q.  (By Mr. Johnson)  Did you ever go to         12:59:28
11  Chadron?                                           12:59:33
12    A.  No.                                          12:59:33
13    Q.  You've never been there?                     12:59:34
14    A.  No.                                          12:59:35
15    Q.  Okay.  What was your understanding of        12:59:37
16  where she would live as a student at Chadron       12:59:43
17  State College?                                     12:59:46
18    A.  On campus.                                   12:59:47
19    Q.  In a dormitory?                              12:59:49
20    A.  Yes.                                         12:59:50
21    Q.  Did you know which dormitory?                12:59:50
22    A.  Yes, I knew at that time.                    12:59:53
23    Q.  And how did you know?                        12:59:55
24    A.  Being a mom, I needed to know where my       01:00:03
25  girl was going to be.  All right?  So I -- I       01:00:05
```

### Page 48

```
 1  knew where she was.                                01:00:10
 2    Q.  Did you talk to Nelson about where he        01:00:15
 3  had dropped her off and moved her into, or --      01:00:18
 4    A.  Yes, sir.                                    01:00:20
 5    Q.  Okay.  All right.                            01:00:20
 6       (Exhibit No. 509 is marked.)                  01:01:05
 7    Q.  (By Mr. Johnson)  Ma'am, I'd like to hand    01:01:05
 8  you what's been marked as Exhibit No. 509, which   01:01:05
 9  is a residence hall contract dated June 9th, 2014, 01:01:08
10  Chadron State College, under Fatima's name.  If    01:01:18
11  you look at the second page of that document, on   01:01:23
12  the second page of the document you'll see some    01:01:45
13  signatures as -- does that show your signature as  01:01:46
14  Lissette Larios?                                   01:01:50
15    A.  Yes.                                         01:01:53
16    Q.  And did you sign that document, on or        01:01:53
17  about June 9th of 2014?                            01:01:55
18    A.  Yes.                                         01:01:58
19    Q.  Is it your understanding that this was a     01:02:00
20  residence hall contract designating the dormitory  01:02:02
21  in which your daughter would be living?            01:02:05
22    A.  Yes, sir.                                    01:02:07
23    Q.  And it specifies that she would be in        01:02:08
24  Room 328 of Andrews Hall in a double room; correct? 01:02:10
25    A.  Yes, sir.                                    01:02:17
```

### Page 49

```
 1    Q.  Did you know who her roommate was in that    01:02:17
 2  particular unit?                                   01:02:20
 3    A.  Yes, I knew at that time.                    01:02:21
 4    Q.  Do you remember who that was?                01:02:24
 5    A.  I want to remember, but I -- I don't think   01:02:33
 6  I -- that I can get it right, so I'm not going to  01:02:36
 7  guess.                                             01:02:38
 8    Q.  That's fine.  That's fine.                   01:02:38
 9       MR. JOHNSON:  Would you mark this as 510,     01:02:44
10  please.                                            01:02:55
11       (Exhibit No. 510 is marked.)                  01:02:56
12    Q.  (By Mr. Johnson)  Now I'm going to hand      01:02:56
13  you a similar document marked as Exhibit No. 510,  01:02:58
14  which is a residence hall contract, it's dated     01:03:01
15  September 26th of 2014, specifying a room -- a     01:03:10
16  double room in the High Rise dormitory, room       01:03:16
17  number 1109.                                       01:03:20
18       Ma'am, there has been other evidence in       01:03:24
19  this case indicating that Fatima changed her       01:03:27
20  residence from Andrews Hall to the High Rise in    01:03:31
21  September of 2014, about a month after she arrived 01:03:36
22  on campus.  Were you aware of that?                01:03:39
23    A.  No, sir.                                     01:03:40
24    Q.  I'm sorry?                                   01:04:00
25    A.  No.  I wasn't aware of it.                   01:04:02
```

13 (Pages 46 to 49)

### Page 50

1  Q. Okay. Did Fatima tell you that she had
2  decided to move from Andrews to High Rise?
3  A. No, sir.
4  Q. Did you ever become aware that she was
5  living in High Rise?
6  A. No, sir.
7       MR. GOULD: Before or after her death?
8  Q. (By Mr. Johnson) Before her death.
9  A. No.
10  Q. Okay. So it was some time after she
11  passed away that --
12  A. Yes.
13  Q. -- you learned that?
14  A. Yes, sir.
15  Q. When did you first learn that Brandon
16  resided in the High Rise dormitory?
17  A. After her death.
18  Q. Okay. All right. Did -- did you
19  understand that 19 is the age of majority in
20  Nebraska?
21       MR. GOULD: Object to form. Do you know
22  what that means?
23  Q. (By Mr. Johnson) Did anyone ever tell
24  you that under Nebraska law an adult is defined
25  as a person 19 or older?

### Page 51

1  A. No.
2  Q. Okay.
3       (Exhibit No. 511 is marked.)
4  Q. (By Mr. Johnson) And, lastly, on this
5  series, ma'am, I'd like to show you Exhibit No.
6  511, which is a third residence hall contract.
7  This one is dated January 8th of 2015, which is,
8  again, for the same unit as Exhibit 510, namely
9  -- excuse me. It's for a room in High Rise, but
10  it changes the room from 1109 to 1108.
11       At any time prior to Fatima's death,
12  were you made aware that she had again changed
13  her room in January of 2015?
14  A. I'm sorry. I need a break right now.
15  Q. Okay. Sure.
16       THE VIDEOGRAPHER: The time is 1:05 p.m.
17  We're now going off the record.
18       (Brief recess.)
19       THE VIDEOGRAPHER: The time is 1:09 p.m.
20  We are now going back on the record.
21  Q. (By Mr. Johnson) Ma'am, I sincerely
22  appreciate your tolerance.
23  A. Yes. Thank you.
24  Q. I want to try to break the time period
25  in question up into a couple of segments. In late

### Page 52

1  August of 2014, Fatima's father, Nelson, drove her
2  out to Nebraska and moved her into Andrews Hall,
3  and she started her career at Chadron State
4  College.
5  A. Yes, sir.
6  Q. All right. And my understanding is she
7  came home for Thanksgiving that year?
8  A. Yes, sir.
9  Q. You recall that?
10  A. Yes.
11  Q. And then did she go back to Chadron,
12  between Thanksgiving and Christmas?
13  A. Yes.
14  Q. And then she came home again for
15  Christmas?
16  A. Yes, sir.
17  Q. And then she came back in January to
18  Chadron?
19  A. Correct.
20  Q. Okay. Let's take those segments one at
21  a time. First, from the time Nelson dropped her
22  off at Chadron till the day she came home for the
23  Thanksgiving break, you had numerous conversations
24  with her by phone over that period of time. Right?
25  A. Yes.

### Page 53

1  Q. Pretty much every day, either she would
2  call you or you would call her?
3  A. Yes.
4  Q. Did she tell you of any problems that she
5  was having in any of those calls during that --
6  that period from August to Thanksgiving?
7  A. Never.
8  Q. Did she ever mention to you that she was
9  having any difficulties in her relationship with
10  Brandon?
11  A. No.
12  Q. Did she talk to you about Brandon during
13  that time period?
14  A. Some.
15  Q. What kinds of things would -- did she
16  mention about Brandon during that time?
17  A. It was mostly me asking her how is Brandon
18  doing, how is -- you know, how's school going for
19  him?
20  Q. Okay. And did she always say fine?
21  A. Yes.
22  Q. All right. Did she ever indicate any
23  problems that either he was having or she was
24  having?
25  A. No.

Atkinson-Baker Court Reporters
www.depo.com

## Page 54

Q. All right. At any time between August of 2014 and Thanksgiving of 2014, did she ever tell you that she was having problems in -- in her relationship with Brandon?
A. No.
Q. Did she ever tell you that they had broken up?
A. No.
Q. When she came home then at Thanksgiving, was she home for like four days?
A. Yes.
Q. All right. Do you know whether Brandon traveled with her coming home from Thanksgiving?
A. No.
Q. All right. Did -- do you know whether she saw Brandon in Monterey or the Monterey area during that Thanksgiving break?
A. I don't remember asking her. Or I don't know.
Q. Do you remember seeing Brandon at your house during the Thanksgiving break?
A. I don't remember.
Q. Okay. Did you have a family Thanksgiving dinner?
A. Yes.

## Page 55

Q. Was that at your house?
A. Yes.
Q. Did Brandon attend that?
A. No.
Q. Okay. So, then, at the end of the Thanksgiving break, Fatima flew back to Chadron; correct?
A. Yes.
Q. Did you take her to the airport?
A. No. Nelson did.
Q. All right. Do you know whether she traveled with Brandon going back to Chadron?
A. I don't know.
Q. All right. So then about three weeks later, she came home for the Christmas break?
A. Yes.
Q. All right. For that three week period between Thanksgiving and Christmas, when she was in Chadron, you continued to talk to her on almost a daily basis?
A. Yes.
Q. Did she mention any problems that she was having during that time?
A. Not at all.
Q. Did she talk about Brandon during that

## Page 56

time?
A. Very briefly.
Q. Anything any different than what she had said earlier?
A. No, just normal conversation.
Q. All right. Did you and she talk about how she was doing academically?
A. Yes.
Q. What was your belief about that?
A. Just like a normal parent, asking their kids --
Q. Sure.
A. -- how -- yes.
Q. Did she tell you, "I'm getting all A's", or, "I'm getting pretty good" --
A. No, normal. She's always been -- was a good student and dedicated.
Q. All right.
A. So --
Q. When you say normal, is that like a 'B' average or 'A' average, or --
A. 'B' and 'A'.
Q. Okay.
A. Yes.
Q. Did you actually see her grades?

## Page 57

A. Yes.
Q. Did they come to your house?
A. Yes.
Q. All right. Was that the case when she was at Austin Peay? Did the grades come to your house?
A. Yes.
Q. How did she do there?
A. Pretty good.
Q. Okay.
A. She did good.
Q. We looked a little bit yesterday at her grades at Austin Peay, and her grade point average was higher the first semester than the second. Do you remember that?
A. I don't remember, no.
Q. Okay. So she comes home for Christmas. Do you know whether or not she traveled home from Chadron with Brandon for the Christmas break?
A. I don't know.
Q. All right. Did you pick her up?
A. I don't remember who picked her up for Christmas break.
Q. Where did she stay when she came home for Christmas?

15 (Pages 54 to 57)

**Page 58**

1  A.  In my house.
2  Q.  And she stayed at your house for
3  Thanksgiving, also?
4  A.  Yes.
5  Q.  So was she home for about three weeks?
6  A.  Yes.
7  Q.  Did -- to your knowledge, did she see
8  Brandon during that time?
9  A.  Yes, a couple of times.
10  Q.  Was he at your house during that time?
11  A.  Yes.
12  Q.  How often?
13  A.  How often?  I don't recall.  All I remember
14  it was a couple of times --
15  Q.  Okay.
16  A.  -- during that period of time.
17  Q.  And did there seem to be any issues or
18  problems between the two of them from your
19  perspective at that time?
20  A.  Not at all.  They both looked normal and
21  yeah, happy.
22  Q.  And up -- let's take it up to the point
23  in time when Fatima left after Christmas to go
24  back to Chadron.  Had she told you that -- any
25  kind of problems she was having at Chadron

**Page 59**

1  whatsoever?
2  A.  None at all.
3  Q.  She didn't tell you she had any health
4  problems, any emotional problems?
5  A.  No.
6  Q.  Any dating problems?
7  A.  No.
8  Q.  All right.  Did you see anything about
9  her on either the Thanksgiving visit or Christmas
10  visit that gave you any concern or cause for
11  concern?
12  A.  Not at all.  She was just that same
13  person, a happy kid, spending time with family
14  members, friends.  She made time for everybody,
15  to see everybody --
16  Q.  Okay.
17  A.  -- and, yeah, just normal.
18  Q.  All right.  And you didn't see anything
19  about her physically that caused you any concerns?
20  A.  No.
21  Q.  Okay.  At -- at any time that Fatima was
22  at Chadron, did you talk to her at all about alcohol
23  or drinking?
24  A.  Not when she was there, but when she was
25  here on vacation I always talked to her.

**Page 60**

1  Q.  Did you ask her if she was drinking while
2  she was in school, or what -- what was the
3  conversation?
4  A.  I didn't ask her specifically if she was
5  drinking, because till today it's hard for me to
6  believe that she was drinking.
7  Q.  Why do you say that?
8  A.  Why?
9  Q.  Uh-hum.
10  A.  Because I want to think that I knew my
11  kids.
12  Q.  I know.
13  A.  And that it's something that I -- we
14  always talked about it, you know.
15  Q.  So --
16  A.  That -- you know, how dangerous alcohol
17  is, and for their safety.
18  Q.  And for you as her mother, it was
19  inconceivable that she would be having a problem
20  with drinking.
21       MR. GOULD:  Object to form.
22  Q.  (By Mr. Johnson)  Is that a -- a fair
23  statement?
24  A.  Yeah, I don't believe that.
25  Q.  Okay.  Did you ever talk with her about

**Page 61**

1  marijuana or recreational drugs?
2  A.  Sometimes.
3  Q.  Was it the same kind of thing, how
4  dangerous it is?
5  A.  Yes.
6  Q.  Did you ever have a concern that she was
7  doing that?
8  A.  No.
9  Q.  Did she strike you as the kind of kid
10  that that just wasn't an issue with?
11  A.  No.
12  Q.  I mean, was that something you didn't
13  worry about because of who she was?  I'm trying to
14  get a feel for it.
15  A.  No.  I knew she -- she was a very smart,
16  intelligent girl and knew, you know, the drugs
17  and alcohol affects, you know.
18  Q.  Yes.
19  A.  So --
20  Q.  So she was one of those kids where you felt
21  like, "I don't need to worry about her doing that
22  kind of thing because that's not her"?
23  A.  Exactly, yes.
24  Q.  Okay.  Had Fatima lived in the dormitory
25  when she was at Austin Peay?

16 (Pages 58 to 61)

```
 1                COURT REPORTER'S CERTIFICATE
 2        I, YVETTE GALLARDO, CSR No. 12889,
 3   Certified Shorthand Reporter, certify;
 4        That the foregoing deposition was
 5   had before me at the time and place therein set.
 6        That the testimony of the witness, the
 7   questions propounded, and all objections and
 8   statements made at the time of the examination
 9   were recorded stenographically by me and were
10   thereafter transcribed;
11        That the foregoing is a true and correct
12   transcript of my shorthand notes so taken.
13        I further certify that I am not a relative
14   or employee of any attorney of the parties, nor
15   financially interested in the action.
16        I declare under penalty of perjury under
17   the laws of California that the foregoing is true
18   and correct.
19
20        Dated this 26TH day of FEBRUARY, 2018.
21
22
23   _____
     YVETTE GALLARDO, No. 12889
24
25
```