**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEBRASKA

3


4    NELSON LARIOS, ET AL,

5              Plaintiff,

6         vs.                         No. 8:17-cv-00031

7
     CHADRON STATE COLLEGE, ET AL,
8
               Defendants.
9    ------------------------------------

10


11


12
                  VIDEOTAPED DEPOSITION OF
13
                       NELSON LARIOS
14


15

                    February 7, 2018
16
                      10:00 a.m.
17


18
              350 Calle Principal, Salon 201
19                 Monterey, California


20


21


22   ATKINSON-BAKER, INC.

23   1-800-288-3376

24   COURT REPORTER:   YVETTE GALLARDO, CSR-12889

25   FILE NO.: AC00850
```

Page 1

**Nelson Larios**
**February 7, 2018**

Atkinson-Baker Court Reporters
www.depo.com

```
 1              APPEARANCES OF COUNSEL
 2
 3   FOR PLAINTIFFS:
 4     ROMANUCCI & BLANDIN, LLC
       BY:  Martin D. Gould, Esq.
 5     321 N. Clark St., Suite 900
       Chicago, Illinois  60654
 6     888.458.1145
       Email: Mgould@rblaw.net
 7
 8
 9   FOR DEFENDANTS:
10     JOHNSON & TABOR, LLP
       BY:  Thomas E. Johnson, Esq.
11     11932 Harbor St., Suite 101
       Omaha, Nebraska  68144
12     Phone: 402.344.0500
13
14   ALSO PRESENT:
15     Videographer - Christopher Throm
16
17
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1              INDEX TO EXHIBITS
 2
 3   EXH. 502 -  Documents....................12, 69
 4   EXH. 503 -  Documents....................16,108
 5   EXH. 504 -  Documents....................16,146
 6   EXH. 505 -  Austin Peay records...............57
 7   EXH. 506 -  Typed document...................144
 8   EXH. 507 -  College transcript...............150
 9   EXH. 508 -  Document from Monterey Athletic..162
10
...
25
                                              Page 4
```

```
 1              INDEX OF EXAMINATION
 2   NELSON LARIOS
 3     By Mr. Johnson...............................5
       By Mr. Gould...............................170
 4
 5   COURT REPORTER'S CERTIFICATE..................178
 6
...
15              -oOo-
...
25
                                              Page 3
```

```
 1         VIDEOTAPED DEPOSITION OF         10:11:15
 2              NELSON LARIOS               10:11:15
 3              February 7, 2018            10:11:15
 4
 5      THE VIDEOGRAPHER:  Good morning, ladies   10:11:15
 6   and gentlemen.  My name is Christopher Throm, your  10:11:16
 7   videographer.  And I represent Atkinson-Baker in    10:11:19
 8   Glendale, California.                               10:11:22
 9      I'm not financially interested in this           10:11:24
10   action, nor am I a relative or an employee of any   10:11:26
11   of the attorneys or any of the parties.  Today's    10:11:28
12   date is February 7th, 2018.  The time is 10:10 a.m. 10:11:30
13      This deposition is taking place at the           10:11:35
14   Monterey Marriott, 350 Calle Principal, Monterey,   10:11:37
15   California 93940.                                   10:11:43
16      This is case No. 8:17-CV-00-31, entitled         10:11:46
17   Larios versus Chadron State College.  The deponent  10:11:54
18   is Nelson Larios.  This deposition is taken on      10:11:58
19   behalf of the defendant.  Your court reporter is    10:12:01
20   Yvette Gallardo, from Atkinson-Baker.               10:12:05
21      Counsel, now please introduce yourself,          10:12:11
22   starting with the questioning attorney.             10:12:12
23      MR. JOHNSON:  My name is Thomas E. Johnson.     10:12:14
24   I'm with the firm of Johnson & Tabor, LLC, 11932   10:12:16
25   Harbor Street, Suite 101, Omaha, Nebraska 68144. I 10:12:21
                                              Page 5
```

2 (Pages 2 to 5)

**Nelson Larios**
**February 7, 2018**

**Atkinson-Baker Court Reporters**
www.depo.com

Page 6

am co-counsel together with Baird Holm, LLP, of Omaha, Nebraska, representing the defendant Chadron State College and the Nebraska State College system.

  MR. GOULD: Martin Gould, on behalf of plaintiffs, Lissette Larios Roohbakhsh, and Nelson Larios.

  THE VIDEOGRAPHER: Would the court reporter please swear the witness in.

  (The witness is duly sworn.)

  NELSON LARIOS, having been first duly sworn, testified as follows:

  EXAMINATION

MR. JOHNSON:

  Q. Sir, would you state your name for the record, please, and spell your first and last name.

  A. It's Nelson Larios. And it's N-E-L-S-O-N, Nelson. Larios is L-A-R-I-O-S.

  Q. Mr. Larios, if I'm correct you are one of the named plaintiffs in the lawsuit about which we are gathered today; is that correct?

  A. That is correct.

  Q. And you are familiar with the complaint that was filed in that lawsuit to initiate it?

  A. Yes.

Page 7

  Q. Did you review it and approve it prior to its filing?

  A. Yes.

  Q. Have you ever given a deposition before, sir?

  A. I don't -- I don't recall.

  Q. Have you ever been placed under oath and testified before?

  A. Yes.

  Q. In what connection have you been under oath?

  A. Traffic violation, and stuff like --

    THE COURT REPORTER: Could you repeat.

    THE WITNESS: Traffic violation.

  Q. (By Mr. Johnson) All right. Anything other than a traffic violation where you have testified under oath?

  A. No.

  Q. Since this is your first experience with a deposition, let me just kind of go over some of the ground rules for you. First of all, you are under oath, the same as if you were testifying in a court of law. And do you understand that that places upon you an obligation to be truthful in your answers to my questions?

Page 8

  A. Yes.

  Q. And you understand that there are significant legal consequences for persons who willfully fail to tell the truth while under oath?

  A. Yes.

  Q. You do?

  A. Yes.

  Q. Are you -- you are represented by counsel today. Correct?

    MR. GOULD: Yes.

    THE WITNESS: Yes.

  Q. (By Mr. Johnson) And your counsel is Mr. Gould?

  A. Yes.

  Q. I will be asking you questions on behalf of Chadron State College, to which I will ask you to answer verbally. We have a court reporter here. We also have a videographer. But our main record in this case is the court reporter's transcript. She will record verbatim everything I ask you and everything you say in response. And in order for her to make that kind of record, you have to verbalize your responses. Okay?

  A. Understand.

  Q. In ordinary conversation, we tend to nod

Page 9

our head and shake our head a lot, but that won't work here today. You need to verbalize your response rather than nod or shake your head, or shrug shoulders, things like that. Understood?

  A. Yes.

  Q. I will do my best to wait until you have completed your answer before I ask you another question, so that the court reporter has an opportunity to accurately record what is said. I would ask that you wait until I finish my question before you answer, likewise, for that purpose. Okay?

  A. Okay.

  Q. Your attorney may make objections for purposes of the record. If he does so, please wait until he finishes his objection before you answer. But you may go ahead and answer the question, notwithstanding his objection, unless he instructs you not to answer, which he will do if he feels that's proper. Okay?

  A. Understand.

  Q. Also, there may come a point in the deposition where you don't hear me clearly or you don't understand my question. If that happens, I'm going to ask that you ask me to speak up, or

**Atkinson-Baker Court Reporters**
www.depo.com

### Page 18

```
1   work?                                           10:33:43
2       A.  Carpentry.                              10:33:43
3       Q.  Okay.  What's your current employment?  10:33:45
4       A.  I work in the construction industry.  I'm  10:33:50
5   a utility locator right now.                    10:33:53
6       Q.  A what?                                 10:33:55
7       A.  Utility locator.                        10:33:56
8       Q.  What does a utility locator do?         10:33:57
9       A.  We find where the utility lines are so  10:33:59
10  they don't get hit when --                      10:34:02
11      Q.  That makes sense.                       10:34:03
12      A.  -- when construction crews are working. 10:34:04
13      Q.  How long have you been a utility locator? 10:34:06
14      A.  I've been doing that for 18 months around. 10:34:07
15      Q.  And what was your employment prior to   10:34:10
16  that?                                           10:34:14
17      A.  Carpentry.                              10:34:15
18      Q.  And was that finished carpentry or --   10:34:16
19      A.  Finished carpentry.                     10:34:18
20      Q.  How long did you do that?               10:34:19
21      A.  For about three years.                  10:34:21
22      Q.  Then prior to that?                     10:34:23
23      A.  Prior to that I worked in landscaping.  10:34:25
24  Pretty much handyman.                           10:34:32
25      Q.  All right.  Are you married?            10:34:34
```

### Page 19

```
1       A.  No.  I'm divorced.                      10:34:37
2       Q.  And how many marriages have you had?    10:34:38
3       A.  One.                                    10:34:40
4       Q.  Who was your wife?  What was her name?  10:34:41
5       A.  Lissette.  Maiden name Romero.          10:34:45
6       Q.  When were you and Lissette married?     10:34:49
7       A.  We were married in 1988.                10:34:51
8       Q.  Where did that marriage occur?          10:34:55
9       A.  In Monterey, California.                10:34:57
10      Q.  Is that where you met her?              10:34:59
11      A.  Yes.                                    10:35:01
12      Q.  What children were born of your marriage  10:35:04
13  to Lissette?                                    10:35:07
14      A.  Emerson.                                10:35:08
15      Q.  And what is Emerson's date of birth?    10:35:09
16      A.  It's ████████.                          10:35:11
17      Q.  1990?                                   10:35:16
18      A.  Yes.                                    10:35:17
19      Q.  And other children of that marriage?    10:35:18
20      A.  Fatima.                                 10:35:20
21      Q.  And what was Fatima's date of birth?    10:35:21
22      A.  Fatima Larios is ████████.              10:35:23
23      Q.  When were you and Lissette divorced?    10:35:28
24      A.  I want to say it was final in 2013.     10:35:34
25      Q.  When was the petition filed, if you recall?  10:35:41
```

### Page 20

```
1       A.  I don't recall.                         10:35:45
2       Q.  Was it more than a year prior to the final  10:35:46
3   date?                                           10:35:49
4       A.  More than -- yes, just -- just about.   10:35:52
5       Q.  Do you recall approximately how old Fatima  10:35:57
6   was when the divorce petition was filed?        10:36:00
7       A.  She must have been 15 or 14.            10:36:06
8       Q.  So was she in middle school or high school  10:36:12
9   at that time?                                   10:36:14
10      A.  She was in high school.                 10:36:15
11      Q.  Was -- was there a custody dispute in the  10:36:16
12  divorce at all?                                 10:36:22
13      A.  No.                                     10:36:23
14      Q.  What was the custody arrangement regarding  10:36:26
15  Emerson and Fatima as a result of the divorce?  10:36:29
16      A.  Fatima was, you know, under age.  Emerson  10:36:34
17  was already over 18.  And so he chose to live with  10:36:40
18  me; and Fatima will stay due to access to school,  10:36:45
19  stay with her mom.  So she will stay with her mom  10:36:52
20  through the school days, and she will come and  10:36:56
21  spend the weekend with me.                      10:36:59
22      Q.  All right. And was that the arrangement 10:37:01
23  that adhered throughout the rest of her high    10:37:04
24  school career?                                  10:37:07
25      A.  Yes.                                    10:37:08
```

### Page 21

```
1       Q.  So she spent every weekend with you and 10:37:08
2   weekdays with her mother?                       10:37:10
3       A.  For the most part.                      10:37:12
4       Q.  And was Emerson living in Lissette's home  10:37:14
5   at that time?                                   10:37:17
6       A.  He was -- Emerson was living with me.   10:37:17
7       Q.  Okay.  So when did you and Lissette first  10:37:20
8   separate your households?                       10:37:26
9       A.  I want to say at the end of 2012, maybe. 10:37:31
10      Q.  All right.  And at that point in time,  10:37:36
11  did you move to a different location?           10:37:40
12      A.  No, I stayed in the house where we lived  10:37:41
13  together.                                       10:37:45
14      Q.  And so Lissette moved?                  10:37:45
15      A.  Lissette moved to a property -- another 10:37:47
16  property that we owned together.                10:37:50
17      Q.  All right. And Fatima moved with Lissette?  10:37:52
18      A.  Yes.                                    10:37:56
19      Q.  And Emerson stayed where he was?        10:37:56
20      A.  Uh-hum.                                 10:37:59
21      Q.  All right.  How long did Emerson continue  10:37:59
22  to live at home?  Did he ever move out on his own?  10:38:02
23      A.  He went to school up north to Santa Rosa  10:38:07
24  for a while.  And then he came back home.       10:38:14
25      Q.  And when he came back, did he live with 10:38:18
```

Nelson Larios
February 7, 2018

Atkinson-Baker Court Reporters
www.depo.com

**Page 166**

1  information to one another.  Anyway, there's a
2  disclosure indicating that either you or your
3  counsel have spoken with a present or former
4  student at Chadron State College by the name of
5  Robin White, with respect to her experiences at
6  Chadron State College, wherein she -- she may have
7  suffered some form of injury or abuse.  Does that
8  name Robin White mean anything to you?
9      A.  Yeah, she -- she did try to reach out.
10     Q.  Is that someone who contacted you?
11     A.  Yes.
12     Q.  When was that?
13     A.  That could be two years ago, maybe.
14     Q.  What did Robin White tell you when she
15  reached out to you?
16     A.  I think what she said is that her daughter
17  experienced some -- something horrible at Chadron,
18  and that she got -- you know, she didn't get any
19  assistance with her complaints either.
20     Q.  What did she tell you had happened to her
21  daughter?
22     A.  I don't -- I didn't let her fill me up with
23  the story.  I don't -- I told her that I was really
24  sorry about what she had encountered, that I would
25  be more willing to let her speak to -- you know, to

**Page 167**

1  someone that, you know, would listen to her
2  concerns.
3      Q.  Did you ever have any follow-up
4  conversations with that person?
5      A.  I -- no.
6      Q.  Did you -- now, when Fatima was home for
7  Christmas over the 2014, 2015 Christmas break, in
8  other words, the last time you saw Fatima --
9      A.  Right.
10     Q.  -- did you see anything about her, or
11  anything about her physical appearance, or her
12  demeanor, or her body language, or anything that
13  caused you any concern?
14     A.  Not -- no.  I mean, she came, you know,
15  all the way from Chadron, and we were all about
16  spending time together and doing things together.
17  I guess I wasn't suspecting anything, so I wasn't
18  looking for anything.  So, therefore, no.
19     Q.  As far as you were concerned, she was
20  the same person you had dropped off at Chadron in
21  August?
22     A.  Right.
23     Q.  Same demeanor, same personality, the same
24  character?
25     A.  Like I say, I -- I probably would have --

**Page 168**

1  if I knew what officials at Chadron knew, maybe I
2  would be looking for signs of some type, but because
3  I wasn't -- you know, I was just excited to see my
4  daughter, I wasn't like looking at anything negative
5  about her demeanor, or nothing.
6      Q.  Did you see any evidence of any physical
7  injury, any bruises, scrapes, scratches, anything?
8      A.  No.
9      Q.  No?
10     A.  I didn't know that we would be sitting
11  over here right now, if I did see it.
12     Q.  Okay.  The answer is you didn't?
13     A.  No.
14     Q.  Okay.  Did you see Brandon at all during
15  that Christmas break?
16     A.  No.
17     Q.  Do you know whether Fatima saw Brandon
18  during that Christmas break?
19     A.  I don't know.
20     Q.  Did Fatima ever tell you about a meeting
21  that she had had with Coach Stack and assistant
22  Coach Grizdovich where they asked her if she was
23  experiencing any problems or difficulties?
24     A.  She didn't tell me.
25     Q.  Did she ever tell you about an e-mail that

**Page 169**

1  she had received from the college's title nine
2  coordinator asking her if she needed any help or
3  assistance?
4      A.  No, she didn't.
5      Q.  What -- what were Fatima's career plans,
6  if you know, if she had any?
7      A.  She wanted to finish college and come back
8  to this community and do some work.  I don't think
9  she knew exactly what she was going to do.
10     Q.  Did you ever have any belief or suspicion
11  that your daughter was experimenting with marijuana?
12     A.  I mean, apparently for what we know now,
13  it's like everything happened so quick at Chadron
14  that, you know -- I mean, she went to a Catholic
15  school and through her friends, you know, I mean,
16  they knew that she occasionally would have a drink,
17  but it wasn't anything like drugs or, you know.
18  So whatever happened now, I didn't know.
19     Q.  One last question: In the complaint that
20  was filed on your behalf in this case, and
21  specifically I think at paragraph 27, there's an
22  allegation made that fighting between Fatima and
23  Brandon began in about October of 2014.
24         What information do you have, if any,
25  that leads you to believe that fights between

COURT REPORTER'S CERTIFICATE

I, YVETTE GALLARDO, CSR No. 12889, Certified Shorthand Reporter, certify;

That the foregoing deposition was had before me at the time and place therein set.

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 22nd day of February, 2018.

_____
YVETTE GALLARDO, No. 12889

(signature waived)