Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

LISSETTE LARIOS ROOHBAKHSH, as )
personal representative of the )
ESTATE OF FATIMA LISSETTE LARIOS )
and on behalf of next of kin, ) Case No.
                            ) 8:17-cv-00031-
     and         ) JFB-CRZ
                      )
NELSON LARIOS, as next of kin )
                      )
     Plaintiffs, )
                      )
     v.            )
                      )
BOARD OF TRUSTEES OF THE NEBRASKA )
STATE COLLEGES )
                      )
     and         )
               ) TAKEN IN BEHALF
CHADRON STATE COLLEGE,    ) OF THE
                   ) PLAINTIFFS
     Defendants. )
_____)

DEPOSITION OF JOEL SMITH, taken at 10:20 a.m. on December 21, 2017, by Rachel McMenamin, CSR, RPR and General Notary Public in and for the State of Nebraska, at 1500 Woodmen Tower, 1700 Farnam Street, Omaha, Nebraska.

Page 2

1   APPEARANCES:
2
    Mr. Martin D. Gould       For Plaintiffs
3   Attorney at Law
    ROMANUCCI & BLANDIN, LLC
4   321 North Clark Street, Suite 900
    Chicago, IL 60654
5
6   Mr. Thomas E. Johnson     For Defendants
    Attorney at Law
7   BAIRD HOLM LAW FIRM
    1500 Woodmen Tower
8   1700 Farnam Street
    Omaha, NE 68102
9
10  ALSO PRESENT: Kimberly Brown

Page 3

1           I N D E X
2   EXAMINATION:   DIRECT  CROSS  REDIRECT  RECROSS
3   JOEL SMITH
4   By Mr. Gould:    3
5   By Mr. Johnson:    111
6           E X H I B I T S
7
    Ex.   Pg. Ref.
8   No.   No.      Description
9   30    25      Student Affairs, Nebraska
                    State College System
10                Policy: 3020
11  31    76      PowerPoint

Page 4

  1           JOEL SMITH
  2      Of lawful age, being first
       duly cautioned and solemnly
  3     sworn as hereinafter certified,
       was examined and testified as
  4     follows:
  5       DIRECT EXAMINATION
  6  BY MR. GOULD:
  7    Q  Mr. Smith, can you please state and spell
  8  your full name for the record?
  9    A  Yeah. Joel Smith.
10    Q  That's S-m-i-t-h?
11    A  S-m-i-t-h, yes.
12    Q  That was an easy one.
13    A  Yeah.
14    Q  Have you ever taken a deposition before?
15    A  I have not, no.
16    Q  Okay. Before we start, I'm going to go
17  over some of the ground rules of the deposition so
18  we're on the same page, okay?
19    A  Sure.
20    Q  So as you can see, we have a court
21  reporter here. She's going to be transcribing
22  everything that you say. For her sake, please wait
23  until I finish asking my question before you give an
24  answer.
25    A  Certainly.

Page 9

1    Q   Is that a yes?
2    A   Yes.
3    Q   And you sent this to Shelley Dunbar --
4  strike that.
5        You forwarded an email to Shelley
6  Dunbar -- strike that.
7        You sent an email to Shelley Dunbar with
8  an attachment --
9    A   With an attachment with the -- with the
10 description.
11   Q   Mr. Smith, please let me finish the
12 question.
13   A   Yes.
14   Q   And I understand what you're --
15   A   No, no.
16   Q   -- saying, but we're going to make her
17 life very difficult.
18   A   Fair enough.
19   Q   Okay.  So on November 4, 2014, at
20 8:15 a.m., you sent Shelley Dunbar an email with an
21 attachment titled Title IX issue?
22   A   Yes.
23   Q   Okay.  And the attachment included a
24 document with a heading that said Chadron State
25 College; correct?

Page 10

1    A   Yes.
2    Q   Can you tell me, where did you get this
3  document from?
4    A   I created the document, put it on the --
5  on the letterhead.
6    Q   Okay.  And then you -- you saved it on
7  your computer, and you sent it to Shelley Dunbar?
8    A   That's correct.
9    Q   Did you also receive this email as part of
10 Exhibit 28, it's CSC 173?
11   A   I did receive that email.
12   Q   Okay.  And then you also received an email
13 from Shelley Dunbar on November 6, 2014, at
14 4:31 p.m., and we've Bates stamped it CSC 175; is
15 that right?
16   A   Yeah.  I was copied on that one.
17   Q   And then you were also copied on another
18 email sent on Wednesday, November 5, 2014, at 2 p.m.
19 sent by Shelley Dunbar; correct?
20       MR. JOHNSON:  What's the Bates number on
21 that?
22       MR. GOULD:  CSC --
23       MR. JOHNSON:  176.
24       THE WITNESS:  176.
25       MR. GOULD:  -- 176.

Page 11

1    A   Yes, I did receive that.
2    Q   Are you aware of any other emails that you
3  were copied on or that you sent or received
4  pertaining to Fatima Larios?
5    A   No.
6    Q   Okay.  We'll address these email -- emails
7  a little bit later in the dep.  I just want to go
8  over some of your background information, your
9  employment information.
10   A   Okay.
11   Q   And then we'll -- we'll start talking
12 about some of the emails, okay?
13   A   Uh-huh.
14   Q   Is that a yes?
15   A   That's a yes.
16   Q   How old are you, sir?
17   A   I'm fifty-nine years old.
18   Q   Okay.  Where did you attend high school?
19   A   Westminster High School in Westminster,
20 Colorado.
21   Q   What year did you graduate?
22   A   1977.
23   Q   Did you receive any secondary education?
24   A   I did.
25   Q   Where was that?

Page 12

1    A   I got my bachelor's degree at Metropolitan
2  State College of Denver.
3    Q   Did you graduate?
4    A   I did.  And I have a master's degree from
5  Regis University.
6    Q   Okay.  What year did you graduate?
7    A   19 -- that's a good question -- 83, I
8  believe it was.
9    Q   And then you said you had a master's
10 degree as well; correct?
11   A   Yeah.  I have a master's degree from Regis
12 University.
13   Q   What was your master's in?
14   A   It was in management.
15   Q   And what was your BA in?
16   A   History and marketing.
17   Q   Your master's was in -- strike that.
18       Was it -- your master's was a
19 management -- any specific subject or just
20 management?
21   A   Quality management.
22   Q   So is that for businesses --
23   A   Yeah.
24   Q   Let me --
25   A   Yeah.

Page 13

1    Q   Mr. Smith, I know you know the answer,
2    just let me finish asking the question, okay?
3    A   Fair enough.
4    Q   Can you explain to me what was -- what did
5    quality management pertain to?
6    A   It's -- it was a term that was happening
7    in the '90s. Demming was the -- the guy who was one
8    of the leaders in it and trying to do 360
9    evaluations of things and better inclusion of
10   personnel and that kind of stuff and a different way
11   of managing things that was more inclusive.
12   Q   So it was, like, a mix of human resources?
13   A   No, it was -- it was at all levels of
14   stuff. It had levels of production, and it also
15   was, you know, how you gather information to make
16   processes better and get information and feedback
17   from people and --
18   Q   And what -- what year did you graduate
19   from your master's program?
20   A   1996.
21   Q   And what year were you hired by Chadron
22   State College?
23   A   2013.
24   Q   And what position were you hired for?
25   A   Director of Athletics.

Page 14

1    Q   Can you briefly go over the history of
2    your employment prior to 2013 --
3    A   Sure.
4    Q   -- chronologically?
5    A   Okay.
6    Q   So you can just give me, you know, between
7    this year and that year I was a teacher at so and so
8    school, between that year and that year I worked at
9    ConAgra.
10   A   Okay. Great. From 1985 until 1996, I was
11   the Assistant Athletic Director at Metropolitan
12   State College at Denver.
13   Q   At Metropolitan?
14   A   State College of Denver.
15   Q   That makes it easier for me.
16   A   Yeah. In 1996, I took the job as the
17   Director of Athletics at Fort Lewis College.
18   Q   Is that in St. Louis, Missouri?
19   A   No, actually, it's in Durango, Colorado.
20   And then in 2001, I became the Commissioner of the
21   Rocky Mountain Athletic Conference.
22   Q   Hold on. Commissioner of --
23   A   The Rocky Mountain Athletic Conference.
24   Q   Okay.
25   A   And I served in that role until I took the

Page 15

1    job at Chadron.
2    Q   So you were the Commissioner of the Rocky
3    Mountain -- Mountain Athletic Conference from 2001
4    to 2013?
5    A   That's correct.
6    Q   Okay. What were your job responsibilities
7    as an Assistant Athletic Director at Metropolitan
8    State College?
9    A   Oh, boy, I did a lot of things. So I -- I
10   was in charge of compliance, I was the fund-raiser,
11   I was the events manager, I scheduled transportation
12   and vehicles, maintenanced them. I guess that's
13   probably pretty much it.
14   Q   Anything pertaining to, like, the safety
15   of students or -- strike that.
16       Were you in charge of anything in terms
17   of -- strike that.
18       When you said "compliance," is that
19   compliance with school --
20   A   It's --
21   Q   When you say "compliance," was that
22   compliance with school policies and procedures?
23   A   NCAA compliance.
24   Q   What about school policies and procedures
25   as they pertain to athletes?

Page 16

1    A   Not necessarily, but I obviously had to
2    live under them, so --
3    Q   I'm sorry, what -- can you say that again?
4    You said "unnecessarily"?
5    A   I -- I wasn't responsible to give that
6    information to student-athletes, but we all worked
7    under whatever rules were -- you know, were under
8    employment then.
9    Q   So if you were made aware of a policy
10   violation, were you required to report to somebody?
11       MR. JOHNSON: Object, foundation.
12   A   Yeah.
13   Q   But it wasn't your responsibility to
14   investigate or discipline that student-athlete;
15   right?
16   A   No.
17   Q   What were your job responsibilities as the
18   Director of Athletics for St. Louis College?
19   A   Fort Lewis.
20   Q   Fort Lewis.
21   A   I was overall in charge of 13 sports and
22   about 300 athletes. I did fund-raising, event
23   management, facilities stuff, and oversaw the staff.
24   Q   When you say you were in charge of 300
25   athletes, were you also in charge, in part, for

Page 25

1  going to mark as 30.
2      (Deposition Exhibit Number 30 was marked
3  for identification.)
4      MR. GOULD: I know we've already marked
5  Policy 3020, but this one's got a date on it, so I'm
6  going to use this one right now.
7      MR. JOHNSON: Do you have a copy?
8      MR. GOULD: Yeah, I do.
9  BY MR. GOULD:
10   Q   Mr. Smith, is that the Policy 3020 that
11  you were provided as an athletic director at Chadron
12  State College?
13   A   I believe so.
14   Q   Can you just read the -- the definition
15  section to yourself?
16   A   About dating violence?
17   Q   Yeah.
18   A   Do you want me to read it out loud?
19   Q   No, no, just to yourself.
20   A   Okay.
21   Q   Title -- strike that.
22      Is it your understanding that -- strike
23  that.
24      Back in November 2014, was it your
25  understanding that domestic violence and dating

Page 26

1  violence was covered under Title IX?
2   A   It was my understanding that if I knew of
3  something like that, I would report it to the
4  Title IX Director.
5   Q   And -- and -- strike that.
6      On November 3, 2014, Coach Rob Stack
7  reached out to you regarding concerns he had about
8  one of his softball player's well-being and safety;
9  right?
10   A   Uh-huh.
11      MR. JOHNSON: Object to the form of the
12  question.
13   Q   Is that a yes?
14   A   That's a yes.
15   Q   Okay. Was -- did Rob Stack reach out to
16  you in person or through -- via cell phone or email?
17   A   He came to my office.
18   Q   Okay. Did Coach Stack come to your office
19  with Assistant coach Aryn Grywusiewicz?
20   A   No.
21   Q   Was November 3, 2014, the first time you
22  had heard about potential dating violence or
23  domestic violence situation involving Fatima Larios
24  and Brandon Finona?
25      MR. JOHNSON: Object to the form.

Page 27

1   A   Yes.
2   Q   Do you know who Fatima Larios is?
3   A   I am aware of who she is now. At the
4  time, I did not.
5   Q   On November 3, 2014, were you made -- made
6  aware that Fatima Larios was a softball player at
7  Chadron State College?
8   A   Yes.
9   Q   Okay. And were you also made aware that
10  the person suspected of physically or
11  psychologically abusing her was a football player at
12  Chadron State College?
13      MR. JOHNSON: Object to the form of the
14  question. You may answer.
15   A   No, because the discussion was only
16  that -- that some of the kids had seen some physical
17  stuff. They did say that she was dating a football
18  player, but they -- all they said was that they had
19  seen some funny behavior on her part.
20   Q   Can you tell me, what did Rob Stack tell
21  you on November 3, 2014, regarding his concerns
22  about Fatima Larios' safety and well-being?
23      MR. JOHNSON: Object to the form of the
24  question, foundation.
25   A   And I don't recall the conversation,

Page 28

1  except for that there was -- that -- that two of the
2  players had come to Aryn and -- and said that they
3  were concerned about her, that she was acting
4  strangely in practices, and he advised me how we
5  should handle that, and I advised him that we should
6  send it to the Title IX person and let them deal
7  with it.
8   Q   So the best -- to the best of your
9  recollection, Coach Stack just told you that two of
10  the players had told him and the assistant coach
11  that Fatima Larios was acting strangely?
12   A   I believe the way he put it was that
13  they -- the two players told Aryn and then Aryn
14  brought it up to Rob.
15   Q   That Fatima Larios was acting strangely?
16   A   Yes.
17   Q   Did -- did you ever meet with Aryn
18  Grywusiewicz?
19   A   No.
20   Q   Was the only face-to-face meeting you had
21  with Rob Stack on November 3, 2014, in regards to
22  the issue with Fatima Larios and -- strike that.
23      Did you end up reaching out to the
24  Title IX Coordinator to handle the situation?
25   A   I went over to her office and discussed it

Page 29

1  with her, and we discussed having -- putting
2  together the letter that we -- that I sent the next
3  day.
4     Q  So at 7:50 a.m. on November 3, 2014, Rob
5  Stack approached you about his concerns about Fatima
6  Larios' safety and well-being; right?
7     A  Uh-huh.
8        MR. JOHNSON:  Object to the form.
9     Q  Is that a yes?
10    A  Yes.
11    Q  Later on that same morning, you went
12 directly to Shelley Dunbar to discuss the issue;
13 correct?
14    A  I don't remember the -- the time or the
15 day, but that day I did, I went and talked to her
16 with it.
17    Q  And if your note says I took this
18 information to Shelley Dunbar on the morning of
19 November 3?
20    A  Uh-huh, so that may have been that I did
21 it right after that happened, then, yeah.
22    Q  There would be no reason to be that you --
23 you didn't take it -- take that information to
24 Shelley Dunbar on the morning of November 3; right?
25    A  That's correct.

Page 30

1     Q  Okay.  Now, you -- did you send this email
2  to Shelley Dunbar after you had already spoken to
3  her on November 3 or before you had spoken to her on
4  November 3?
5     A  After I spoke to her.
6     Q  So the morning of November 3, Shelley
7  Dunbar was already made aware of this potential
8  Title IX violation involving Fatima Larios; correct?
9     A  Yes, I -- based on what I noted there,
10 yes.
11    Q  Okay.  Is there a reason why you, then,
12 also typed up this memo and sent it to Shelley
13 Dunbar after she had already been made aware of the
14 situation?
15    A  She -- she asked to have a document
16 that --
17    Q  Okay.
18    A  -- that we had had a conversation.
19    Q  And did you send this memo to Shelley
20 Dunbar in part because it was your understanding
21 that it was Shelley Dunbar's responsibility to
22 investigate and respond to this potential Title IX
23 violation?
24    A  That's correct.
25    Q  So as an athletic director, it wasn't

Page 31

1  your -- strike that.
2        As an athletic director at Chadron State
3  College, was it your responsibility to investigate
4  potential Title IX violations?
5     A  No.
6     Q  You never had any training on how to
7  investigate Title IX investigations; correct?
8     A  No.
9     Q  You didn't know what was required of you
10 in terms of an investigation into a Title IX
11 investigation?
12    A  No.
13    Q  Strike that.
14       The reason that you titled your attachment
15 to Shelley Dunbar on November 3, 2014, as Title IX
16 issue is because you believed based off of what you
17 had heard from Coach Stack that what was going on
18 with Fatima Larios involved a potential Title IX
19 violation; correct?
20    A  As -- in my role of reporting some -- when
21 there's information, I felt that I had to report
22 that information to him.  I don't -- I didn't
23 investigate to find out whether that was -- whether
24 it was a violation or not.
25    Q  Sure.  And that's not your role --

Page 32

1     A  No.
2     Q  -- as -- that's not your role as an
3  athletic director; correct?
4     A  That's correct.
5     Q  You're not responsible for determining
6  whether or not there was a Title IX violation or
7  there wasn't; right?
8     A  That's correct.
9     Q  And the reason that you titled the
10 attachment Title IX issue was because, from your
11 understanding, the issue involving Fatima Larios
12 involved dating violence or domestic violence;
13 right?
14       MR. JOHNSON:  Object to the form.
15    A  I'm not aware why I -- I did that.  I
16 think I probably just did it for simplicity knowing
17 it was going to Shelley, so -- and to keep it in my
18 filing system under it, so --
19    Q  How did you know that it was going to
20 be -- that -- strike that.
21       What types of offenses does Shelley -- is
22 Shelley Dunbar responsible for investigating as
23 Title IX Coordinator?
24       MR. JOHNSON:  Object, foundation.
25    A  You know, I don't -- I don't know.

DIRECT - SMITH (Gould)

Page 37

1  A  No.
2  Q  Was -- were you sending -- were you
3  sending an email to Shelley Dunbar because you
4  believed that Fatima Larios and Brandon Finona
5  needed counseling on their dating issues?
6      MR. JOHNSON: Object to form.
7  A  I did not have enough information to know
8  that one way or the other, so no.
9  Q  Did you -- when you spoke with Coach
10 Stack, did he say anything about the fact that he
11 believed or other players believed Fatima was
12 getting beaten by Brandon Finona?
13 A  No.
14     MR. JOHNSON: Object, foundation.
15 Q  Did Coach Stack ever tell you that he or
16 the other coaches or players believed that Fatima
17 Larios was being psychologically abused by Brandon
18 Finona?
19     MR. JOHNSON: Object, foundation.
20 A  No.
21 Q  So all you were made aware of was that
22 there was -- was that -- strike that.
23     Just so I'm clear here --
24 A  Uh-huh.
25 Q  -- the only thing you were made aware of

Page 38

1  by Coach Stack was, one, Fatima was acting
2  strangely, and two, she was wearing long-sleeved
3  shirts when she likely should not have been?
4      MR. JOHNSON: Object, foundation.
5  Q  Is that correct?
6  A  Yes.
7  Q  Okay. Did you ever ask Coach Stack what
8  he meant when he said she was acting strangely?
9  A  No.
10 Q  Okay. Were you not interested -- strike
11 that.
12     What did you under -- what did you believe
13 he meant when he said Fatima was acting strangely?
14 A  I -- I --
15     MR. JOHNSON: Foundation.
16 A  I wasn't aware. I -- as he brought the
17 information to me from Aryn, there was a -- there
18 was a tenor that there was a concern about what was
19 happening with Fatima. And when that happened, the
20 first thing that I thought of was to -- to give it
21 to the Title IX Coordinator so they can investigate
22 it.
23 Q  So on November 3, 2014, it became clear to
24 you that Coach Stack and Coach Aryn Grywusiewicz
25 were concerned for Fatima Larios and Fatima Larios'

Page 39

1  safety and well-being; correct?
2  A  No.
3      MR. JOHNSON: Object, form and foundation.
4  Please take a break and let me make my objections.
5      THE WITNESS: Sure.
6      MR. JOHNSON: Thanks. Go ahead.
7  A  I was not aware of that, that they -- that
8  they had made that decision.
9  Q  So you said that they took -- Coach Stack
10 took his concerns to you about -- or Coach Stack
11 approached you regarding his concerns about Fatima
12 Larios; right?
13 A  Uh-huh.
14     MR. JOHNSON: Object to the form of the
15 question.
16 A  Yes.
17 Q  Okay. What concerns are you specifically
18 referring to?
19     MR. JOHNSON: Object, foundation.
20 A  The -- the fact that she was acting
21 strangely and that she was covering herself and that
22 the kids were concerned about her.
23 Q  And you never asked the follow-up question
24 as to what specifically were the other players or
25 coaches concerned about?

Page 40

1  A  No.
2  Q  Okay. Was it because you -- you didn't
3  care at that point in time?
4  A  It had nothing to do with whether I cared
5  or not. It had everything to do that I felt like at
6  that time it was time to give that to the Title IX
7  Coordinator --
8  Q  Sure.
9  A  -- and let her investigate what was going
10 on so it's fair for both sides.
11 Q  So on November 3, 2014, did you ever ask
12 Rob Stack what -- what -- what he and Coach Aryn
13 Grywusiewicz believed Fatima was doing when she was
14 wearing long-sleeved shirts?
15 A  No.
16 Q  Did you ever ask -- did he ever mention to
17 you that they saw bruises unrelated to softball on
18 Fatima's body?
19 A  No.
20 Q  Okay. And on November 3, 2014, it's your
21 testimony that Rob Stack never mentioned to you that
22 he, the players on his team or other coaches
23 believed Fatima Larios was being beaten or struck by
24 another student-athlete on campus; correct?
25     MR. JOHNSON: Object, foundation.

10 (Pages 37 to 40)

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

Page 49

1  Q  And if they're not passing their classes,
2  who does she report that to?
3  A  Both me and to the -- actually, she
4  reports it to a compliance team of faculty members
5  that we have and then to the head coach.
6  Q  Okay. And if a student -- is there --
7  strike that.
8      What is the requisite GPA that a
9  student-athlete needs to be able to participate in
10 sports?
11 A  At that time it was 2.0 and they had to
12 pass a minimum of 6 credit hours.
13 Q  And if they don't get a 2.0, what happens?
14 A  Then they would be ineligible for the next
15 semester. In this case where the sport is in the
16 spring, then she would have lost her eligibility.
17 Q  And who has the conversation with the
18 student to explain to them that they can't
19 participate in athletics until their GPA goes up?
20 A  Usually the compliance person along with
21 the coach.
22 Q  Are you involved in that conversation?
23 A  No, not necessarily.
24 Q  Do you ever look into why a student's
25 grade may be falling?

Page 50

1  A  Yeah, we talk about it as a whole along
2  with our compliance team, and we don't have a ton of
3  those issues, but the issues that we have, we do
4  talk about.
5  Q  When you say "we talk about it," is there,
6  like, a committee of people that talk about why a
7  student's grades are falling?
8  A  We have a compliance team of people from
9  the registrar's office, the financial aid office,
10 faculty members, our faculty athletic rep, and
11 that's part of our dialogue -- ongoing dialogue is
12 to talk about challenges that kids have with
13 academics.
14 Q  And are you involved in those
15 conversations?
16 A  I am.
17 Q  Have you ever had a -- have you ever had
18 meetings where you were asking questions as to why a
19 student's grades were falling?
20 A  Only in the general sense is if there's a
21 concern about specific classes that they're taking
22 or majors that they're having, then I imagine we've
23 had a dialogue about that, but specifically to any
24 particular athlete, not with that committee, no.
25 Q  Did you ever -- do you ever ask

Page 51

1  questions -- strike that.
2      If you have a student -- student-athlete
3  who's -- isn't meeting the requisite GPA passing of
4  classes, does the committee ever look into whether
5  there's personnel problems that are affecting his
6  ability to focus or do work?
7  A  No. I would say that probably is the
8  coach -- coach might have some knowledge base about
9  that because they would be the first direct contact
10 point with a student-athlete.
11 Q  So do you expect coaches to be familiar
12 with students' personal lives if there's problems
13 that are affecting their ability to do work at
14 school?
15 A  Yeah, I think that their coaches have a
16 vested interest in making sure that their kids are
17 being successful in academics. So yeah, I think our
18 coaches would want to know what the academics are of
19 a student-athlete.
20     MR. JOHNSON: I need to take a break when
21 you get to a good point.
22 Q  I'm sorry, was the only conversation you
23 had in person with anybody about the Fatima Larios
24 potential Title IX violation in November 2014 the
25 conversation you had with Shelley Dunbar in person?

Page 52

1      MR. JOHNSON: Object, form, foundation.
2  A  Yes.
3  Q  Okay. Every other communication you had
4  was simply an email that you were cc'd on; right?
5  A  Uh-huh.
6  Q  Is that a yes?
7  A  Yes.
8  Q  You never spoke with Shelley Dunbar in
9  person after you had reported Coach Stack's concerns
10 on November 3, 2014; right?
11 A  I don't recall whether we did or not. We
12 may have, but I don't recall it.
13 Q  And then did you -- you never followed up
14 with Coach Stack or Assistant Coach Aryn
15 Grywusiewicz after November 3, 2014, to see how
16 Fatima Larios was doing; right?
17 A  I -- I had -- in my general meetings with
18 Rob, I had discussions about how she was doing,
19 especially after she responded that she didn't want
20 any help from Title IX, and I encouraged Rob to
21 continue to monitor her.
22 Q  Okay. After a conversation with Rob Stack
23 on November 3, 2014, did you know one way or the
24 other whether the players' concerns were that Fatima
25 Larios was raped?

13 (Pages 49 to 52)

Page 53

1  A  No.
2  Q  You didn't know -- so as far as you know,
3  she could have been raped, or she -- or she wasn't
4  raped?
5  A  I have no idea.
6     MR. JOHNSON:  Object, form of the
7  question, foundation.  You may answer.
8  Q  And you never asked any questions as to
9  whether the concerns involved a sexual assault or a
10 sexual rape; right?
11 A  I was unaware of any of that.
12 Q  And you never asked Rob Stack those
13 questions; correct?
14 A  No.
15 Q  Okay.  Did you ever ask Rob Stack whether
16 there was any problems going on with Fatima's family
17 such as a recent death in the family?
18 A  No.
19 Q  Did you ever ask Rob Stack whether he was
20 aware of any -- anything that was affecting Fatima
21 Larios' personal life that could be causing her to
22 act strangely?
23 A  No.
24 Q  Is it fair to say that Rob Stack's --
25 strike that.

Page 54

1     Is it fair to say when Rob Stack spoke to
2  you, he spoke in generalities?
3     MR. JOHNSON:  Object to the form of the
4  question and foundation.
5  A  I -- generalities, I'm not sure if I
6  understand the -- the concept that you're trying to
7  get to.
8  Q  Sure.  And I guess what I'm getting at is
9  it seems like there was -- you didn't -- when you
10 left that meeting with Rob Stack, you didn't -- you
11 didn't fully understand what the specific concerns
12 were or what the specific allegations were; right?
13 A  That's correct.
14 Q  Okay.  The only thing you really knew is
15 that the coaches had some sort of concern?
16 A  Concern.
17 Q  You didn't know whether it involved
18 academics, sexual abuse, or physical abuse; right?
19 A  No.
20 Q  You didn't know one way or the other?
21 A  No.  I think there was a -- in the
22 dialogue, there was a discussion about the boyfriend
23 because the boyfriend came up somehow, but I don't
24 know -- I think that was just that she was dating a
25 football player.

Page 55

1  Q  So as far as you knew after your meeting
2  with Rob Stack -- strike that.
3     Is it fair to say that all you knew after
4  your meeting with Rob Stack was simply that Fatima
5  Larios had a boyfriend; right?
6     MR. JOHNSON:  Object, form of the
7  question.
8  A  No.  I knew that there were concerns about
9  her behavior and -- and what she was covering
10 herself with and that a couple players had some
11 concerns about her.
12 Q  Okay.
13 A  I knew that.
14 Q  Specific to the boyfriend, when you heard
15 that Fatima Larios had a boyfriend, you didn't know
16 whether that boyfriend was having a positive or a
17 negative impact on Fatima's life; right?
18 A  No, I did not know.
19 Q  Okay.  Did you ever ask Rob Stack whether
20 the boyfriend was a student at Chadron State
21 College?
22 A  I don't recall.
23 Q  Did you ever --
24 A  I think -- I think they told me he was a
25 football player, so I made the assumption he was a

Page 56

1  student.
2  Q  And you didn't know whether there was
3  concerns that the football player boyfriend was
4  harming Fatima?
5  A  None.
6     MR. JOHNSON:  Okay.  We're going to take a
7  break.  I've got to go to the restroom.
8     (A short recess was taken.)
9  BY MR. GOULD:
10 Q  Mr. Smith, it's your testimony today that
11 after your meeting with Coach Stack on November 3,
12 2014, you didn't know whether Fatima Larios was
13 suspected of acting strangely because she had a
14 death in the family or because another student was
15 physically or psychologically abusing her; is that
16 right?
17 ==A  I didn't have any idea that that was==
18 ==happening except for that there was something about==
19 ==the boyfriend and the kids were concerned about her.==
20 ==Q  Okay.  But you didn't know whether it==
21 ==could -- whether it was something that happened in==
22 ==her family or whether it was from another student;==
23 ==right?==
24 ==A  I don't know.==
25 Q  And you never asked any questions to Rob

Page 57

1   Stack as to what he thought was going on with Fatima
2   Larios; correct?
3       A   No.
4       Q   Can you tell me why you didn't ask any
5   follow-up questions to Rob Stack?
6       A   I didn't think it was my duty to do that.
7   That's the Title IX Coordinator's job. Rob was also
8   giving me second-hand information. He didn't know
9   the initial information. It was coming from Aryn,
10  and so I felt like the best thing to do was get it
11  in the hands of the Title IX Coordinator so they get
12  the right information.
13      Q   And you -- at no point in time prior to
14  January 31, 2015, did you ever ask to interview any
15  of the students -- student-athletes that were
16  reporting their concerns about Fatima Larios; right?
17      A   No.
18      Q   And at no point in time did you personally
19  reach out to Aryn Grywusiewicz to find out what she
20  had known about potential problems or safety issues
21  or concerns they had with Fatima Larios; right?
22      A   Not that I recall.
23      Q   Did you ever reach out to anyone from the
24  dorms or from the -- the Housing Department --
25      A   No.

Page 58

1       Q   Prior to -- at any point in time did you
2   ever reach out to anyone from the dorms to find out
3   how Fatima was doing in the dorms?
4       A   No.
5       Q   You never reached out to any of Fatima's
6   or her boyfriend's RA's; right?
7       A   No.
8       Q   Never reached out to any of Fatima's --
9   her -- strike that.
10          Did you even know who her boyfriend was at
11  the time?
12      A   No. I mean, I knew the name because I had
13  written it down, so they told me his name, but I
14  didn't know him personally or her.
15      Q   Does the name Brandon Finona sound
16  familiar?
17      A   That's correct.
18      Q   Did you ever reach out to Brandon Finona
19  or Fatima Larios' RAs to find out how they were
20  doing in the dorms?
21      A   No.
22      Q   Did you know that the RAs filled out
23  something called observation notes at the beginning
24  of every semester?
25      A   Uh-huh.

Page 59

1       Q   You were aware of that?
2       A   I -- I didn't know that they did it on
3   that. I know they do that.
4       Q   Okay. What was your understanding as to
5   what -- as to why RAs were filling out observation
6   notes?
7       A   I have no idea.
8           MR. JOHNSON:   Object, foundation.
9       A   I have no idea that they did it. I was
10  not made privy that they did it about Larios and
11  Brandon.
12      Q   Were you ever made aware that they -- that
13  the RAs -- strike that.
14          But you were made aware that RAs do fill
15  out observation notes?
16      A   I know that they do in general, yes.
17      Q   How do you know that?
18      A   We just over the years have talked about
19  how they do their process.
20      Q   Did you ever -- did you ever know as to
21  why observation notes were being filled out by
22  Larios?
23      A   No.
24      Q   Did you --
25      A   I didn't know that they were.

Page 60

1       Q   I'm sorry, and I -- maybe there's a little
2   confusion here, but you said you were aware that RAs
3   do fill out observation notes?
4       A   Uh-huh.
5           THE REPORTER:   Yes?
6       Q   Is that a yes?
7       A   Yes.
8       Q   Okay. Were you -- were you aware that
9   they filled out observation notes on all the
10  students -- strike that -- the RAs fill out
11  observation notes on all the students on their
12  floors?
13      A   I'm not sure of how it's structured, but I
14  know they do it.
15      Q   Okay. So -- but you didn't know whether
16  or not the RAs actually filled out observation notes
17  for Fatima Larios or Brandon Finona; right?
18      A   I did not know they did -- I was not aware
19  that they had filled out any for either one of them.
20      Q   Did you assume that they did because --
21  because the RAs were filling out observation notes
22  on all the students in the dorms?
23      A   No.
24      Q   Did you ever ask -- did you ever tell
25  Coach Stack or Shelley Dunbar to reach out to any of

15 (Pages 57 to 60)

DIRECT - SMITH (Gould)

Page 61

1  the housing staff in the dorms to find out how
2  Fatima was doing in the dorms?
3    A  No.
4    Q  Did you ever reach out to Fatima
5  Larios' -- strike that.
6       Did you ever reach out to anybody in the
7  dorms to find out how -- strike that.
8       Did you ever reach out to anybody in the
9  dorms to find out whether Fatima Larios was having
10 any problems with other students?
11   A  No.
12   Q  Did you ever reach out to anybody in the
13 dorms to ask them to monitor Fatima Larios'
14 well-being?
15   A  No.
16   Q  Did you ever reach out to anyone in the
17 dorms to report back to you on Fatima's well-being
18 periodically?
19   A  No.
20   Q  Did you ever reach out to anyone in the
21 dorms to warn them that Fatima Larios was reported
22 to having potential Title IX -- strike that.
23      Did you ever reach out to anyone in the
24 dorms, whether it was a resident director, an AR, or
25 the housing director to warn them that there were

Page 62

1  reports that Fatima Larios was the victim of a
2  Title IX violation?
3    A  No, because I wasn't aware that she was a
4  victim of a Title IX violation.  I gave the
5  information to the Title IX Coordinator.
6    Q  Okay.  Well, but you gave the information
7  to the Title IX Coordinator because you suspected
8  that something happened with Fatima Larios that --
9  strike that.
10      You gave the information to the Title IX
11 Coordinator because you believed that whatever the
12 concerns were about Fatima Larios that there was a
13 suspected violation of Title IX; right?
14      MR. JOHNSON:  Object to form of the
15 question.  Go ahead.
16   A  Not necessarily.  I just knew that it was
17 an issue that she would have to review to see what
18 was going on.  I was aware that there was an issue
19 that needed to be reported under the mandatory
20 reporting requirement.
21   Q  But the Title IX Coordinator is only
22 responsible for investigating potential Title IX
23 violations; right?
24   A  Correct.
25   Q  Okay.  So if -- if there was an -- if

Page 63

1  there was an issue involving Fatima Larios that
2  didn't involve Title IX, is there any reason why you
3  would send the Title IX Coordinator an email about
4  those concerns?
5    A  No.  I would send the email to the
6  Title IX Coordinator if I was concerned about
7  something that I thought might -- she needs to
8  investigate.  That's what I did
9    Q  But you thought something that might
10 involve a Title IX violation; right?
11   A  It might, yeah.
12   Q  Okay.  Or do you just send Shelley Dunbar
13 emails to handle work that you don't want to do?
14   A  No.
15   Q  Okay.  So specific to potential Title IX
16 violations?
17   A  It doesn't have anything to do with work I
18 have to do.  It's not my responsibility to
19 investigate Title IX things.
20   Q  And I just want to be clear here.  You
21 thought that Fatima Larios may have been the victim
22 of a Title IX violation; correct?
23   A  I thought that there were -- there were
24 things that were -- that I needed to give to her to
25 look into.  I didn't make any value judgments nor

Page 64

1  did I ask any questions to know.
2    Q  Something that was said to you suggested
3  that you should send -- strike that.
4       Something that was said to you by Coach
5  Stack made you believe that it could be a Title IX
6  issue and there could be a Title IX violation; right?
7    A  Perhaps, yeah.
8    Q  Okay.  Or was it just something that
9  was -- that was information that was provided to you
10 and you didn't want to deal with it so you thought
11 Shelley Dunbar might want to handle it?
12   A  No, that's not true.
13   Q  Okay.
14   A  ==I thought that the -- there were issues==
15 ==about the way that she was behaving, that she was==
16 ==covering up her arms and that the kids had concerns==
17 ==about her.==
18   Q  Okay.
19   A  To me, that was -- those were things that
20 might do that.  And they mentioned the boyfriend, so
21 I think toward that point, that's where it needed to
22 be.
23   Q  And what I'm -- and when you left the
24 meeting with Coach Stack, did you have any opinion
25 as to whether Fatima Larios was wearing long-sleeved

16 (Pages 61 to 64)

DIRECT - SMITH (Gould)

Page 105

1  Q   As an athletic director, if you were made
2  aware that a -- one of your student-athletes was the
3  victim or potential victim of a criminal offense,
4  would you report that to the Chadron Police
5  Department or campus security?
6      A   Yeah, it would be --
7          MR. JOHNSON:  Object, foundation.
8      A   I would be obligated to if it was a
9  criminal offense.
10     Q   So if one of your student-athletes --
11 strike that.
12         If you suspected that one of your
13 student-athletes was the victim of a criminal
14 offense, you would have reported it to the Chadron
15 Police Department or campus security; correct?
16         MR. JOHNSON:  Object, foundation.
17     A   Yeah, I'm not aware of any of those
18 situations happening.
19     Q   But if -- if you are, I'm asking a
20 hypothetical here.  If you were aware -- strike
21 that.
22         As an athletic director, if you were made
23 aware that one of your student-athletes may have
24 been a victim of a criminal offense, crime in
25 Nebraska, would you have reported that to Chadron

Page 106

1  Police Department or campus security?
2          MR. JOHNSON:  Object, foundation.
3      A   Yes, I would have if I thought it was a
4  criminal offense.
5      Q   Do you know who Sherri Simons is?
6      A   I do.
7      Q   Who was Sherri Simons?
8      A   She's the Director of Housing.  She was
9  the Director of Housing.
10     Q   Okay.  Was Sherri Simons the Title IX
11 Director starting in January of 2015?
12     A   At some point she took over that role,
13 yes.
14     Q   Had you ever forwarded any -- strike that.
15         Have you ever reached out to Sherri Simons
16 about potential Title IX violations that you became
17 aware of?
18     A   No.
19     Q   Prior to January -- strike that.
20         How many -- on how many occasions have you
21 reached out to -- strike that.
22         You were the athletic director at Chadron
23 State College for how long?
24     A   In my fifth year now, so since 2013.
25     Q   Okay.  So in the five years that you were

Page 107

1  athletic director, have you ever reached out to a
2  Title IX Coordinator at the university regarding a
3  potential Title IX violation other than the Fatima
4  Larios case?
5      A   Yeah, we did it with the wrestling hazing.
6      Q   Was that the only other incident?
7      A   That I'm aware of, yes.
8      Q   Do you know who was in charge of
9  investigating that incident with the wrestlers?
10     A   Ted Tewahade who's our current Title IX
11 Coordinator.
12     Q   Did you have any role in the investigation
13 into Fatima's death?
14     A   No.
15     Q   Did you ever speak to Coach Stack, Aryn
16 Grywusiewicz, Shelley Dunbar, Sherri Simons, or Jon
17 Hansen about what you guys believed happened to
18 Fatima Larios?
19         MR. JOHNSON:  I'm going to object to the
20 form of the question.
21     A   Not that I recall.
22     Q   Do you recall speaking to anyone from the
23 Chadron -- strike that.
24         Do you recall speaking to any employees
25 from Chadron State College about what you believe

Page 108

1  happened to Fatima Larios?
2      A   Not that I --
3          MR. JOHNSON:  Object to the form.
4      A   Not that I recall.
5      Q   Prior to this deposition -- strike that.
6          I don't want to know what you spoke to
7  your lawyer about, but I want to know on how many
8  occasions have you met with your lawyers in
9  preparation for this deposition?
10         MR. JOHNSON:  I'm going to object to that
11 for purposes of preventing a waiver.  We've had this
12 discussion before.  I'll let the witness go ahead
13 and answer as long as there's an understanding that
14 I'm not waiving my objection on that basis.
15     A   We met yesterday.
16     Q   How long was that meeting for?
17     A   Two hours.
18     Q   And was that the only other time you've
19 met -- strike that.
20         Was that the only time you had met with
21 your counsel in preparation for this deposition?
22     A   Yeah, in preparation for this deposition.
23 I met with George when he was up on campus, but we
24 didn't really get -- we weren't at that point where
25 we were talking about depositions.

27 (Pages 105 to 108)

DIRECT - SMITH (Gould)

Page 109

1  Q   Were you ever made aware that the United
2  States Department of Education's civil rights --
3  strike that.
4      Were you ever made aware that the United
5  States' Department of Education Office of Civil
6  Rights was investigating Chadron State College for
7  alleged failures in Title IX obligations?
8  A   I was aware of that, yes.
9  Q   When did you become aware of that?
10 A   I don't recall when I was aware of that.
11 I know that we had to fill paperwork out for it.
12 Q   Who asked you to fill out paperwork?
13 A   I don't recall.
14 Q   Are student-athletes required to live in
15 the dorms their freshmen year?
16 A   Yes.
17 Q   And are transfer students also required to
18 live in the dorms their freshman year?
19 A   I don't know that answer.  I don't know if
20 it's qualified by them being freshmen or what, so I
21 don't know the answer to that.
22 Q   Had you ever spoken to Fatima Larios'
23 parents at any point in time?
24 A   I met her father and uncle when she passed
25 and -- at her memorial service that we had for them.

Page 110

1  Q   Okay.  Did you speak with them?
2  A   Just said hi and sorry for their loss.  I
3  should qualify that.  It wasn't the memorial service
4  that we had with the sit-down, it was a -- we did a
5  balloon thing out on the softball field, and they
6  were at that, and that's where I talked to them.
7  Q   Have you ever spoken to any of Fatima's
8  softball player teammates about Fatima Larios?
9  A   No.
10 Q   Do you know which dorm Fatima Larios was
11 living in in the fall of 2014 semester?
12 A   I'm assuming it was High Rise.
13 Q   And what makes you think it was High Rise?
14 A   That's where they found her, so --
15 Q   You never received -- strike that.
16     You've never obtained a Title IX
17 certification, have you?
18 A   I have not.
19 Q   And you never called campus security or
20 the Chadron Police Department regarding any concerns
21 reported to you about Fatima Larios; correct?
22 A   No.
23     MR. GOULD:  No further questions.
24     MR. JOHNSON:  I want to get you on the
25 road.  I have just a couple of questions.

Page 111

1         CROSS-EXAMINATION
2  BY MR. JOHNSON:
3  Q   Mr. Smith, do you have, as we sit here
4  today and without reference to any documents, a
5  detailed and specific recollection of your
6  conversation with Coach Stack on November 3 of 2014?
7  A   I do not.
8  Q   Is it possible that things were said in
9  that meeting that you have lost recall of?
10 A   Yes.
11 Q   If there is a conflict between
12 documentation with respect to that meeting and your
13 present recall of that meeting, would it be your
14 testimony that the documentation is likely more
15 accurate than your recall?
16 A   I would say the documentation is more
17 likely.
18     MR. JOHNSON:  That's all I have.
19     MR. GOULD:  That's all I've got for you.
20     MR. JOHNSON:  We'll read and sign.
21     (The deposition was concluded at
22 12:36 p.m.)
23
24
25

Page 112

1              J U R A T
2
3     I, JOEL SMITH, do hereby state under oath
4  that I have read the above and foregoing deposition
5  in its entirety and that the same is a full, true,
6  and correct transcription, with my noted corrections,
7  if any, of my testimony so given at said time and
8  place.
9
10
          _____
11          (Deponent's Signature)
12         _____
              (Date)
13
14
   STATE OF NEBRASKA   )
15                     ) ss.
   COUNTY OF DOUGLAS   )
16
17     Subscribed and sworn to before me on this
18  _____ day of _____, 2018.
19
20
21
22
          _____
           GENERAL NOTARY PUBLIC
23
24
25

28 (Pages 109 to 112)

## Page 113

```
 1              CERTIFICATE
 2    STATE OF NEBRASKA   )
                          ) ss.
 3    COUNTY OF DOUGLAS   )
 4         I, Rachel McMenamin, General Notary Public
 5    in and for the State of Nebraska, do hereby certify
 6    that JOEL SMITH was by me duly sworn to testify the
 7    truth, the whole truth and nothing but the truth, and
 8    that the deposition by him as above set forth was
 9    reduced to writing by me.
10         That the within and foregoing deposition
11    was taken by me at the time and place herein
12    specified and in accordance with the within
13    stipulations, the reading and signing of the witness
14    to his deposition having not been waived.
15         That I am not counsel, attorney or relative
16    of either party or otherwise interested in the event
17    of this suit.
18         IN TESTIMONY WHEREOF, I have placed my hand
19    and notarial seal this 8th day of January, 2018.
20
21         --------------------
              GENERAL NOTARY PUBLIC
22
      COST: $_____
23
24
25
```

## Page 114

```
 1         IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF NEBRASKA
 2
      LISSETTE LARIOS ROOHBAKHSH, as  )
 3    personal representative of the  )
      ESTATE OF FATIMA LISSETTE LARIOS )
 4    and on behalf of next of kin,   ) Case No.
           and                        )  8:17-cv-00031-
 5    NELSON LARIOS, as next of kin   )  JFB-CRZ
              Plaintiffs,             )
 6         v.                         )
      BOARD OF TRUSTEES OF THE NEBRASKA )
 7    STATE COLLEGES                  )
           and                        ) CERTIFICATE
 8    CHADRON STATE COLLEGE,          ) OF REPORTER
              Defendants.             )
 9    _____)
10
           I, Rachel McMenamin, General Notary Public,
11    do hereby certify that I served as the Court Reporter
      at the deposition of JOEL SMITH on December 21, 2017,
12    at 1500 Woodmen Tower, 1700 Farnam Street, Omaha,
      Nebraska, in which the costs of reporting and
13    transcribing the deposition were $_____, and that
      such costs are to be paid by counsel for the
14    plaintiffs.
           I further certify that the original and
15    copies were sent to:  Original and 1 copy to
      Mr. Martin D. Gould; 1 copy to Mr. Thomas Johnson.
16
           Dated this 8th day of January, 2018.
17         Delivered:  _____
18         _____
              GENERAL NOTARY PUBLIC
19            Rachel McMenamin
              Thibault, Suhr & Thibault, Inc.
20            6818 Grover Street
              Omaha, NE 68127
21            (402) 331-2500
22
23
24
25
```

## Page 115

```
 1                  January 8, 2018
 2    Mr. Thomas Johnson
      Attn:  JOEL SMITH
 3    1500 Woodmen Tower
      1700 Farnam Street
 4    Omaha, NE 68102
 5    Dear Mr. Smith:
 6    You will recall on December 21, 2017, I took your
      deposition at 1500 Woodmen Tower, 1700 Farnam Street,
 7    Omaha, Nebraska dealing with the case of LISSETTE
      LARIOS ROOHBAKHSH, as personal representative of the
 8    ESTATE OF FATIMA LISSETTE LARIOS and on behalf of
      next of kin, Plaintiffs v. Board of Trustees of the
 9    Nebraska State Colleges and Chadron State College,
      Defendants.  Your signature on the deposition was not
10    waived.
11    The minuscript of the transcript, which is an exact
      duplicate of the original, is ready for your review.
12    I would appreciate it if you would read it, then sign
      the errata sheet and jurat page and return back to me
13    in the enclosed envelope as soon as possible.  You
      may keep the minuscript.  Local practice allows a
14    witness 30 days in which to read and sign the
      original and return same to the reporter.
15
      As you read the minuscript, please note any
16    corrections you might have on the correction sheet
      enclosed with the minuscript giving the page number,
17    line number, and the reason for the correction to be
      made as so indicated on the sheet.
18
      After reading and noting any corrections on the
19    sheet, please sign the jurat page and also the
      correction page.  Please sign both pages in front of
20    a Notary Public and then have the Notary sign on the
      proper line.
21
      Thank you for your cooperation in this matter.
22
                     Yours truly,
23
24                   Rachel McMenamin
      cc:  Mr. Antonio M. Romanucci
25       Mr. Thomas Johnson
```

## Page 116

```
 1    DEPOSITION CORRECTIONS OF JOEL SMITH
 2    CASE:  LARIOS v. BOARD OF TRUSTEES OF THE NEBRASKA
                STATE COLLEGES, ET AL.
 3         Case No. 8:17-cv-00031-JFB-CRZ
 4    PAGE  LINE                    REASON FOR
      NO.   NO.     CORRECTION      CORRECTION
 5
 6    ____ _____*_____*_____
 7    ____ _____*_____*_____
 8    ____ _____*_____*_____
 9    ____ _____*_____*_____
10    ____ _____*_____*_____
11    ____ _____*_____*_____
12    ____ _____*_____*_____
13    ____ _____*_____*_____
14    ____ _____*_____*_____
15    ____ _____*_____*_____
16    ____ _____*_____*_____
17    ____ _____*_____*_____
18
19              _____
                SIGNATURE OF WITNESS
20    STATE OF NEBRASKA)
                       ) ss
21    COUNTY OF DOUGLAS)
22         Subscribed and sworn to before me this
           _____ day of _____, 2017.
23
24              _____
                GENERAL NOTARY PUBLIC
25
```

116

```
 1  DEPOSITION CORRECTIONS OF JOEL SMITH
 2  CASE:   LARIOS v. BOARD OF TRUSTEES OF THE NEBRASKA
                    STATE COLLEGES, ET AL.
 3          Case No. 8:17-cv-00031-JFB-CRZ

 4  PAGE   LINE                              REASON FOR
    NO.    NO.        CORRECTION             CORRECTION
 5
 6   67 *   1  *  I did Not       *  That is what I said
 7  ___ *  ___ * _____  * _____
 8  ___ *  ___ * _____  * _____
 9  ___ *  ___ * _____  * _____
10  ___ *  ___ * _____  * _____
11  ___ *  ___ * _____  * _____
12  ___ *  ___ * _____  * _____
13  ___ *  ___ * _____  * _____
14  ___ *  ___ * _____  * _____
15  ___ *  ___ * _____  * _____
16  ___ *  ___ * _____  * _____
17  ___ *  ___ * _____  * _____
18
19                                _____
                                  SIGNATURE OF WITNESS
20  STATE OF NEBRASKA)
                     ) ss
21  COUNTY OF DOUGLAS)

                State of Nebraska -- General Notary
                         KRISTOL CUMMINGS
                         My Commission Expires
                           January 11, 2022

22            Subscribed and sworn to before me this
    26 day of January , 2018.
23
24              _____
                     GENERAL NOTARY PUBLIC
25
```

THIBAULT, SUHR & THIBAULT, INC.
Omaha, Nebraska (402) 331-2500

```
1                        J U R A T
2
3          I, JOEL SMITH, do hereby state under oath
4   that I have read the above and foregoing deposition
5   in its entirety and that the same is a full, true,
6   and correct transcription, with my noted corrections,
7   if any, of my testimony so given at said time and
8   place.
9
10                  _____
11                       (Deponent's Signature)
12                       January 26, 2018
                              (Date)
13
14
    STATE OF NEBRASKA    )
15                       )  ss.
    COUNTY OF DOUGLAS    )
16
17         Subscribed and sworn to before me on this
18   26 day of January, 2018.
19
                          State of Nebraska -- General Notary
20                              KRISTOL CUMMINGS
                                My Commission Expires
21                                January 11, 2022
22                       _____
                             GENERAL NOTARY PUBLIC
23
24
25
```