Atkinson-Baker, Inc.
www.depo.com

```
 1           IN THE UNITED STATES DISTRICT COURT FOR
                   THE DISTRICT OF NEBRASKA
 2

 3   LISSETTE LARIOS ROOHBAKHSH, as  )No. 8:17-cv-00031
     personal representative of the  )
 4   ESTATE OF FATIMA LISSETTE LARIOS)
     and on behalf of next of kin,   )
 5                                   )
              and                    )
 6                                   )
     NELSON LARIOS, as next of kin,  )
 7                                   )
              Plaintiff,             )
 8   vs.                             )
                                     )
 9   BOARD OF TRUSTEES OF NEBRASKA   )
     STATE COLLEGES,                 )
10                                   )
              and                    )
11                                   )
     CHADRON STATE COLLEGE,          )
12                                   )
              Defendants.            )
13

14       VIDEOTAPED DEPOSITION OF STEPHANIE PARIS

15                Oro Valley, Arizona

16                November 20, 2018

17

18

19

20

21   ATKINSON-BAKER, INC.
     (800) 288-3376
22   www.depo.com

23   REPORTED BY:  NANCY P. RICHMOND, RPR,
                   CSR NO. 50864
24   FILE NO.:     AC0AFB8

25
```

Page 1

**EXHIBIT 57**

Atkinson-Baker, Inc.
www.depo.com

## Page 2

```
       A P P E A R A N C E S

FOR PLAINTIFF:
ROMANUCCI & BLANDIN, LLC
BY:  MARTIN GOULD, ESQ.  (Telephonically)
33 North LaSalle Street
20th Floor
Chicago, Illinois  60602
(312) 458-1000
mgould@rblaw.net
FOR DEFENDANTS:
JOHNSON & TABOR
BY:  THOMAS E. JOHNSON, ESQ.  (Telephonically)
11932 Arbor Street
Suite 101
Omaha, Nebraska  68144
tjohnson@johnsontabor.com
(402) 506-4444

ALSO PRESENT:
   Kim Brown, paralegal, Baird Holm LLP
      (Telephonically)
   Nicholas Watts, videographer
```

## Page 3

```
              I N D E X

WITNESS: STEPHANIE PARIS

EXAMINATION                       PAGE
   By Mr. Johnson                    5
   By Mr. Gould                     48


          E X H I B I T S
NUMBER          DESCRIPTION        PAGE

Exhibit 1  Affidavit of Stephanie Paris    19
Exhibit 2  Plaintiff's Fourth Supplemental 20
           Rule 26(a) Disclosures
Exhibit 3  Bates numbers 3553-3554 email   34
           string
Exhibit 4  Bates numbers 3355-3556 email   35
           string
```

## Page 4

ORO VALLEY, AZ:  Tuesday, November 20, 2018; 8:18 a.m.

THE VIDEOGRAPHER:  I am Nicholas Watts, your videographer, and I represent Atkinson Baker, Incorporated, in Glendale, California.  I am not financially interested in this action, nor am I a relative or employee of any attorney or the parties.

The date is November 20th, 2018.  The time is 8:18 a.m.  This deposition being taken place at the Holiday Inn Express, 11075 North Oracle Road, Oro Valley, Arizona 85737.  This is case number 8:17-cv-00031, entitled Larios versus Chadron State College.  The deponent is Stephanie Paris.  This deposition is being taken on behalf of the defendants.  Your court reporter is Nancy Richmond from Atkinson Baker, Incorporated.

Counsel, will you now please introduce yourselves?  Counsel, will you --

MR. GOULD:  Martin Gould on behalf of plaintiff.

MR. JOHNSON:  Thomas E. Johnson of Johnson & Tabor as co-counsel with Baird Holm, LLP, on behalf of defendant, Nebraska State College

## Page 5

System.

And may I ask, there is a lot of wind noise in that read in.  Is there a fan running there?

THE COURT REPORTER:  No, there isn't.

THE VIDEOGRAPHER:  I believe that might be noise on the line, the telephone line itself.  I'm hearing everything clearly.

MR. JOHNSON:  Okay.  All right, thank you.

THE VIDEOGRAPHER:  Court reporter, will you now swear in the witness?

STEPHANIE PARIS,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION
BY MR. JOHNSON:

Q.  Good morning.  Thank you for coming down for the deposition.

A.  No problem.  Thank you.

Q.  We may have a little bit of a time lag here, so it would be helpful for a variety of reasons if you will allow me to finish the questions

Atkinson-Baker, Inc.
www.depo.com

**Page 26**

1   A. No.
2   Q. Okay. The next line, next sentence,
3   "These witnesses are expected to have information
4   regarding decedent's death." What do you know about
5   the nature and circumstance of Fatima's death?
6   A. The only thing that I know is what I heard
7   after everything occurred, was, I guess, some of her
8   teammates at Chadron noticed some markings on her
9   and reported it to the head coach and that
10  transpired into her hanging herself in the dorm and
11  committing suicide. I don't know how long in
12  between that, but that's kind of where it started,
13  and that's what I know.
14  Q. Similar to the question I asked you
15  earlier, what is your basis for that knowledge and
16  belief? What is that based upon?
17  A. Just my conversation with Rob Stack after
18  the incident had occurred.
19  Q. Any other conversations that you've had
20  with anybody about those topics?
21  A. No.
22  Q. Goes on to say that, "These witnesses will
23  have knowledge regarding Fatima's past physical
24  condition." What specific knowledge do you have
25  about Fatima's physical condition?

**Page 27**

1   A. The only knowledge I have is physically
2   she -- and mentally she was in a good position at
3   Austin Peay. I mean, like I said previously, we
4   never had any issues with her, you know, mentally
5   or, you know, breaking down or having social issues.
6   I mean, everyone loved Fatima. She physically was
7   in great condition. She took care of herself. She
8   was always in the top of anything physically we were
9   doing, as far as conditioning or anything like that.
10  Q. Did she suffer any injuries to your
11  knowledge while she was at Austin Peay?
12  A. I don't recall that.
13  Q. Going on then on page thirty-one of
14  Exhibit 2, "These witnesses will have knowledge
15  regarding Fatima's and Brandon's personality." Do
16  you have any knowledge regarding Brandon's
17  personality?
18  A. I have no knowledge of anything to do with
19  Brandon.
20  Q. Going on, "social life and habits." Do
21  you have any knowledge with respect to the social
22  life and habits of either Fatima Larios or Brandon
23  Finona-Gardner?
24  A. I can only speak on Fatima. Fatima -- you
25  know, I mean, the players, you know, would do things

**Page 28**

1   socially, you know, like -- like most college kids.
2   Most of the time the coaches aren't there for every
3   single thing that they're doing and going out and
4   doing. But Fatima always, you know, made -- made --
5   you know, was on time to everything, never was late
6   to anything, never was an issue at practice. So
7   whatever she did socially, it did not affect her
8   academically, nor her physically on the field.
9   Q. All right. What information do you have
10  about Fatima's work life?
11  A. Her work life?
12  Q. Yeah, that's what it says here,
13  "decedent's work life" -- "work and life
14  activities." So, I guess, what do you know about
15  her work activities?
16  A. Well, I can speak on her work ethic,
17  maybe. I mean, she wasn't working when she was at
18  Austin Peay, but, you know, as far as her work
19  ethic, I mean, she was -- she worked hard. She
20  was -- she was the kid you wanted twenty of. I
21  mean, that's really all I can say. She did
22  everything right and came to practice with the right
23  approach every day.
24  Q. Okay. Now I want to go back to your
25  affidavit, if we could, please --

**Page 29**

1   A. Okay.
2   Q. -- Exhibit Number 1. Let me just see if
3   there's anything additionally I need to ask you
4   about this. Do you happen to know how many division
5   one softball programs are in Tennessee?
6   A. If you give me a second, I can probably --
7   I'd say close to ten.
8   Q. When you were recruiting Fatima, did you
9   also happen to recruit a young lady by the name of
10  Annie Aldrete?
11  A. No, I don't recall that name.
12  Q. Did you recruit anybody else from the
13  Monterey area while you were recruiting Fatima?
14  A. No. She was actually one of the few kids
15  that I only had from that area of California. Most
16  of ours were southern Cal.
17  ==Q. During the recruiting process, did Fatima==
18  ==indicate to you any particular reason why she might==
19  ==be interested in Austin Peay as opposed to any other==
20  ==division one school?==
21  ==A. I think Fatima had been overlooked, and we==
22  ==found her late. And when I say late, I mean, most==
23  ==of -- most of the athletes are usually committed by==
24  ==their sophomore or junior year, and so she wasn't==
25  ==committed. So I think she was just excited for the==

8 (Pages 26 to 29)

Stephanie Paris
November 20, 2018

Atkinson-Baker, Inc.
www.depo.com

## Page 30

1  opportunity to play division one and was willing  08:53:40
2  to -- to go wherever to make that happen.  08:53:45
3     Q.  When did you actually sign her to a letter
4  of intent?
5     A.  We would have signed her the fall of 2013.
6  No, wait.  I'm sorry.  2012, 'cause she came in
7  2013.
8     Q.  So you signed her during her senior year
9  of high school?
10    A.  Yeah.
11    Q.  And that's late for softball players?
12    A.  Very.
13    Q.  Do you know if she had any other one
14 division offers, any other division one offers?
15    A.  I don't recall that.
16    Q.  Do you know if she had any other
17 scholarship offers, period?
18         MR. GOULD:  I'm going to object to
19 foundation, speculation.
20         MR. JOHNSON:  That's why I asked her
21 if she knows, Marty.
22    Q.  Do you know?
23    A.  I do not recall that.
24    Q.  Okay.  I assume that softball, varsity
25 softball, was a spring sport at Austin Peay

## Page 31

1  University?
2     A.  Correct.
3     Q.  Correct?
4     A.  Yes.
5     Q.  So what did you consider to be the season
6  for softball?  When did it begin and when did it end
7  normally?
8     A.  The season will begin in February, the
9  first weekend in February, and depending on how well
10 you do the end of the year, the conference
11 tournament is usually the first week -- first
12 weekend or second weekend in May, and then it --
13    Q.  And that's followed by the Women's College
14 World Series?
15    A.  Right.  Yeah, so it could go further into
16 June.
17    Q.  Okay.  Is there fall ball at Austin Peay?
18    A.  There is -- you're allowed -- NCAA allows
19 you eight games to play.  Usually those games are
20 played against, you know, just local junior college
21 teams or division two teams that you can get to come
22 in.  So you're allowed eight games.
23    Q.  All right.  So Fatima arrived on campus, I
24 assume, then in about August of 2013, correct?
25    A.  Correct.

## Page 32

1     Q.  And did she participate in fall softball?
2     A.  Yes.
3     Q.  Do you recall how she performed during the
4  fall ball?
5     A.  I do not recall specifically, but, you
6  know, obviously good enough to where she was
7  starting in the spring.  So she did well.
8     Q.  Would you consider her to be primarily a
9  defensive player as opposed to an offensive player?
10    A.  Yes.  A defensive player.
11    Q.  All right.  Now, am I correct, ma'am,
12 that -- okay.  I assume that Fatima, like the other
13 students, would have left to go home for the
14 Christmas break; is that correct?
15    A.  Yes.
16    Q.  And then when they come back, I assume
17 practice starts right away?
18    A.  In January, yes.
19    Q.  And you're practicing hard, leading up to
20 the February start of season, correct?
21    A.  Correct.
22    Q.  Do you know whether Fatima's family ever
23 visited her when she was at Austin Peay, her parents
24 or her siblings?
25    A.  I don't recall that, but I -- I can't

## Page 33

1  speak for 100 percent on that.
2     Q.  Do you recall whether you had contact with
3  her parents during the recruiting process?
4     A.  Yeah, we had -- we had contact.
5     Q.  In-home visit?
6     A.  Not an in-home visit, no.
7     Q.  Where did you have contact with her
8  parents?
9     A.  We spoke at the tournament, and then once
10 they came out on a visit.  I believe it was Nelson
11 and her that came out on -- actually, I think it was
12 her mom, too.  They came out to check the school out
13 and tour campus, and, you know, we made an offer
14 that weekend.  So they came out and made the trip.
15    Q.  And when you made the offer that weekend,
16 did she sign right then and there?
17    A.  No, he -- no.
18    Q.  How -- how long after you made the offer
19 did she take it?
20    A.  Well, she verbally committed, and then you
21 can't legally sign her until the signing period in
22 November.  So she came out in the summer, and I
23 don't really recall how soon she verbally committed.
24 But we did not sign her until the signing period in
25 November.

Stephanie Paris
November 20, 2018

Atkinson-Baker, Inc.
www.depo.com

### Page 38

1  that's the case now." Is that a reference to what
2  you thought when she first approached you back in
3  January?
4     A.  Right.  I was thinking, you know, if she's
5  homesick and really feels like she needs to go home,
6  it's because she just left them over Christmas
7  break, and sometimes that happens a lot.  When kids
8  go home and then they have to go back to school,
9  they really start missing their family when they go
10 back at school.  So I thought once we kind of got in
11 the groove of practice and games and she was playing
12 and she got in the groove of things that, you know,
13 she may change her mind because she was, you know,
14 in the experience of being a college softball
15 player.
16    Q.  Okay.  Then at the top of the page, is
17 that a response from Tara Pfeifler by email to you,
18 also dated February 27th?
19    A.  Yes.
20    Q.  And Tara writes, "She came to see me as
21 well," in the first sentence, and then in the bottom
22 paragraph of her response she says, "You may want to
23 discuss this with Cheryl."  Who is Cheryl?
24    A.  Cheryl was our senior women's
25 administrator.  She was who I reported to.  So she

### Page 39

1  was my athletic director that I reported to.
2     Q.  Do you recall whether you had any oral
3  conversations with Tara Pfeifler about this
4  situation?
5     A.  I don't recall that.
6     Q.  Do you recall whether you had any oral
7  communications with Cheryl Holt about it?
8     A.  I don't recall, but I'm -- I'm certain
9  that I did because you just have to report, you
10 know, this type of stuff.  When kids are trying to
11 transfer or leave, I mean, you have to report it.
12 So I'm sure that I had some sort of conversation
13 with -- with Cheryl Holt.
14    Q.  Take a look at, if you would, please, at
15 Exhibit Number 3, which is an email from you to
16 Cheryl Holt, dated March 1 of 2014, which is a day
17 or two after your email exchange with Tara Pfeifler.
18    A.  Okay.
19    Q.  All right.  You've had a chance to read
20 that?  Is that, in fact, an email that you sent to
21 your athletic director on March 1 --
22    A.  Yes.
23    Q.  -- 2014?
24    A.  Yes.
25    Q.  And does that refresh your recollection

### Page 40

1  that you and Fatima had a meeting that day, March 1,
2  2014?
3     A.  Yes.
4     Q.  And can you tell me, to the best of your
5  recollection, what was communicated in that meeting
6  between you and Fatima Larios on March 1 of 2014?
7     A.  Well, it sounds like, you know, she -- we
8  wanted to just double check before we, you know,
9  released her and just make sure that we weren't
10 making any quick decisions on just trying to
11 transfer her out of here and that she was truly
12 clear on what was about to happen, as far as being
13 released to contact other schools, and, you know,
14 just making sure that that's really what she
15 ultimately wanted to do.
16    Q.  Did she tell you that -- did she confirm
17 for you at that time that that is what she wanted to
18 do?
19    A.  Yeah.  I mean, it's in the email, so yes.
20    Q.  Did she ask for permission to contact
21 other schools?
22    A.  I believe so, yes.
23    Q.  To the best of your knowledge and
24 recollection, was it her intent that she would
25 continue to be a team member for the rest of that

### Page 41

1  year?
2     A.  I think -- I think that was her intention,
3  but I think once we went through the scenario of how
4  that would look, as far as, you know, perception
5  from her teammates and, you know, with her being on
6  the team and, like I said in the email, taking away
7  reps from other, you know, teammates that were truly
8  committed to being on the team and becoming better
9  at Austin Peay, she understood that.  She didn't,
10 you know, balk at anything that we told her as far
11 as, you know, how that would look in, you know,
12 wearing an Austin Peay uniform but contacting other
13 schools.
14            And I would say that's pretty standard
15 procedure.  You know, when you have a kid come in
16 that wants to leave in the middle of the season or
17 at the beginning of the season, usually they're not
18 allowed to stay on the team and practicing and --
19 and doing everything as usual.
20    Q.  So did you advise Fatima at that meeting
21 that she would -- that you would grant her the
22 release, permit her to contact other schools, but
23 that she would no longer be a member of your team?
24    A.  Correct.
25    Q.  So would that mark the last day that she

11 (Pages 38 to 41)

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1  version, a ptx file would be preferable, and then | 09:46:47 |
| 2  the original, as well, with the exhibits. | 09:46:52 |
| 3          THE COURT REPORTER: Okay. And you | 09:46:58 |
| 4  need this tomorrow? | 09:46:58 |
| 5          MR. JOHNSON: Actually, Friday is | 09:47:02 |
| 6  soon enough. Tomorrow would be great; Friday is | 09:47:04 |
| 7  acceptable. And all we really need is a draft. | 09:47:08 |
| 8          THE COURT REPORTER: And, Mr. Gould? | 09:47:36 |
| 9          MR. GOULD: I also -- I'd like an | 09:47:37 |
| 10 electronic version, e-mailed with the exhibits. I | 09:47:40 |
| 11 don't want a hard copy, though. You don't have to | 09:47:43 |
| 12 mail anything. | 09:47:47 |
| 13         (The deposition concluded at 9:48 a.m.) | |
| 14              ---------------------- | |

REPORTER'S CERTIFICATE

I, NANCY P. RICHMOND, Certified Shorthand Reporter, certify:

   That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;
   That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;
   That the foregoing is a true and correct transcript of my shorthand notes so taken.
   I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.
   I declare under penalty of perjury under the laws of Arizona that the foregoing is true and correct.
   Dated this 20th day of November, 2018.

   _____
   NANCY P. RICHMOND, CSR No. 50864

Page 62

STATE OF ARIZONA  )
COUNTY OF PIMA    )

        I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.
        EXECUTED this ____ day of _____, 2018, at Tucson, Arizona.


                _____
                    STEPHANIE PARIS

Page 63

17 (Pages 62 to 64)

```
 1                REPORTER'S CERTIFICATE
 2

 3   I, NANCY P. RICHMOND, Certified Shorthand Reporter,
 4   certify:
 5
 6        That the foregoing proceedings were taken
 7   before me at the time and place therein set forth,
 8   at which time the witness was put under oath by me;
 9        That the testimony of the witness, the
10   questions propounded, and all objections and
11   statements made at the time of the examination were
12   recorded stenographically by me and were thereafter
13   transcribed;
14        That the foregoing is a true and correct
15   transcript of my shorthand notes so taken.
16        I further certify that I am not a relative or
17   employee of any attorney of the parties, nor
18   financially interested in the action.
19        I declare under penalty of perjury under the
20   laws of Arizona that the foregoing is true and
21   correct.
22        Dated this 20th day of November, 2018.
23
24               [signature]
                 NANCY P. RICHMOND, CSR No. 50864
25   Signature was requested.
```