1          IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF NEBRASKA
2               Case No. 8:17-cv-00031

3

4    LISSETTE LARIOS ROOHBAKHSH, as
     Personal representative of the ESTATE OF
5    FATIMA LISSETTE LARIOS and on behalf of
     Next of kin, and NELSON LARIOS, as next of kin,
6
                  Plaintiffs,
7    v.

8    BOARD OF TRUSTEES OF THE NEBRASKA
     STATE COLLEGES and CHADRON STATE
9    COLLEGE,

10                Defendants.
     _____/
11

12

13              DEPOSITION OF PETER LAKE

14

15              Friday, December 14, 2018
                10:24 a.m. to 5:40 p.m.
16                Pages 1 to 308

17

18

19                U.S. Legal Support
              1800 2nd Street, Suite 875
20               Sarasota, FL 34236

21

22

23    ------------------------------------------
                    REPORTED BY:
24         TERRI L. FERREIRA, COURT REPORTER

25

**EXHIBIT**

tabbies®   3



Peter Lake 12/14/2018

1    document that's at the end of Exhibit 1, the three-page

2    document, reflects a $20,000 nonrefundable retainer.

3        Q.    And do you know if you have exhausted that

4    retainer?

5        A.    I do not believe that we have.

6        Q.    Do you know how much you've billed to date?

7        A.    Again, I'm not the one that does billing or

8    invoicing and my understanding of what occurs is that we

9    enter into a consulting arrangement of this type for

10   expert services and the retainer is transmitted and at

11   some point, Jennifer and others communicate about

12   invoices or billing or other financial matters.  It's

13   not really what I do.

14       Q.    And there's no other outstanding bills that

15   you're aware or invoices that you're aware of; correct?

16       A.    No.

17       Q.    Did you read any depositions in this case?

18       A.    No.

19       Q.    You didn't read one deposition?

20       A.    No, did not.

21       Q.    You didn't read Shelley Dunbar's deposition?

22       A.    I did not.

23       Q.    You didn't read Sherry Simons' deposition?

24       A.    As such, no.  The only information I reviewed

25   is what is exactly in the index of documents.



Peter Lake 12/14/2018

1    Q.   Let me ask you this:  During the 2014, 2015

2   school year, do you know whether or not Chadron State

3   College had a Title IX coordinator, someone with that

4   job responsibility?

5    A.   It was would appear to me that someone at

6   Chadron State from the materials I reviewed was tasked

7   with Title IX response tasks.

8    Q.   But you don't know whether or not they had

9   someone who specifically was designated as a Title IX

10   coordinator; correct?

11    A.   I have not reviewed an organizational chart

12   and I do not know if the title Title IX coordinator was

13   a job or a principal job or associated with a compliance

14   job.

15    Q.   And can you tell us what is a Title IX

16   coordinator?

17    A.   The term "Title IX coordinator" is a term that

18   the Department of Education uses to colloquially

19   describe the part 106 compliance officer, pursuant to

20   regulations under Title IX.  It's a term that they use

21   to describe the individual who has compliance

22   responsibilities and over the years that descriptor has

23   been connected with a variety of iterations from the

24   Department of Education about who those individuals are

25   and what responsibilities the Department of Education



1      Q.   So without looking at, without looking at your

2   report, do you know one way or the other the nature of

3   the complaints made to Chadron State College

4   administrators, coaches or employees about any sort of

5   physical or emotional abuse perpetrated against Fatima?

6           MS. JOYCE:  Objection, form.

7           THE WITNESS:  I wouldn't attempt to make a

8      recollection of that type without refreshing my

9      recollection.

10  BY MR. GOULD:

11     Q.   Okay.  And you don't know when those reports

12  were made during that school year, do you?

13          MS. JOYCE:  Objection, form.

14          THE WITNESS:  I have knowledge of some of

15     those, but again, I'd have to refresh my recollection

16     to do it.

17  BY MR. GOULD:

18     Q.   Sitting here right now, you don't know when

19  those reports were made?

20          MS. JOYCE:  Objection, form.

21          THE WITNESS:  If I refresh my recollection, I

22     would be able to identify the sequence of statements

23     that were made to various Chadron employees.

24  BY MR. GOULD:

25     Q.   Do you know the nature of the complaints made



Peter Lake 12/14/2018

1    to the Chadron employees?

2                 MS. JOYCE:  Objection, form.

3                 THE WITNESS:  I'm not sure what the word

4        "nature" means.

5    BY MR. GOULD:

6        Q.   What was specifically told to them about what

7    was going on with Fatima Larios?

8        A.   Well, I mean, I think the documents speak for

9    themselves, but if you're asking me to reproduce the

10   documents from eidetic memory, I'm not able to do that

11   without recollection.

12       Q.   I just want to know today you're giving

13   opinions on whether or not the university complied with

14   its responsibilities or whether or not it adequately

15   investigated these allegations and I want to know, do

16   you even know what the allegations were?

17                MS. JOYCE:  Objection, form.

18                THE WITNESS:  At the time I produced my

19       report, I reviewed all of the documents and did know

20       at that time, and again, I'm capable of refreshing my

21       recollection by looking back.  We want to be very

22       specific about who said what to whom at what time.

23   BY MR. GOULD:

24       Q.   Well, I want to know generally sitting here

25   right now, do you know what the allegations were in



Peter Lake 12/14/2018

1    regards to the type of suspected abuse or abuse that was

2    perpetuated against Fatima Larios when she was at

3    Chadron State College?

4            MS. JOYCE:  Objection, form.  He's already

5        told you that he needs to look at the documents to

6        refresh his recollection as to the specifics.  So if

7        you want to ask him about the specifics, allow him to

8        refresh his recollection.

9            MR. GOULD:  Please, no speaking objections.

10   BY MR. GOULD:

11       Q.   I'm asking you generally, do you know what the

12   allegations were regarding the type of physical or

13   emotional abuse perpetrated against Fatima Larios when

14   she was at Chadron State College?

15           MS. JOYCE:  Objection, form.

16           THE WITNESS:  I'm not aware of any

17       allegations, per se.

18   BY MR. GOULD:

19       Q.   Okay.  Can you tell me -- tell me a little bit

20   about what you believe happened to Fatima -- strike

21   that.

22           Do you know what the basis of this complaint

23   is?  Strike that.

24           Do you know, what are the allegations made in

25   plaintiffs' complaint in this case?

 1  BY MR. GOULD:

 2      Q.   I didn't hear a last name that was stated.

 3           MS. JOYCE:  Again, you don't have to answer

 4      that.

 5           Move on.  He's answered.

 6  BY MR. GOULD:

 7      Q.   You told me that the case involves arguments;

 8  correct?

 9           MS. JOYCE:  Objection, form.

10           THE WITNESS:  I saw evidence in the documents

11      I reviewed that individuals perceived that there were

12      arguments that had occurred.

13  BY MR. GOULD:

14      Q.   Do you know what the nature of those arguments

15  were?

16      A.   No, I do not.

17           MS. JOYCE:  Objection, foundation.

18  BY MR. GOULD:

19      Q.   Do you know whether there was any threats of

20  physical violence made from one individual to another?

21           MS. JOYCE:  Objection, form and foundation.

22           THE WITNESS:  I am unaware of any specific

23      threats of violence.

24  BY MR. GOULD:

25      Q.   Are you aware of any allegations that Fatima

Peter Lake 12/14/2018

1    or Brandon physically harmed the other?

2              MS. JOYCE:  Objection, form and foundation.

3       Whose allegations?

4              MR. GOULD:  If the witness doesn't understand

5       the question, he can let me know; otherwise, you

6       know, he can answer the question.  This is not your

7       deposition, it's the witness's deposition.

8              MS. JOYCE:  Just giving you the opportunity to

9       clarify.

10             THE WITNESS:  I have trouble with the word

11      "allegations."  I mean, technically the answer's no

12      to your question.

13   BY MR. GOULD:

14       Q.   Do you know whether or not there was any

15   reports regarding physical violence between Fatima and

16   Brandon while they were at the Chadron State College?

17             MS. JOYCE:  Objection, form and foundation.

18             THE WITNESS:  I have trouble with the word

19      "report."

20   BY MR. GOULD:

21       Q.   What is your trouble with the word "report"?

22       A.   I need to know what you mean by that.

23       Q.   What is your understanding of the word

24   "report"?

25       A.   It varies on the circumstances.  That's a

1    little too open ended for me to answer.  I'm actually

2    more curious what your understanding is.

3        Q.   Okay.  So are you saying you can't answer that

4    question because you don't know what I mean by saying

5    report?

6        A.   Yes.

7        Q.   Was there any information provided -- was

8    there any information provided to any Chadron State

9    College employees about actual or suspected physical

10   violence between Fatima and Brandon?

11              MS. JOYCE:  Objection to form.

12              THE WITNESS:  I'll do my best with this, but I

13      recall seeing some information that some individuals

14      that, I believe, approached an athletic director,

15      assistant athletic director with some concerns.  I

16      wouldn't characterize those as reports, but I think

17      they may have raised concerns about things they had

18      heard.

19   BY MR. GOULD:

20       Q.   And can you tell me what were the things that

21   they heard?

22       A.   I would need to refresh my recollection from

23   the narrative that I was provided.

24       Q.   So sitting here you don't know what things

25   were heard by other students?



Peter Lake 12/14/2018

1        MS. JOYCE:  Objection, form.

2        THE WITNESS:  I would know if I were able to

3    refresh my recollection.

4  BY MR. GOULD:

5      Q.  Okay.  But without looking at your report,

6  sitting here today, you don't know what the specific

7  things that were heard and relayed to Chadron State

8  College employees was?

9        MS. JOYCE:  Objection, form.

10       THE WITNESS:  I would only feel comfortable

11    testifying after I refreshed my recollection.  I

12    don't want to misstate what I reviewed or what other

13    people said.

14  BY MR. GOULD:

15     Q.  Do you know who were -- what were names of the

16  students that made reports to Chadron State College

17  employees about Brandon and Fatima's relationship?

18       MS. JOYCE:  Objection, form.

19       THE WITNESS:  Also in the documents that were

20    provided to me, and I could refresh my recollection

21    and give you those names.

22  BY MR. GOULD:

23     Q.  Sitting here today, without looking at your

24  report, you don't know who those individuals were?

25       MS. JOYCE:  Objection, form.

1          THE WITNESS:  Same answer as before, I would

2     know if I were able to refresh my recollection.

3  BY MR. GOULD:

4      Q.   And do you know what those individuals

5  expressly told the coaches about what the relationship

6  was between Brandon and Fatima?

7          MS. JOYCE:  Objection, form.

8          THE WITNESS:  I would know if I were able to

9     refresh my recollection.

10  BY MR. GOULD:

11     Q.   Do you know whether or not there were any

12  reports made to Chadron State College's resident staff

13  regarding Brandon and Fatima's relationship?

14          MS. JOYCE:  Objection, form.

15          THE WITNESS:  Again, I'll do my best with

16     this, but I recall that I saw a variety of entries

17     from resident staff about Fatima.

18  BY MR. GOULD:

19     Q.   And what were those entries, what did they

20  describe, what did they say?

21     A.   Again, the document speaks for themselves, and

22  I'd be glad to share them with you if you would --

23     Q.   Well, Mr. Lake, you're here to testify about

24  your opinions in this case and the basis for those

25  opinions and I'm trying to understand your knowledge of

1    Q.   Okay.  But can you tell me, what was the

2  information, can you tell me anything you know about the

3  information that was provided from Fatima's softball

4  teammates to the softball coaches?

5    A.   I can if we pull the emails up.

6    Q.   Okay.  So sitting here today with your entire

7  report in front of you, you can't tell me anything about

8  what information was provided to Fatima's softball

9  coaches from the players?

10          MS. JOYCE:  Objection, form.

11          THE WITNESS:  I'd feel most comfortable

12    refreshing my recollection so as to get exactly what

13    they said right because you're basically asking me to

14    reproduce precise conversations from my eidetic

15    memory, and I'm not able to do that at this time.

16  BY MR. GOULD:

17    Q.   I don't want you to produce precise

18  information, I want you to tell me anything that you can

19  recall at all, any information about what information

20  was provided from Fatima's teammates to the softball

21  coaches about Brandon and Fatima's relationship or about

22  Fatima in general?

23          MS. JOYCE:  Objection, form.

24          THE WITNESS:  The overarching thing that

25    appears to me in this is I was unable to detect



Peter Lake 12/14/2018

1    actual notice to Chadron for purposes of Gebser and

2    Davis from anyone anywhere and particularly from

3    Fatima herself.

4    BY MR. GOULD:

5         Q.   That wasn't my question.  I move to strike

6    your answer as nonresponsive.

7              I want to know what information, if anything,

8    can you tell me about the reports made from the softball

9    players to the coaches?

10             MS. JOYCE:  Objection, form.

11             THE WITNESS:  What I'm going to say and you

12   can strike it if you choose is I didn't see actual

13   notice for purposes of the Gebser and Davis from

14   anyone to any other person at Chadron State based on

15   any of the emails that I looked at.

16   BY MR. GOULD:

17        Q.   And who were the softball player teammates

18   that made the reports to the softball coaches?

19             MS. JOYCE:  Objection, form, and asked and

20   answered.

21             THE WITNESS:  Their names are reflected in the

22   emails.  I need to refresh my recollection to pull --

23   I'd need to pull the emails up to get their names.

24   BY MR. GOULD:

25        Q.   So without actually, physically looking at the



1        Q.    -- from the softball player teammates?

2               MS. JOYCE:  Objection, foundation.

3               THE WITNESS:  I do recall that there was some

4        communication with the individual charged with

5        compliance obligations who appeared to have Title IX

6        responsibilities.

7    BY MR. GOULD:

8        Q.    And what was the communication with Fatima?

9        A.    Again, it's in the emails, and specifically, I

10   would want to refresh my recollection to get the exact

11   statements that were made.

12       Q.    But sitting here today, can you tell me

13   anything about the communications between Fatima and the

14   coaches or Fatima and anybody from Chadron State

15   College?

16              MS. JOYCE:  Objection, form.

17              THE WITNESS:  What I recall is that the

18       coaches received some information that they felt

19       apparently they wanted to share with compliance and

20       Title IX at Chadron State and that's the extent

21       without refreshing my recollection I feel comfortable

22       trying to construct from memory.

23   BY MR. GOULD:

24       Q.    Okay.  Do you know whether the coaches --

25   strike that.



1    Title IX violations?

2            MS. JOYCE:  Objection, foundation.

3            THE WITNESS:  Because I'm not recalling who

4       that individual is, I can't answer any other

5       questions about --

6    BY MR. GOULD:

7       Q.    Do you know who Sherry Simons is?

8       A.    If her name appears in the email thread, I

9    would be able to locate her, but otherwise I do not.

10      Q.    Do you know who Jessica Eatman is?

11      A.    Without looking at the documents, I'd want to

12   be careful about -- this name sounds familiar to me, but

13   I'm not sure I can locate her specifically without

14   refreshing my recollection.

15      Q.    Do you know Cassidy Mitchell is?

16      A.    Same.

17      Q.    Do you know who Aspen Eubanks is?

18      A.    Same.

19      Q.    Do you know who Erin Gruwizovitz is?

20      A.    I'm -- I almost need you to spell that for me

21   to have a sense of what -- it seems like that's a

22   difficult name to pronounce.

23      Q.    But do you know who Erin G is, referred to as

24   Erin G in this case?

25      A.    Erin G, if she appears in the email thread,

Peter Lake 12/14/2018

1          THE WITNESS:  I'm aware of a couple of

2     incident reports that were provided to me.  One

3     appears to straddle January 1st of 2015, '16, 2015,

4     and another on January 20th.

5     BY MR. GOULD:

6        Q.   And can you tell me, was there any information

7     in those reports indicating Fatima was the potential

8     victim of domestic violence or dating violence?

9          MS. JOYCE:  Objection, form.

10          THE WITNESS:  I'd have to pull those incident

11     reports up again to see exactly what they say.

12     BY MR. GOULD:

13        Q.   Was there any information in those incident

14     reports involving these arguments or fights between

15     Brandon and Fatima?

16        A.   I know there was information about quarreling

17     that had occurred between them in the email threads and

18     in the documents I reviewed.  I can't locate it without

19     specifically pulling them up to the incident reports;

20     I'm not exactly sure what those accident reports

21     relate --

22        Q.   What quarreling are you referring to?

23        A.   Between Fatima and Brandon.

24        Q.   And when you say the word "quarreling," what

25     do you mean?



Peter Lake 12/14/2018

1   discrimination associated with it.

2       Q.   If the physical altercation was a domestic

3   situation, would that fall under your purview as a Title

4   IX coordinator?

5           MS. JOYCE:  Objection, foundation.

6           THE WITNESS:  Federal guidance since the

7       VAWA/SaVE regulations has essentially pushed the

8       VAWA/SaVE violations like domestic violence as

9       something in the purview of the Title IX coordinator

10      to consider.  Now, technically it's not Title IX,

11      it's Clery, that many of us will examine those types

12      of things.

13  BY MR. GOULD:

14      Q.   So a Title IX coordinator -- strike that.

15           So do you know in this, in this case, do you

16  know why Shelly Dunbar was -- strike that.

17           Do you know who was responsible for

18  investigating the reports of dating violence going on

19  between Brandon and Fatima?

20          MS. JOYCE:  Objection, form.

21          THE WITNESS:  I did not actually have that

22      knowledge.  I'm aware that Dunbar had Title IX

23      coordinating responsibilities and I saw evidence in

24      what I looked at of what I would call, you know,

25      otherwise determining what's occurring and so I saw



1    compliance with the core DOE metric of response,

2    which is investigate or otherwise determine, but what

3    I did not see evidence of is a full-blown formal

4    investigation like kicking to an external party to do

5    it or reference to, you know, an investigative body

6    of some kind.

7  BY MR. GOULD:

8       Q.   And you don't know whether or not Shelly

9  Dunbar was the one responsible for the investigation

10 because you never read her deposition; right?

11           MS. JOYCE:  Objection, form and foundation.

12           THE WITNESS:  It is correct that I did not

13   read her deposition and there are probably many

14   reasons I don't know exactly what she did because,

15   again, the knowledge I had was limited by what I was

16   asked to review.

17 BY MR. GOULD:

18      Q.   Well, would you have wanted to know what her

19 job responsibility was specifically as it relates to

20 reports involving Fatima and Brandon?

21      A.   For the purposes of what I was asked to do,

22 actually no, because without actual notice under Gebser

23 and Davis there's no need to do anything and so it

24 really doesn't matter to me what job assignments people

25 have; if the institution hasn't even received actual



1  regulatory compliance?

2      A.   Oh, absolutely because when you're trying to

3  coordinate Title IX response, technically you are a part

4  106 coordinator, but because of guidance from the

5  Department of Ed connecting the Clery Act to operations

6  of the Title IX coordinator, you are actually the Title

7  IX slash sometimes Clery Act coordinator, and they just

8  don't speak of it that way, but that's actually your

9  job.  And it's actually really significant because, you

10  see, the Clery Act framework provides for administrative

11  fines and they have often been rather severe, so that

12  obligation from a coordinator's point of view, if you

13  want to come in to administrative compliance, you're

14  well aware of the fact that the new VAWA/SaVE

15  requirements have a special force of law for

16  administrative enforcement purposes.

17          But again, the thing here, and I just don't

18  think Ms. Schuster really fully understands this is that

19  which is a legal standard for one purpose is not a legal

20  standard for others, and by it's very nature, these

21  roles were designed not to be for use in civil actions

22  for damages in court.

23      Q.   So, and I see no citations in your response to

24  question 1A; what is the basis for that opinion?

25      A.   The regulations themselves.



1      Q.   So your response to question 1A is not based

2   on any facts of this case; correct?

3      A.   It's based on legal fact.

4      Q.   But not on any specific facts relevant to the

5   Fatima Larios's case; correct?

6      A.   Well, it isn't necessarily to make the

7   statements that I made to have any external facts

8   whatsoever.  In fact, her assertion I think just -- only

9   to the extent as an important framework for discussion,

10  to that extent, you know, my answer is no, actually it

11  doesn't for all purposes and you want to be clarifying

12  on what exactly you mean by important framework.

13     Q.   Okay.  So you ultimately have a disagreement

14  with her opinion, her opinion on what the relevant laws

15  are to this case; right?

16          MS. JOYCE:  Objection, form.

17          THE WITNESS:  I mean, I think she's wrong.

18  BY MR. GOULD:

19     Q.   Okay.  But you're arguing with her

20  interpretation of the relevance of the Clery Act;

21  correct?

22     A.   I suppose it could be characterized that way,

23  but wrong is wrong, gray is gray.

24     Q.   Okay.  Your opinion, your opinion 1A doesn't

25  require you to have an analysis -- strike that.



1          I'm looking here now at question 1B and then

2    your response?

3          A.    Uh-huh.

4          Q.    Do you agree with Ms. Schuster's statement

5    that when a school knows or reasonably should know of

6    possible sexual violence, it must take immediate and

7    appropriate steps to investigate or otherwise determine

8    what occurred?

9          A.    What I tried to clarify here is what OCR has

10   actually said as opposed to what she said and it

11   deviates slightly and I think in some ways importantly,

12   not the least of which was a consistent problem I found

13   throughout the report, was conflating standards for

14   money damages in court with OCR guidance and then,

15   frankly, in some cases either colloquializing or

16   mischaracterizing actual OCR guidance by using

17   argumentative terms.

18         Q.    In regards to your number of opinions in this

19   case stating that there was insufficient actual notice

20   sufficient to warrant money damages in court; is that

21   right?

22         A.    Most of the opinions I've delivered in this

23   report are similarly pointing out that the assertions

24   made by Ms. Schuster about the governing standards under

25   Title IX are inaccurate or misleading.



Peter Lake 12/14/2018

1      Q.   Okay.

2      A.   And one of them in particular is that I keep

3   trying to clarify that if the issue presented, which is

4   the only issue that was really presented to me is

5   whether or not what are the governing standards for

6   money damages in court, Gebser and Davis, statements

7   like when a school knows or reasonably should know of

8   possible sexual violence, it must take immediate and

9   appropriate steps; this is -- these are things that are

10   derived from guidance, not -- and are inconsistent with

11   Gebser and Davis and deliberately so because the Gebser

12   and Davis cases imagined that OCR enforcement would

13   substantially deviate from enforcement in court.

14      Q.   Okay.  So are most of your opinions based off

15   of the opinions in Gebser and Davis?

16           MS. JOYCE:  Objection, form.

17           THE WITNESS:  No, they are based on Gebser

18      Davis, they're based on OCR guidance, they're based

19      on knowledge of the Clery Act and how it operates

20      with VAWA/SaVE.

21           THE COURT REPORTER:  I'm sorry, can you say

22      what -- what is that last word you said?

23           THE WITNESS:  Sorry, it's VAWA/SaVE.  It's

24      V-A-W-A-/S-A-V-E.

25           THE COURT REPORTER:  Thank you.



1          THE WITNESS:  Actually, the code of federal

2     regulations has some specific mandates about exactly

3     what needs to be covered.  We could pull it if you

4     want.

5  BY MR. GOULD:

6      Q.   Okay.  Let's look at your response to question

7  1B here.

8      A.   Okay.

9      Q.   Is the basis for your response here other

10  statutes and laws?

11          MS. JOYCE:  Objection, form.

12  BY MR. GOULD:

13      Q.   Strike that.

14          What is the basis, what is the basis for this

15  response, what are you relying on?

16      A.   This particular response I relied on Gebser

17  and Davis, governing guidance documents from OCR over

18  the years, and let's see if there's anything else that's

19  here that -- and I also did look at the Ohio and Harris

20  case, which I found inadequate.

21      Q.   So your response to question 1B relies almost

22  entirely on case law; correct?

23          MS. JOYCE:  Objection, form, misstates

24     testimony.

25          THE WITNESS:  It's actually incorrect with

1     what I said because I said it's Gebser Davis, OCR

2     guidance, which is not case law and then I did also

3     have a quick look at the Ohio Harris case, which I

4     don't think is actually even relevant here, but...

5   BY MR. GOULD:

6        Q.   In terms of determining what duty the

7   university had to Fatima Larios, do you intend to offer

8   an opinion as to what duty the district court should

9   apply in this case?

10       A.   I would almost object on that one, but it's

11  not my job to tell a federal judge what the law is, nor

12  do I see an expert as a proxy for oral argument on legal

13  cases, but I do think that if I'm asked by a court of

14  competent jurisdiction to discuss how OCR administrative

15  enforcement has deviated from Gebser and Davis since

16  1999 or particularly since 2001, I'm more than competent

17  to help a court of competent jurisdiction do that should

18  they seek my advice on that.

19       Q.   Have you ever seen a situation where the Court

20  sought testimony from an expert to advise the Court as

21  to what the duty is in a case, what the legal duty is in

22  a case?

23            MS. JOYCE:  Objection, form.

24            THE WITNESS:  It's interesting how experts on

25    legal duty can influence legal opinions.  As you may



1       in is what I'm doing right here and right now.

2    BY MR. GOULD:

3        Q.   Do you know -- okay.  I'm going to -- strike

4    that.

5            Do you know whether or not Sawny -- strike

6    that.

7            Do you know whether or not Shelley Dunbar,

8    Chadron's Title IX coordinator, had any training on how

9    to conduct Title IX investigations or analyze potential

10   Title IX violations before she became the Title IX

11   coordinator?

12           MS. JOYCE:  Objection, form and foundation.

13           THE WITNESS:  Yeah, I may or may not know her.

14       I don't have any specific recollection.  I do not

15       recall if she's ever been attending anything that

16       I've done education or training-wise.  I seem to

17       recall someplace in Sandra Schuster's report that

18       training was done at Chadron and if she were there at

19       the time, I would assume she would have been there or

20       part of it, but I didn't even check the timeline to

21       see, to see what she's doing, so.

22   BY MR. GOULD:

23       Q.   Do you know whether -- so you don't know what

24   type of training, if any, Shelley Dunbar underwent prior

25   to becoming Title IX coordinator; correct?



Peter Lake 12/14/2018

1    A.   That's correct, and it wouldn't really have

2  been relevant to what I was looking at because whether

3  she's trained or not, if she receives actual notice,

4  Gebser and Davis says she has to act on it and I wasn't

5  asked to assess Chadron's risk of losing a Title IX

6  case; I was simply asked the questions that were

7  presented to me.

8    Q.   Who crafted these questions?

9    A.   These came to me under cover of letter, which

10  I believe we've reproduced, and it was my understanding

11  was -- this came from the law firm and I would assume

12  primarily George.

13    Q.   Okay.  So the lawyers sent you the questions,

14  and you were just answering them?

15    A.   I did not generate these questions, they were

16  posed to me.

17    Q.   Okay.  Do you know whether or not the

18  university can be civilly liable if they fail to train

19  their employees on how to respond to Title IX

20  violations?

21          MS. JOYCE:  Objection, form and foundation.

22          THE WITNESS:  That question goes pretty well

23     beyond the scope that I was engaged for because, you

24     know, potentially, I suppose, theoretically, and, you

25     know, again, I don't even really think about this,



1  how to assess whether somebody has a competency, a high

2  competency in conducting Title IX investigations?  Are

3  you going to present facts and see if they're applying

4  what you taught?

5          MS. JOYCE:  Objection, form.

6          THE WITNESS:  It's a heck of a question.  It's

7      more of a discussion with an academic committee.

8      Better watch out, you might end up like me teaching,

9      sound like a professor.

10         We're in the curriculum development mode right

11     now; I mean, that's where we are with this, so it's

12     hard to say exactly where that's going to come out,

13     and again, one of the challenges is that this isn't

14     like the American Arbitration Association training or

15     JAMS training, where there are really specific things

16     that people have to be trained on to be a qualified

17     arbitrator or mediator; this field lacks those kind

18     of standards.  We don't have the American Title IX

19     coordinator's act that says these are the things; if

20     we did, we'd be a little farther down the road.  I

21     tend to think eventually we will have something like

22     that, but I don't know if I'll live long enough to

23     ever see something like that.

24  BY MR. GOULD:

25     Q.   Okay.  I'm looking here at question 3A to your



1    report.  Okay.  Your response here is based off of

2    Gebser and Davis; correct?

3         A.    I'm just rereading it.  Gebser and Davis and

4    OCR guidance.

5         Q.    Okay.  Now, are there certain -- under certain

6    factual circumstances, would a university be required to

7    engage in a reasonably diligent inquiry under Gebser and

8    Davis?

9              MS. JOYCE:  Objection, form.

10             THE WITNESS:  I mean, it essentially calls for

11        a legal opinion, analyzing the cases.  I mean, I have

12        talked about them, so I'll give you my thoughts on

13        that.  I'm of the opinion that Gebser and Davis are

14        so narrowly decided that the moment actual notice is

15        recovered, I think institutions could comply with the

16        deliberate indifference standard very easily by

17        taking an action independent of any investigation

18        whatsoever.  I don't think it's a good idea.  I would

19        never encourage somebody to do that because I think

20        you could have due process or other issues.  But

21        what's noticeable in Gebser and Davis is the Court

22        was very concerned about the administrative burden on

23        colleges trying -- and universities or education

24        facilities trying to manage this and the idea of

25        creating a constitutionally or statutorily created



Peter Lake 12/14/2018

1    training mandate, it's pretty obvious that the

2    majority steers clear of that as they possibly could.

3  BY MR. GOULD:

4        Q.   Well, so there are a set of facts in which a

5  university would be required to engage in a reasonably

6  diligent inquiry into what had occurred; correct?

7              MS. JOYCE:  Objection, foundation.

8              THE WITNESS:  Well, again, I would say that

9    the question the way it's formulated is a little

10    problematic because the answer technically could be

11    no under Gebser and Davis and even for OCR purposes,

12    the standard that is articulated by Expert Schuster

13    is not exactly the one that's used by us here.

14  BY MR. GOULD:

15        Q.   So here's my next question:  In your response

16  to question 3A, are you relying on any facts in this

17  case to reach that opinion?

18        A.   This question basically asks a question about

19  law and regulatory mandates, so you could substitute

20  Chadron for any university in the United States, you'd

21  get the same answer.

22        Q.   Okay.  And is that the same thing for your

23  response to question 3B?

24        A.   Let's have a look.  Yes.

25        Q.   Okay.  Is that the same response you have for



1   question 3C?

2       A.   Yes.

3       Q.   So the facts of this specific case don't

4   really matter in terms of what your opinion is in

5   response to question 3C; right?

6       A.   You could substitute any college or university

7   in America and get the same answer.

8       Q.   And is that the same response you have for

9   question 3D?

10      A.   3D is a little more complicated because Ms.

11  Schuster makes this assertion about five primary

12  institutional requirements and I had to sort of

13  methodically pick out exactly what OCR said opposed to

14  that assertion, but at the end of the day, it

15  essentially is the same answer because these regulatory

16  requirements have been applied generally to so-called

17  recipients throughout the United States.

18      Q.   Okay.  So the specific facts of this case

19  don't have -- have no bearing on your response to

20  question 3D; right?

21           MS. JOYCE:  Objection, form.

22           THE WITNESS:  I mean, you know, except for the

23      fact that only -- this question's only triggered

24      because of this case.  You know, the basic statements

25      in here about OCR guidance, Gebser and Davis, remain



Peter Lake 12/14/2018

1    true, whichever institution you're talking about.

2    BY MR. GOULD:

3        Q.   And the facts don't matter; correct?

4             MS. JOYCE:  Objection, form.

5             THE WITNESS:  Again, I guess they do matter at

6        some level because we wouldn't be having the

7        conversation if it weren't for this.

8    BY MR. GOULD:

9        Q.   And in which facts are you relying on to have

10   that opinion?

11       A.   Well, if no one were suing Chadron, I'd doubt

12   I'd be here.

13       Q.   Other than that, is there any other facts that

14   you're relying on in that response?

15       A.   No.

16       Q.   Okay.  Now, I'm looking at question 3E; do you

17   have the same response here, the specific facts of this

18   case have no bearing on your answer to question 3E?

19            MS. JOYCE:  Objection, form.

20            THE WITNESS:  This one does blend, I think,

21       Chadron with statements that would apply generally to

22       any institution and because there were indications in

23       the materials that I looked at that suggested there

24       was hearsay, the statement, even a rumor, you know,

25       is sort of a characterization potentially of that, so

1    I was thinking about the email chain that I looked at

2    when I answered this question, but in the end, the

3    answer is the same.

4  BY MR. GOULD:

5        Q.   Do any of the opinions you've given in this

6  case or are any of the opinions you gave in this

7  case -- strike that.

8             Do any of the opinions you give in this case

9  rely on the facts of the case at all?

10            MS. JOYCE:  Objection, form.

11            THE WITNESS:  I mean, my opinions are based on

12    the materials that were reviewed to me and so the

13    entire predicate for the opinions was this packet of

14    material I looked at.  I found in many cases that I

15    didn't need to make particular reference to any

16    particular item that appeared in there, but there was

17    in particular, I think at the end, some questions

18    that related to an understanding of OCR's

19    administrative closure of the matter and so I would

20    not have been able to form an opinion on that without

21    reviewing what OCR --

22  BY MR. GOULD:

23        Q.   Just so we're clear, so you said there's one

24  opinion in which you actually had to rely on the facts

25  to give a response?



Peter Lake 12/14/2018

1          MS. JOYCE:  Objection, form.

2          THE WITNESS:  I didn't actually say that, but

3     what I did say is there is one that I would not have

4     been able to answer without reading OCR's

5     September 26th, 2017, letter, and that's seven.

6   BY MR. GOULD:

7       Q.   Have you ever worked for OCR?

8       A.   No.

9       Q.   Have you ever performed investigations on

10   behalf of OCR?

11      A.   No.

12      Q.   Have you ever been involved in any capacity

13   with an OCR investigation?

14      A.   I've worked with recipients that are under

15   investigation regularly.

16      Q.   So you assisted in responding to OCR's request

17   for information, things like that?

18          MS. JOYCE:  Objection, form.

19          THE WITNESS:  It's a bit of a non sequitur, so

20    I don't actually construct responses to OCR's

21    requests, that's lawyer work, but I may actually help

22    administrators in the process of doing that.  In some

23    cases it's working within the parameters of an agreed

24    to voluntary resolution.

25   BY MR. GOULD:

1   not finding sufficient evidence to support either an

2   individual or systemic finding and presumably not

3   limiting the individual finding to individuals other

4   than Ms. Larios is influential to me.  I mean, --

5        Q.   Individual finding of what?

6        A.   Exactly what they said, that there was not

7   sufficient evidence to support either an individual or

8   systemic finding against Chadron State.

9        Q.   Individual finding of what?

10       A.   Well, for purposes of what they investigate,

11  to see if there's been an unaddressed hostile

12  environment, whether there's been prompt --

13       Q.   So what is your understanding of what OCR was

14  investigating in this case?

15       A.    Well, that's an interesting thing because we

16  don't always know exactly what they're looking at, but

17  an educated guess based on what was happening in transit

18  in this time period is that it appears that Chadron was

19  under systemic review as a result of the individual

20  complaint.  The new processing manual that came in in

21  the summer of '17 allowed a more quick administrative

22  resolution in some matters and it appears OCR exercised

23  that new processing manual to essentially end the

24  systemic finding.  But when they look, they can look

25  thoroughly through any aspect of your Title IX



1    compliance program, and frankly, they're also free to

2    identify information of federal compliance issues in

3    areas other than this, so sometimes these will lead to

4    some interesting things related to Clery compliance.

5        Q.   Are you just speculating as to what you

6    believe Title -- OCR was investigating in regards to the

7    Fatima Larios incident?

8            MS. JOYCE:  Objection, form.

9            THE WITNESS:  I'm making an expert assessment

10       based on a tremendous amount of experience observing

11       OCR behavior and how they resolve matters.  It is

12       unknown exactly what they did and why they did it,

13       but what they said is very telling because they did

14       add that specific line, not obtained sufficient

15       evidence to support either an individual or systemic

16       finding.  And they would have been able to simply

17       close the case administratively without making that

18       statement, so.

19   BY MR. GOULD:

20       Q.   Do you know the basis of OCR's statement

21   there?

22       A.   Other than what they said, that's all I know.

23       Q.   Okay.  So you don't know what information was

24   provided to OCR; correct?

25           MS. JOYCE:  Objection, form and foundation.



1          THE WITNESS:  That's actually incorrect

2     because I am aware -- I was shown actually what

3     Chadron State provided in response to OCR questions

4     and looked at that material, so I saw what Chadron

5     sent to OCR.

6          Now, I don't know -- they were free to look at

7     other things or disregard it.  I did not see the

8     complainant's initiating documents or any other

9     because sometimes there are other individuals

10     involved and they don't always disclose who those

11     people are, so no, I don't have OCR's file on this.

12   BY MR. GOULD:

13     Q.   Do you know whether OCR was provided any

14   depositions of witnesses?

15     A.   I don't recall seeing anything that tells me

16   that; although, I can't say it's not in there, I really

17   wasn't looking for that because I was triggering

18   specifically on their conclusion and how they arrived at

19   it.

20     Q.   So you don't know how OCR arrived at this

21   conclusion; correct?

22     A.   I only know they got there.

23     Q.   And you don't know what methodology they used

24   to get to that conclusion?

25     A.   I have some knowledge of that because we watch



1   of investigation performed administratively over a

2   period of 20 months.  That's some value to me, is

3   that, you know, I acknowledge it's not outcome

4   determinative, it's not law in the case, it's not

5   collateral estoppel and because they don't really

6   tell us exactly how they arrived at this, it would be

7   helpful to know that, but we don't.  But I do place

8   some emphasis on it.  I think that this was not an

9   investigation that transited for just two or three

10   months, it's almost two years in gestation, and it --

11   I know from the record that I saw that OCR was

12   communicating with Chadron and saw things and during

13   all of that time period, if they'd had some concerns,

14   they could have raised them at any time and I don't

15   see any evidence of that.  I see --

16   BY MR. GOULD:

17       Q.   You don't know how many investigators OCR were

18   actually reviewing this, Fatima Larios's complaint, do

19   you?

20       A.   I have no idea.

21       Q.   You don't know whether the investigators

22   actually reviewed any of the materials provided to them;

23   correct?

24       A.   I do not have any specific knowledge of any

25   particular behavior of any operative at OCR and it's



1    possible that the materials were sat on a file desk and

2    never were looked at.  I know from experience working

3    with people at OCR that they do typically look at

4    things, that they don't just let them sit on the desk,

5    but --

6        Q.    And you don't know --

7        A.    -- I don't know that for sure.

8        Q.    -- case loads of the OCR investigators working

9    on the Fatima Larios case, do you?

10       A.    I do not.

11       Q.    Okay.  You don't know what facts they relied

12   upon to reach any sort of the conclusion in this case

13   assuming that they even did reach a conclusion?

14       A.    Well, I mean, I'll say this, that whatever

15   they had and whatever they obtained, and that's their

16   language, they didn't see sufficient evidence to support

17   an individual or systemic finding, so that indicates to

18   me that they had something and they did look at it;

19   otherwise, they'd be essentially not committing or

20   stating the truth because they acknowledged they

21   obtained it and they didn't see sufficient evidence to

22   support something, so somebody must have looked at

23   something, but who it was and what it was, I don't know.

24       Q.    Ask you to look at question 7B here.

25       A.    Sure.



1  from that.  This is one where I see evidence that when

2  Title IX reached out to Ms. Larios, she ideated, which

3  she has a legal right to do, is the right to her own

4  privacy and the right to her own determination.  And I

5  want to make this as clear as I can that Title IX not

6  only protects you from unconsented-to contact, but it

7  also protects your right to consent.  And so as

8  difficult as young people's relationships can be, the

9  law respects a certain amount of autonomy in those

10  relationships unless the line crossed into hostile

11  environment and certainly for purposes of money damages

12  under Gebser and Davis, without actual notice and

13  deliberate indifference, there's just no case in federal

14  court.

15       Q.   Okay.  Isn't that a decision that a judge has

16  to make?

17       A.   Well, a lot of the things I'm responding to in

18  Ms. Schuster's report, and that's really what I was

19  hired to do, was not to come here and offer my own

20  opinions apart from responding to what she has said and

21  I have to say, I read her report more in the nature of a

22  trial brief or motion for summary judgment than actual

23  expert report, so I found myself in the position of

24  clarifying what I think are very misleading statements

25  of law connected in some cases with fact.



1          Now, here, it is clearly within the purview of

2    the federal court to make its own decision on Gebser and

3    Davis.  I'm not inviting a judge to give over the

4    autonomy of an Article III court to the opinion of a

5    professor in a law school, but if you -- if someone asks

6    me my opinion, that's what it is.

7          Q.   Okay.  So I'm looking at the basis for your

8    opinion here in question 7B and you've listed three

9    specific facts that you relied upon; is that right?

10              MS. JOYCE:  Objection, form.

11              THE WITNESS:  I didn't -- well, let's see

12        exactly what it is.  We're looking at 7B.  My

13        articulation is I reviewed materials provided me

14        under cover of the letter dated November 15, 2018, so

15        that's the basis.

16   BY MR. GOULD:

17        Q.   Okay.  Did Chadron State College fail to

18   adequately respond to the potential Title IX violations

19   involving Fatima Larios from an OCR administrative

20   perspective?

21              MS. JOYCE:  Objection, form and foundation.

22              THE WITNESS:  Well, I don't work for OCR, I'm

23        not an OCR operative, we've established that.  OCR

24        itself said they didn't find individual --

25   BY MR. GOULD:



1        THE WITNESS:  I was responding to very

2   specific questions.  I reviewed Ms. Schuster's

3   report, I looked at some case law, limited, exactly

4   what I disclosed, and OCR guidance throughout the

5   years.

6        MR. GOULD:  Okay.  I think we're done.  I

7   don't want to hold you up.

8        MS. JOYCE:  Thank you.  And I have no

9   questions.  You have the opportunity to read and sign

10  your deposition transcript before it becomes final.

11  I advise you to do so.  It sounds like you would like

12  to do that.

13       THE WITNESS:  Yeah, I usually do because I use

14  some big icky words and I feel sorry for you.

15       THE COURT REPORTER:  Are you ordering?

16       MR. GOULD:  Yeah, condensed, PDF, electric.  I

17  don't want a hard copy, with all the exhibits.  Let's

18  make sure we have all the exhibits.

19       (The deposition concluded at 5:40 p.m.)

20

21

22

23

24

25

Peter Lake 12/14/2018

1                    CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA       )

5    COUNTY OF SARASOTA     )

6

7            I, TERRI L. FERREIRA, Court Reporter, certify

8    that PETER LAKE personally appeared before me and was

9    duly sworn on December 14, 2018.

10           WITNESS my hand and official seal this 7th day

11   of January, 2019.

12

13

14

15

16

17                        Terri L. Ferreira
                          Notary Public, State of Florida
18                        My Commission NO.:  GG128993
                          Expires:  July 1, 2020
19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA   )

4   COUNTY OF SARASOTA )

5

6           I, TERRI L. FERREIRA, do hereby certify

7   that I was authorized to and did stenographically

8   report the deposition of PETER LAKE; that a review of

9   the transcript was requested; and that the foregoing

10  transcript, pages 3 through 304, is a true record of

11  my stenographic notes.

12          I FURTHER CERTIFY that I am not a relative,

13  employee, or attorney, or counsel of any of the

14  parties, nor am I a relative or employee of any of the

15  parties' attorney or counsel connected with the

16  action, nor am I financially interested in the action.

17          DATED this 7th day of January, 2019.

18

19

20

21

22                  Terri L. Ferreira, Court Reporter

23

24

25



Peter Lake 12/14/2018

1                        CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA       )

5    COUNTY OF SARASOTA     )

6

7            I, TERRI L. FERREIRA, Court Reporter, certify

8    that PETER LAKE personally appeared before me and was

9    duly sworn on December 14, 2018.

10           WITNESS my hand and official seal this 7th day

11   of January, 2019.

12

13

14

15

16

17                      Terri L. Ferreira
                        Notary Public, State of Florida
18                      My Commission NO.:  GG128993
                        Expires:  July 1, 2020
19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA   )

4    COUNTY OF SARASOTA )

5

6            I, TERRI L. FERREIRA, do hereby certify

7    that I was authorized to and did stenographically

8    report the deposition of PETER LAKE; that a review of

9    the transcript was requested; and that the foregoing

10   transcript, pages 3 through 304, is a true record of

11   my stenographic notes.

12           I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorney or counsel connected with the

16   action, nor am I financially interested in the action.

17           DATED this 7th day of January, 2019.

18

19

20

21

22                    Terri L. Ferreira, Court Reporter

23

24

25

