IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LISSETTE LARIOS ROOHBAKHSH, as personal representative of the Estate of Fatima Lissette Larios and on behalf of next of kin; and NELSON LARIOS, as next of kin;<br><br>                    Plaintiffs,<br><br>    vs.<br><br>BOARD OF TRUSTEES OF THE NEBRASKA STATE COLLEGES, and CHADRON STATE COLLEGE,<br><br>                    Defendants. | **8:17CV31**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on a motion for summary judgment filed by defendants Board of Trustees of the Nebraska State Colleges and Chadron State College (collectively, "Chadron State" or "the College"), Filing No. 100.[1]

This is an action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) *et seq.* ("Title IX"). Title IX is a federal statute banning discrimination on the basis of sex in federally funded educational programs. *Id.* The plaintiffs are the parents of Fatima Larios, who had been a student and athlete at Chadron State College from

---

[1] Also pending is defendant's motion for relief under FRCP 56(e) AND NECivR 56(b)(1), Filing No. 148. Chadron State contends the plaintiffs' submissions in opposition to its motion for summary judgment do not comply with the Court's local Rules. It requests that the Court deem all the facts in its statement of undisputed material facts admitted, strike the plaintiffs' statement of facts, and grant defendant's motion for summary judgment. Alternatively, the defendant asks the court to order the plaintiffs to refile their statement of additional facts to be consistent with FCRP 56(e) and NECivR 56.1(b)(1) and to grant the defendant additional time to file a reply brief.

The Court has reviewed the parties' submissions and declines to exalt form over substance. The Court reviews the facts underlying the parties' purportedly undisputed statements of fact. The Court finds that the defendant's request should be denied. The facts are sufficiently developed to enable the Court to rule without further briefing. The requested relief is unnecessary.

August 2014 until her suicide on January 31, 2015. Plaintiff Lissette Larios Roohbakhsh is also the personal representative of decedent Fatima Larios's estate.

In their complaint, the plaintiffs allege that Chadron State was deliberately indifferent to reports of dating violence against Fatima by one of its students. They allege that if Chadron State had complied with its own policies and Title IX by properly responding to third-party reports of the abuse and took appropriate steps to protect Fatima's safety, Fatima's death could have been prevented.

Chadron State asserts it is entitled to a summary judgment of dismissal. It contends that undisputed evidence shows that the plaintiffs cannot prove the elements of a Title IX claim. First, it argues that Chadron State did not have actual notice that Fatima Larios experienced discrimination while a student at Chadron State, contending that the College's level of actual knowledge must amount to reliable reports of specific behavior so severe as to deprive the victim of access to educational opportunities. Next, it argues that even if the plaintiffs could meet the actual notice requirement, Title IX is inapplicable because the plaintiffs cannot show that the alleged dating violence was based on sex rather than interpersonal conflict. Chadron State disputes that Fatima Larios was the victim of dating violence, arguing that Fatima Larios was the physical aggressor. Further, it argues the plaintiffs' claims fail as a matter of law because the College was not deliberately indifferent in its response to the rumors relayed to it regarding Larios. Chadron State also argues that the plaintiffs cannot show that the college's deliberate indifference caused the student to undergo harassment, physical assaults, or deprivation of educational opportunities. Last, it argues that the College cannot be held responsible

under Title IX for Larios's suicide because the decision to inflict self-harm is an efficient intervening cause under Nebraska state law.

In response, the plaintiffs argue that there are genuine issues of material fact on all these issues.

I.    FACTS

The facts are gleaned from the parties' respective statements of undisputed facts in their briefs and from the court's review of the evidence.  *See* Filing No. 102, Defendants' Brief at 2-31; Filing No. 113, Plaintiffs' Brief at 3-100; Filing Nos. 103 & 104, Indices of Evid.; Filing Nos. 113 & 114, Indices of Evid.

Fatima Larios ("Larios") and Brandon Finona-Gardner ("Gardner") first met in their hometown of Monterey, California.  Filing No. 104-1, Ex. 5, Deposition of Brandon Finona-Gardner ("Gardner Dep.") at 12-13.  Gardner was a junior at a public high school at the time, and Larios was a senior at a nearby private, all-girls high school.  *Id.*  They dated from August 2012 to the date of Larios's death on January 31, 2015.

Larios first attended college in Clarksville, Tennessee, on an athletic scholarship.  She played softball on an NCAA Division I team.  Larios and Gardner continued to date in a long-distance relationship.  In August 2014, Gardner began college at Chadron State on a football athletic Scholarship.  Larios then transferred to Chadron State and began playing softball for Chadron State, an NCAA Division II school.

Larios moved into the College's Andrews Hall and Gardner moved into the College's High Rise resident hall in August 2014.  Tayler Saunders was a Residence Hall Advisor ("RA") at Gardner's dormitory.  During Gardner's move into the dormitory, his mother told RA Saunders that "it was common for Brandon and his girlfriend Fatima to

argue frequently and rather loudly." Filing No. 104-30, Incident Report/Memo of conversation at 1. Saunders stated that she believed "Brandon's mother had informed her" of Gardner and Larios's arguments as if to issue "a warning so that [the College's] staff wouldn't be surprised by the consistency of the arguments that would likely ensue." *Id.* In late September 2014, Fatima Larios moved from her dormitory to Gardner's dormitory. Filing No. 103-3, Ex. 3, Deposition of Lissette Roohbakhsh ("Roohbakhsh Dep.") at 48; Filing No. 103-18, Ex. 46, Residence Hall Contract. Larios's mother was not aware of the change. Filing No. 103-3, Roohbakhsh Dep. at 50.

Chadron State hosted an on-campus Halloween dance for students on October 31, 2014. There were reports of an altercation between Fatima Larios and another student at the dance. There is evidence in the record that RA Saunders would occasionally consume alcohol in the dorms with students she oversaw on the third floor, which was contrary to Chadron State's code of conduct. It is undisputed that Fatima Larios began consuming increasingly more alcohol while at Chadron State.

During the relevant time period, Robert Stack was the College's Head Softball Coach and Aryn Grywusiewicz was Assistant Softball Coach. Sometime in late October 2014, Coach Grywusiewicz noticed fingerprint bruises on Larios's upper arm and a huge bruise on Fatima's inner leg from groin to mid-thigh that she believed to be unrelated to softball. Filing No. 104-5, Ex. 9, Deposition of Aryn Grywusiewicz ("Grywusiewicz Dep.) at 34-39. Several players later told Coach Grywusiewicz that Larios had told them Brandon was hitting her. *Id.* at 39-40. Larios's teammates, Brooke Wakefield and Rebeka Prokaski, also noticed bruises on Larios's upper arms. Filing No. 104-15, Ex. 24, Deposition of Brooke Wakefield ("Wakefield Dep.") at 12-14, 18. They questioned Larios

4

about the bruises, and Larios initially claimed they were softball-related. Filing No. 104-16, Ex. 25, Deposition of Rebeka Prokaski ("Prokaski Dep.") at 25. Larios later stated that the bruises "came from" Gardner, but warned Wakefield to "back off." Filing No. 104-15, Ex. 24, Wakefield Dep. at 15, 33.

On or about November 2, 2014, Wakefield and Prokaski told Coach Grywusiewicz that Larios had told them that Gardner was hitting her. Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 39, 44; Filing No. 104-15, Ex. 24, Wakefield Dep. at 15:2-13. The following day, a third player, Jessica Eatmon-Hoopes, reported to Coach Grywusiewicz that she had "heard" Gardner was hitting Larios. Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 40, 45. Coach Grywusiewicz then informed the head coach of the softball players' concerns and her own concerns about Larios's bruises. Filing No. 104-4, Ex. 8, Stack Dep. at 32-35; Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 56.

Head Coach Stack then met with the Athletic Director, Joel Smith, and informed Smith of the concerns. Filing No. 103-5, Ex. 10, Smith Dep. at 26-28, 56. Smith testified he recalled "there was something about her boyfriend and the kids were concerned about her" and "there were concerns about her behavior and—and what she was covering herself with." *Id.* at 55-56. Athletic Director Smith passed the information on to the College's Director of Human Resources and Title IX Compliance Coordinator, Shelley Dunbar. *Id.* at 29. Smith testified he felt that the best course was to get the information to Title IX Coordinator Dunbar so she could follow up as appropriate, since the concerns were based on second-hand information. *Id.* at 40, 57.

On November 3, 2014, Dunbar met with Coach Grywusiewicz to discuss Fatima Larios. Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 66-67. Coach Grywusiewicz

testified that she told Dunbar that Larios had transferred to Chadron State because Gardner was there to play football, that Grywusiewicz had noticed bruising that was not softball-related, and that two players had reported that that Larios told them that the bruises "came from" Gardner. *Id.* at 66-67. Dunbar recounted the conversation in an email to various Chadron State administrators as follows:

> Previously Fatima had told three girls on the team that Brandon is aggressive and he had hurt her. When the girls saw the recent bruises, they were very concerned but Fatima said they were from softballs.

Filing No. 103-16, Ex. 35, Email. Dunbar also reported:

> At parties they are seen fighting but it is both of them. Fatima was in a fight herself with another girl at a party because Brandon brought this girl to the party. Incidents seem to happen when alcohol is involved. Fatima was hanging out with the team at first but lately has not doing that so much.

*Id.*

Dunbar again met with Coach Grywusiewicz the following day. Filing No. 104-19, Ex. 30, Dunbar Notes at 1. Coach Grywusiewicz stated that she had noticed that Larios had seemed more withdrawn and emotional and had socialized less with the team. *Id.* Coach Grywusiewicz also stated she had heard that both Larios and Gardner had displayed aggressive behavior at parties. *Id.* Dunbar then advised Grywusiewicz to meet with Larios, explain her concerns and express the desire to know if everything was alright. *Id.*

Dunbar recapped the meetings with Coach Grywusiewicz in an email to Head Coach Stack and Athletic Director Smith and informed them she believed "the right approach" to move forward was to let Larios know there was a process if Larios felt she needed help. Filing No. 103-12, Ex. 31, Email. Dunbar wrote that "[t]his will be touchy because we do not know how [Larios] will react and I don't want to be over baring [sic] on

her." *Id.* She stated that Grywusiewicz's contact with Larios would "cover the obligation of the college to reach out if we have information there may be a possible violation of our 3020 policy," adding that Dunbar would then follow up with Grywusiewicz and would send the policy and a letter to Larios, noting "[t]he letter will state she is not under any obligation to go further with the matter—but it will also state that we do not tolerate acts of violence against our students." *Id.*

On November 5, 2014, Dunbar sent a letter to Larios explaining that the College would not tolerate dating violence, it states:

> I have enclosed a copy of Board Policy 3020 which explains what Chadron State College must do when sexual violence, assault or harassment occurs. The policy provides a great deal of information including reporting issues, the investigatory process, confidentiality and possible consequences. I am the College's Title IX Coordinator and I am responsible for coordinating the College's response to reports of that nature.
>
> Please understand that the College will not tolerate sexual violence or sexual harassment in any form, including, but not limited to, dating violence, domestic violence, stalking, sexual assault; acquaintance date or stranger rape; non-consensual sexual intercourse: sexual cyber harassment or sexual bullying. The College will take appropriate action to prevent, correct, and discipline harassing or violent behavior that is found to violate Board policies and principles of equal opportunity and access.

Filing No. 103-13, Ex. 32, Correspondence dated Nov. 5, 2014 at 1. The letter also stated "[i]f you would . . . like to discuss anything in violation of this policy that may have occurred with you . . . please contact me . . . [,]" but noted that Larios was not required to contact her. *Id.* Dunbar also stated she had "some contact and referral information for counseling/mental health services, medical services, law enforcement, and educational resources that I can provide to should you feel you maybe in need of." *Id.*

The enclosed Board Policy 3020 defines and outlines sexual violence or sex harassment reporting, policies and procedures. *Id.* at 2-8. It states:

Sexual violence and sex harassment are prohibited by law and by Board policy and the Colleges will not tolerate sexual violence or sex harassment in any form, including. but not limited to, sexual assault; stalking; dating violence; domestic violence; acquaintance, date or stranger rape; non-consensual sexual intercourse; sexual cyber harassment or sexual bullying. The [Nebraska State] Colleges will take appropriate action to prevent, correct, and discipline harassing or violent behavior that is found to violate Board policies and principles of equal opportunity and access.

*Id.* at 2.  Further, it provides:

The [Nebraska State] Colleges have a responsibility to respond to reports of sexual violence or sex harassment and attend to the needs of the students who are involved. Reports of sexual violence and sex harassment are taken with the utmost seriousness, and the student will be promptly referred to the appropriate persons or resources for assistance.

*Id.*

The following day, November 6, 2014, Dunbar sent an email to Larios entitled "Concern" with both Dunbar's November 5, 2014, letter and Board Policy 3020 attached. Filing No. 103-14, Ex. 33, Email.  Dunbar again introduced herself, saying that her office had received some recent information that prompted her to send Board Policy 3020.  *Id.* at 1.  She asked Larios to contact her "if you would like [Dunbar's] assistance."  *Id.*  The same day, Dunbar sent an email to coaches Stack and Grywusiewicz stating "I sent off a letter to Fatima this afternoon under our Title IX obligations.  The letter is a general statement reaching out to her if she would like some assistance and I attached BP 3020." Filing No. 103-15, Ex. 34, Email.  She asked Grywusiewicz to follow up with her regarding the discussion with Larios.  *Id.*

Dunbar summarized the November 6, 2014, meeting between Coach Grywusiewicz and Larios in an email to Jon Hansen, Vice President for Enrollment Management, Marketing, and Student Services, and Athletic Director Joel Smith:  "Aryn G (Coaching  Assistant) also gave Fatima the opportunity to discuss concerns with her

relationship with Brandon Finona and the bruises. Fatima did not open up to Aryn or express a need for assistance, she told Aryn she hasn't been herself lately because she is homesick." Filing No. 103-16, Ex. 35, Email. She wrote "[Assistant Coach Grywusiewicz] feels the teammates will continue to come to her if they feel Fatima is having problems." *Id.*

On November 10, 2014, Larios responded to Dunbar's earlier email, stating "Hi Mrs. Dunbar, I'm just curious why this information is being sent to me?" Filing No. 103-17, Ex. 36, Email chain. Dunbar replied

> Hi Fatima,
>
> As I mentioned, it may or may not pertain to you at this time but due to recent confidential information provided to my office, as the Title IX Coordinator, I am obligated under Federal statutes to provide policy information and to reach out to students when concerns that may be in violation of Policy 3020 are brought to my attention. Again, at Chadron State College, our students' well-being is top priority with us. We want to insure students feel they are in a safe environment where they can meet their educational and professional developmental goals.

*Id.* Larios never responded to that email from Dunbar. Filing No. 103-11, Ex. 29, Declaration of Shelley Dunbar at 2.

Gardner testified in his deposition that Larios had informed him that the Title IX Coordinator had reached out to her about possible abuse but stated that "people shouldn't be in her business." Filing No. 104-1, Ex. 5, Gardner Dep. at 52. Larios also told Gardner that her teammates were nosy. *Id.* at 51-52. He also testified that, beginning in the summer of 2014, Larios had physically hit him eight to ten times, had given him a black eye, and had used broken hangers and a broomstick to hit him. *Id.* at 44-45. Gardner's suitemate, Sam Couch, also testified that Larios had been violent with Gardner. Filing No. 104-9, Ex. 16, Deposition of Sam Couch ("Couch Dep.") at 37-39, 107, 114.

On November 12, 2014, Assistant Coach Grywusiewicz and Head Coach Stack met with Larios "to discuss in further detail on why the letter was sent to her." Filing No. 103-8, Ex. 17, Email. Grywusiewicz reported that "[n]othing was revealed on [Larios's] end" but that if anything else happened or if Larios "decid[ed] to come forward" Grywusiewicz would let Dunbar know. *Id.* Grywusiewicz testified that during the meeting, she and Coach Stack made best efforts to make Larios comfortable enough to open up to them regarding any problems. Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 101. Grywusiewicz stated, however, that Larios appeared from her body language and tone to be very closed off, like she did not want to talk. *Id.* at 101-102. Coaches Grywusiewicz and Stack continued to notice that Larios was wearing long-sleeved shirts and long pants to softball practice that winter. Filing No. 104-4, Ex. 8, Stack Dep. at 147-148; Filing No. 104-5, Grywusiewicz Dep. at 55. Coach Grywusiewicz was alarmed by that fact. Filing No. 104-4, Ex. 8, Stack Dep. at 147; Filing No. 104-5, Grywusiewicz Dep. at 55. She believed that Larios Fatima was wearing long-sleeve shirts or long-sleeve pants to potentially cover up bruises or other marks on her body. *Id.* Coach Stack testified he had concerns about Larios's well-being and safety before January 31, 2015. Filing No. 104-4, Ex. 8, Stack Dep. at 189.

Athletic Director Smith testified that he encouraged Head Coach Stack to continue to monitor Larios "after Larios responded that she didn't want any help from Title IX." Filing No. 103-5, Ex. 10, Deposition of Joel Smith ("Smith Dep.") at 52. Coach Grywusiewicz and teammates Wakefield and Prokaski testified that Larios appeared less social or talkative with certain teammates, and effectively cut off friendships with the teammates who had reported their concerns to the coaching staff, after the meeting

between Larios and her coaches. Filing No. 104-5, Ex. 9, Grywusiewicz Dep. at 75-76, 102-103; *see also* Filing No. 104-15, Ex. 24, Wakefield Dep. at 43 ("[Larios] did distance herself from me after that."); Filing No. 104-16, Ex. 25, Prokaski Dep. at 30-31. Larios continued to attend practice and she finished the fall semester with a 3.25 GPA. Filing No. 104-20, Ex. 18, Deposition of Aspen Eubanks at 69:18-22; Filing No. 104-18, Ex. 27, Undergraduate Transcript.

At the start of Spring semester, in January 2015, the softball team began meeting six days a week for practice, for approximately two to three hours each day. Filing No. 104-4, Ex. 8, Stack Dep. at 96. Head Coach Stack did not notice or hear of any further concerns regarding Larios' behavior. Filing No. 103-25, Ex. 55, Declaration of Robert Stack at 2.

Cassy Mitchell was the Resident Director for Gardner's and Larios's dormitory and Yadira Gurrola was the RA on the ninth floor of the dormitory during the relevant time period. At approximately 11:30 p.m. on January 15, 2015, RA Jessica Martin RA Gurrola were making rounds, and RA Gurrola was monitoring a now-defunct, location-based anonymous message board "app" called "Yik Yak" on her cell phone. Filing No. 104-13, Ex. 21, Deposition of Yadira Gurrola ("Gurrola Dep.") at 35-36. RA Gurrola noticed that someone had posted an anonymous report of "domestic violence" at or near room 320 in the College's High Rise dormitory. Filing No. 104-11, Affidavit of Yadira Gurrola at 2-3. Someone posted a comment that he or she could hear slapping and punching. *Id.*, Ex. A, Incident Report at 1. RAs Gurrola and Martin immediately went to the third floor and stood near room 320. *Id.* They could hear people talking within the suite but did not hear anything "too extreme." *Id.* at 2. A few minutes later, they returned to the third floor as

part of their regular rounds and heard Larios and Gardner loudly arguing in Room 320. *Id.* at 1-2. They requested that Larios and Gardner keep it down. *Id.* at 2. As Gurrola and Martin walked away, they heard Larios yell, "You need to get your hands off of me!" *Id.* The RAs immediately returned and asked Larios to step out of the room to speak with them. *Id.* When asked to leave Gardner's room, Larios did not cooperate and expressed her desire to stay, stating, "Okay, I'll leave in a little bit. I'm trying to talk to my boyfriend of two years." *Id.* Based on Larios's response, Gurrola had the impression that Larios resented their intervention. Filing No. 104-13, Ex. 21, Gurrola Dep. at 79. Gardner then stepped out of the room and explained that he had not "gone after" Larios, but rather had just touched her arm. Filing No. 104-11, Gurrola Aff., Ex. A, Incident report at 2. RA Gurrola prepared an Incident Report recording her recollection of the event soon after her interaction with Larios and Gardner and submitted it to Residence Hall director Cassy Mitchell. *Id.* at 34, 37; Filing No. 104-6, Ex. 11, Deposition of Cassy Mitchell ("Mitchell Dep.") at 71.

On January 12, 2015, Sheryl Simons was given a dual role as the Director of Housing and Residence Life and Interim Title IX Director. Filing No. 104-3, Ex. 7, Deposition of Sheryl J. Simons ("Simons Dep.") at 133-136. On the morning of January 16, 2015, Simons reviewed the incident report, and was satisfied that the RAs had appropriately followed up on the reported argument. Filing No. 104-3, Ex. 7, Simons Dep. at 30-31, 38. She testified, however, that she believed it was possible that Gardner was slapping and punching Larios in the dorm, or that either student had been punched or slapped, when she read the incident report. *Id.* at 40, 79. Simons did not take any actions to determine if Larios or Gardner were being slapped or punched in the dorm, nor did she

inform campus security or law enforcement of a possible battery. *Id*. at 51. The incident report was also passed on to the College's Senior Director of Student Affairs, Pat Beu. *Id.* Pat Beu is also the Chair of Chadron State's Behavior Intervention Team, which is a multi-disciplinary group whose purpose is to support students with behavioral and/or mental health issues. Filing No. 119-8, Ex. DD, Expert Report of Saundra Schuster at 40.

On January 16, 2015, RA Jazz Bozner completed a Student Observation Report in which he notes as follows:

> Brandon Finona-Gardner and his girlfriend, Fatima Larios on the 11th floor, had a fight on Thursday evening that was disturbing other residents during quiet hours. Jessica [Martin] and Yadi [Gurrola] had to ask them to step outside of the room and to be respectful of those trying to sleep. Brandon was cooperative, though Fatima was somewhat resistant/uncooperative. They ended up simply speaking in the lobby, but this isn't the first time a fight between the two has occurred.

Filing No. 104-26, Ex. 43, Student Observation Report. RA Tayler Saunders also completed a Student Observation Report in which she noted as follows about Gardner:

> Brandon is doing okay. He is a little upset about not being at home and is not enjoying the cold. He is still nice and outgoing. He is also dating Fatima again and they got into a big fight this week when Jessica [Martin] and Yadi [Gurrola] were on-duty Thursday evening.

Filing No. 104-27, Ex. 44, Student Observation Report at 1.

On January 19, 2015, Residence Hall Director Mitchell sent an email to Simmons, and Billie Knifong, the Manager of Residence Life Programs, noting:

> Apparently, my building is having several relationship problems at the moment, but nothing overwhelming at the moment . . . Brandon Finona-Gardner in 319 had a fight with his girlfriend Fatima Larios (1108) on Thursday evening. The two were being loud to the point where others on different floors were being disturbed . . . Fatima Larios in 1108 had a fight with Brandon Finona-Gardner in 319 on Thursday evening. She was rather rude to Yadi and Jessica when they asked the two to respect quiet hours.

Filing No. 104-28, Ex. 45, Email.

On January 20, 2015, a male student called Residence Hall Director Cassy Mitchell to report a problem on the third floor. Filing No. 104-6, Ex. 11, Deposition of Cassy Mitchell ("Mitchell Dep.") at 99. Mitchell went to the third floor and heard Larios yelling and screaming, as well as banging or hitting sounds coming from inside Room 320. *Id.* Mitchell knocked on the door to Room 320 and Larios opened the door only part way, blocking Mitchell's view. *Id.* at 103. Larios was not crying, but she appeared to be angry. *Id.* at 104-105, 110-111. Mitchell told Larios that she needed to leave the room because they were being too loud, and Larios slammed the door in RD Mitchell's face. *Id.* at 105, 111. Mitchell remained by the door of Room 320 and after approximately three minutes, the shouting resumed. *Id.* at 113. Mitchell was about to knock on the door again when Larios stormed out of the room and slammed the door behind her. *Id.*

Larios's teammates Aspen Eubanks and Alex Trujillo exited the room after Larios. *Id.* Mitchell told them she had concerns about Larios's and Gardner's frequent arguing and asked that they talk to Larios because Larios did not appear receptive to Mitchell's attempts. *Id.* at 113-114. Mitchel testified she had concerns about Larios's safety and well-being. *Id.* at 115. Approximately 10 minutes later, Mitchell was told Gardner had left the dorm and saw Larios take the elevator to her room. *Id.* She stated she assumed the fight would not persist. *Id.* at 116; Filing No. 104-17, Ex. 26, Incident Report/Memo of Conversation.

The following day, Mitchell, Simons, Pat Beu, and others exchanged emails about the events of the night before. Filing No. 104-20, Ex. 37, Email Correspondence. RD Mitchell noted that Larios was "pretty stubborn" and acted as if she wanted Mitchell to

"get lost and mind [her] own business." *Id.* Simons asked Beu to speak to Gardner and Larios to "get something resolved before it escalates." *Id.* at 3; *see also* Filing No. 104-3, Ex. 7, Simons Dep. at 78. On January 23, 2015, RA Tayler Saunders completed a Student Observation Report in which she noted as follows about Gardner: "Brandon seems to be doing well. I haven't heard any fighting this week or seen him and Fatima together." Filing No. 104-23, Ex. 40, Student Observation Report.

On January 30, 2015, RA Bozner completed a Student Observation Report in which he notes as follows about Larios: "Fatima was at softball practice with all the other ladies. She apparently has been busy running around or hanging out with her boyfriend. Aspen [Eubanks] and Alex [Trujillo] said that she is typically with him." Filing No. 104-24, Ex. 41, Student Observation Report. RA Saunders completed another Student Observation Report on January 30, 2015, noting "Brandon appears to be better this week. I continue to hear that he and Fatima have verbal arguments on a regular basis." Filing No. 104-25, Ex. 42, Student Observation Report.

Gardner testified that he and Larios met at an indoor track on the afternoon of January 30, 2015. Filing No. 104-1, Ex. 5, Gardner Dep. at 62-63. They were not fighting at that time. *Id.* Later that evening, Fatima arranged for her friend to buy alcohol for the night, telling Gardner that she wanted to drink "one last time" before softball season began. *Id.* at 64-65. Gardner and Larios consumed 12-18 beers in Gardner's dorm room and then went to a basketball game and to off-campus parties, where Larios continued to consume alcohol. *Id.* at 43, 65. At some point, Gardner left the party by himself and went to a friend's room in Gardner's dorm. *Id.* at 67. Approximately 10 minutes later, Larios went to that same room. *Id.* at 67-68. She was upset and began yelling at Gardner. *Id.*

at 67-68. Larios then "stormed downstairs" to Gardner's room, and Gardner followed her. *Id.* at 68. Gardner testified that Larios hit and scratched him and tore his shirt as he tried to leave. *Id.* at 69. As he was leaving his dorm room, Gardner encountered RA Saunders, who asked him if everything was okay. *Id.* at 69. Gardner told Saunders that everything was fine and that he was going to Larios's room. *Id.* at 69.

In Larios's dorm room, Gardner tried calling and texting Larios and then fell asleep on her bed. *Id.* at 71-72. At approximately 2:30 a.m., Gardner's suitemate Sam Couch returned to their suite with Chadron State student and softball player, Morgan Wilhelm. Filing No. 104-9, Ex. 16, Couch Dep. at 58. They entered Gardner's room and found Larios hanging in the closet with a power cord looped around her neck. *Id.* at 58-65. Couch reported that Larios did not have a pulse and was unresponsive when he found her. Filing No. 104-21, Ex. 38, Affidavit in Support of Search Warrant. Couch and Wilhelm attempted CPR and called 911. Filing No. 104-9, Ex. 16, Couch Dep. at 66. Chadron State Security and Chadron police officers arrived at the scene soon after and took over attempts to revive Larios. Filing No. 104-21, Ex. 38, Affidavit in Support of Search Warrant at 2. Dr. Peter W. Schilke, M.D. of the Regional West Medical Center determined Larios died due to hanging. Filing No. 104-22, Ex. 39, Autopsy Report.

The plaintiffs' psychological expert, Donna Peters, opines that there is a link between being a victim of intimate partner violence and suicide and there is a strong association between intimate partner violence perpetration/victimization and substance use and abuse. Filing No. 115-13, Ex. M, Donna Peters, Psy.D., Expert Report at 30-31. Dr. Peters also expresses the opinion that there is an association between alcohol use and suicide. *Id.* at 32. Peters states that professional intervention for intimate partner

violence, suicidality, and problematic drinking behavior was available and would have been beneficial to Larios. *Id.* at 33-36. Jerry Cassiday, Chadron State counselor and member of the Behavioral Intervention Team, testified that Chadron State College can require a student to undergo counselling under some circumstances, including alcohol abuse and suicidal ideation. Filing No. 115-12, Ex. L, Deposition of Jerry Cassiday ("Cassiday Dep.") at 30-31. He agrees that women subjected to dating violence are more likely to suffer from alcohol abuse. *Id.* at 22. He also stated that parents can be contacted if there is a serious health issue with a student, or police can be contacted to ensure everyone is safe. *Id.* at 35. There is also expert evidence that Chadron State failed to provide a response to reports of dating/intimate partner violence that met the standard of care under Title IX and failed to train personnel consistent with industry standards on Title IX. Filing No. 119-8, Ex. DD, Expert Report of Saundra K. Schuster at 20-25.

     II.     LAW

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042, (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

"A genuine dispute of material facts exists when "factual issues . . . may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Id.* at 251. In the summary judgment context, the court views the facts and draws all reasonable inferences in favor of the nonmoving party. *Oglesby v. Lesan*, 929 F.3d 526, 532 (8th Cir. 2019). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson,* 643 F.3d at 1042; *see Anderson*, 477 U.S. at 255.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Individuals whose Title IX rights have been violated have a private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).

Sexual harassment and sexual abuse clearly constitute discrimination under Title IX. *Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60, 75 (1992); *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281–82 (1998); *Roe v. St. Louis Univ.*, 746 F.3d 874, 881–82 (8th Cir. 2014). "[S]tudent-on-student sexual harassment, if sufficiently severe" can rise to the level of discrimination actionable under Title IX. *Davis as Next friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *see also Roe,* 746 F.3d at 882 (stating "Educational institutions may be liable for deliberate indifference to known acts of harassment by one student against another").

To establish a claim under Title IX based on peer harassment, a plaintiff must show as a threshold matter, that the defendant is a title IX funding recipient. *Davis*, 526 U.S. at 650. "Where a plaintiff's Title IX claim is based on harassment, the school is liable in damages only where it is '(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (internal quotation marks omitted)). Additionally, the behavior must be serious enough "to have the systematic effect of denying the victim access to the educational opportunities or benefits provided by the school.'" *Id.* (quoting *Davis*, 526 U.S. at 650). "Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" *Davis*, 526 U.S. at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

Liability under Title IX cannot be imposed unless an appropriate person has actual knowledge of discrimination. *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 661 (8th Cir. 2001). Actual knowledge of discrimination within the meaning of a Title IX peer

harassment claim requires more than after-the-fact notice of a single instance in which the plaintiff experienced sexual assault.  *See K.T. v. Culver-Stockton Coll.*, 865 F.3d at 1058.  Actual knowledge may be established where the recipient has prior knowledge of (1) harassment previously committed by the same perpetrator and/or (2) previous reports of sexual harassment occurring on the same premises or actual knowledge that an assailant poses a substantial risk of sufficiently severe harm to students based on the assailant's previous known conduct.  *Id.*  An "appropriate person" is one "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf."  *P.H. v. Sch. Dist.*, 265 F.3d at 661; *Gebser*, 524 U.S. at 290 ("An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination").  Further, "'[a] plaintiff must show that the institution had "substantial control over both the harasser and the context in which the known harassment occurs.'"  *Roe*, 746 F.3d at 882 (quoting *Davis*, 526 U.S. at 645).

Deliberate indifference requires an "official decision by the recipient not to remedy the violation."  *Gebser*, 524 U.S. at 290.  "[F]unding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  That standard is intended to afford flexibility to school administrators.  *Roe*, 746 F.3d at 882.  "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law."  *Davis*, 526 U.S. at 649.

Deliberate indifference further incorporates a causation requirement—a Title IX recipient "may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 644–45; *see Roe*, 746 F.3d at 882*; Williams v. Bd. of Regents of Univ. Sys. of Ga.,* 477 F.3d 1282, 1295-96 (11th Cir. 2007). In a case involving student-on-student sexual harassment, a plaintiff must show that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination. *Williams,* 477 F.3d at 1296.

The injury in a Title IX action is the deprivation of an equal educational opportunity. *Farmer*, 918 F.3d at 1106 (holding that once the plaintiff shows that the funding recipient was deliberately indifferent to their complaints of peer sexual harassment, the plaintiff can show the requisite harm caused by that deliberate indifference by alleging and proving that the college's inaction deprived them of the benefits of the education program); *see Davis*, 526 U.S. 650 (identifying injury as harassment that "can be said to deprive the victims of access to the educational opportunities or benefits provided by the school").

The most obvious example of student-on-student sexual harassment capable of triggering a damages claim involves the overt, physical deprivation of access to school resources. *Davis*, 526 U.S. at  650. "It is not necessary, however, to show physical exclusion to demonstrate that a student has been deprived of an educational opportunity by the actions of another student." *Id.* at 651. Rather, the harassment must have a "concrete, negative effect" on the victim's education or access to school-related resources. *Id.* at 654; *see also id.* at 652 (noting a drop in a harassment victim's grades

as evidence of a negative impact on education ); *Doe v. Erskine Coll.*, No. CIV.A. 8:04-23001RBH, 2006 WL 1473853, at *13 (D.S.C. May 25, 2006) (taking a medical leave from school and losing scholarships due to a drop in grades found sufficient to show deprivation of educational opportunities and to withstand a motion for summary judgment in case involving a sexual assault); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 968 (D. Kan. 2005) (being diagnosed with behavioral and/or anxiety disorders, or becoming homebound or hospitalized due to unrelenting harassment over four years amounted to deprivation of opportunities); *Murrell v. School District No. 1, Denver*, 186 F.3d 1238, 1248–49 (10th Cir. 1999) (physical violence, *see Vance v. Spencer Cty. Pub. School District*, 231 F.3d 253, 259 (6th Cir. 2000); *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1027–28 (E.D. Cal. 2009) (persistent harassment over three days at sports camp was severe, pervasive, and objectively offensive to the point that it undermined and detracted from the plaintiff's educational experience and satisfied the element that the discrimination effectively bar a victim's access to an educational opportunity or benefit).  Where a university's failure to timely respond or take precautions to prevent further sexual assaults causes a student to withdraw from the school, the alleged discrimination "effectively bars [her] access to an educational opportunity or benefit," namely pursuing an education at [the university]." *Williams*, 477 F.3d at 1297 (11th Cir. 2007); *see Ross v. Univ. of Tulsa*, No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *4 n.2 (N.D. Okla. July 2, 2015) (noting in dicta that the plaintiff's "alleged injury is of a type the statute seeks to avoid (discriminatory deprivation of educational benefits), and such injury was allegedly caused by the Title IX violation (discriminatory handling of rape complaint led to withdrawal from [the college]."]).

Because the extent of foreseeable risk depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 784 N.W.2d 907, 914 (Neb. 2010) (noting that foreseeability determinations are particularly fact dependent and case specific). Decisions of foreseeability are not particularly "legal," in the sense that they do not require special training, expertise, or instruction, nor do they require considering far-reaching policy concerns, rather, deciding what is reasonably foreseeable involves common sense, common experience, and application of the standards and behavioral norms of the community—matters that have long been understood to be uniquely the province of the finder of fact. *Id.*

A decedent's state of mind at the time of suicide involves factual questions that "ordinarily must be decided by the jury and not by way of a summary judgment motion." *See Moore v. Hamilton Southeastern Sch. Dist.*, 2013 WL 4607228, at *20 (S.D. Ind. Aug. 29, 2013) ("In a suicide case, the decedent's mental health and state of mind at the time of death are factual questions, which ordinarily must be decided by the jury and not by way of a summary judgment motion."); *see also Rondini v. Bunn*, No. 7:17-cv-01114-RDP, 2018 WL 317713 at *12 (N. D. Ala. Jan. 8, 2018) ("the question of proximate cause is almost always a question of fact to be determined by the jury"). The general rule regarding suicide as an intervening event that breaks the chain of proximate causation ordinarily does not apply to conduct that foreseeably causes suicide. *See Patton v. Bickford*, 529 S.W.3d 717, 732 (Ky. 2016); 25A C.J.S. Death § 68 (2017); *see, e.g., Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 810-11 (S.D. Ohio

2018) (finding a student's suicide as a result of bullying is reasonably foreseeable, not an "intervening cause" barring liability of school for failing to stop the bullying).

"Where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, 503 U.S. at 66 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). If the statutory provisions at issue do not specify the available remedies, federal common law governs the analysis. *Id.* at 60. Emotional distress damages are generally recoverable under Title IX. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1204 (11th Cir. 2007) ("When an entity accepts funding from the federal government, it does so in exchange for a promise not to discriminate against third-party users of its services. A foreseeable consequence of discrimination is emotional distress to the victim, and emotional damages have long been available for contract breach in the public accommodations context.") A Title IX claim against a university survives a plaintiff's death and may be brought by the executor or personal representative, without reliance on a State's wrongful-death statute. *Rondini v. Bunn*, No. 7:17-cv-01114-RDP, 2018 WL 317713 at *19 (N.D. Ala. Jan. 8, 2018). Generally speaking, parents of a student whose rights were violated do not have standing to assert personal claims under Title IX, but do have standing to assert claims on the student's behalf. *Dipippa v. Union Sch. Dist.*, 819 F. Supp. 2d 435, 446 (W.D. Pa. 2011).

III. DISCUSSION

The evidence, viewed in the light favorable to the plaintiffs, shows that there are genuine issues of material fact on the elements of a Title IX peer-harassment claim. There is no dispute that Chadron State is a federally funded institution. The plaintiffs

have presented facts sufficient to support a reasonable inference of systematic sex discrimination on the part of Chadron State.

The Court agrees with the plaintiffs that there is evidence from which a jury could reasonably conclude that the dating violence directed at Larios was gender-based. Evidence tending to show that Larios may have been the aggressor in violent episodes is not material to this determination. In the context of Title IX protections, physical abuse in the context of a romantic relationship cannot be assumed to be nothing more than interpersonal conflict. Also, Gardner's testimony on who was the aggressor is a matter of credibility that cannot be resolved by the Court. At the least, the evidence creates a material issue of fact.

There is evidence that the College had actual knowledge that Larios had been subjected to dating violence. The assistant coach had observed suspected domestic violence injuries. The physical evidence was corroborated by teammates' reports that Larios had stated that Gardner was responsible for those injuries. The coaches and administrators were aware of the suspected injuries, the alleged perpetrator of the injuries, and reports of violence. The Title IX compliance officer was also aware of the observation of injuries, credible reports of injuries, and public altercations, fights and arguments in connection with the couple. The information was relayed to the highest levels of the administration.

There is also evidence sufficient to create a genuine issue of fact as to whether the College was deliberately indifferent to the reported harassment. In the context of the "constellation of surrounding circumstances, expectations, and relationships," a jury could reasonably find that the College's response to the reported harassment was clearly

unreasonable. That context includes the fact that episodes of domestic violence were reported to have occurred in dorm rooms on the college campus, between students and athletes who were expected to be supervised by college personnel, advisors, and coaches. Both the victim and her alleged attacker lived in dorms and were under the control of the College and the abusive incidents occurred at the college.

College personnel had reason to be concerned about violence with the couple: there were reports on social media that physical violence was occurring within the dorm; resident advisors heard Larios scream at Gardner to get his hands off her from within the dorm room. College personnel were also aware the Larios had exhibited troubling behavior in that she was withdrawn and emotional and had cut off relationships with friends. In light of the known circumstances, a jury could reasonably conclude that the College's investigation of and response to the domestic violence occurring within its walls was inadequate.

The College's investigation of the serious, corroborated, reports of physical abuse could be viewed as cursory. The alleged perpetrator, a male, was not interviewed, investigated, counselled, or disciplined and his coaches were not contacted. The only investigatory efforts were directed toward the female participant. Disruptive arguments and altercations between the couple continued to occur and arguably escalated. Appropriate school officials, including coaches, the athletic director, the residence hall director, and the vice-president of student affairs had actual knowledge of the alleged conduct.

The evidence also reveals what could be interpreted as victim-shaming or victim blaming, in that Larios was cautioned or warned about conduct that would not be

tolerated, whereas Gardner was not contacted despite the defendant's contention that Gardner may have been the victim. Also, Chadron State did not interview or inform Gardner of the allegations, nor did it conduct any investigation, or inform the football coach.

There is competing expert testimony on the standard of care and the parameters of an appropriate response. On this record, the Court is unable to conclude that the College's response was reasonable as a matter of law. The record also shows that the college arguably turned a blind eye to the episodes of excessive drinking that provoked or exacerbated the violent episodes. Although the College took some action in response to the situation, there is a jury question with respect to whether it was deliberately indifferent and whether it responded in a manner that was clearly unreasonable in light of the circumstances of the case.[2]

---

[2] The facts, viewed in the light most favorable to the plaintiffs, align more closely with cases that have found a school's response was deliberately indifferent than to those that have not. Particularly troubling is the College's failure to conduct an investigation of reports of serious misconduct, or to take active measures to prevent it. *Compare Mathis v. Wayne Cty. Bd. of Educ.*, 496 Fed. Appx. 513, 516 (6th Cir. 2012) (affirming denial of judgment as a matter of law when the evidence trial suggested that the defendant took little to no immediate action to protect the student from harassment, did not conduct any substantive investigation, and did not promptly punish the behavior), *and Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448–49 (6th Cir. 2009) (finding deliberate indifference when the school district responded to harassment with verbal reprimands to the perpetrators, the harassment escalated, and the school district's "only response was to employ the same type of verbal reprimands that it had used unsuccessfully"), *and Williams*, 441 F.3d at 1298-99 (reversing dismissal of Title IX claim in case involving recruiting and admitting a known sexual offender and failing to warn or inform athletes of policies, and delaying disciplinary hearing of rapist for eight months), *and Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000)(stating that response to sexual harassment was insufficient when the only response was talking to the offending students, failing to conduct any investigation, failing to discipline the students and failing to inform law enforcement), *and Doe v. Erskine Coll., No. CIV.A. 8:04-23001RBH, 2006 WL 1473853, at *10 (D.S.C. May 25, 2006) (finding genuine issues of fact existed regarding the adequacy of College's handling of charges of rape) with Long v. Murray Cty. Sch. Dist.*, 522 Fed. Appx. 576, 577–78 (11th Cir. 2013) (Mem.) (affirming grant of summary judgment on a showing of prompt disciplinary responses to reported harassment), *and Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168 (5th Cir. 2011) (finding taking statements after every report of harassment and changing the student's classes an appropriate response to incidents of bullying), *and S.S. v. E. Ky. Univ.*, 532 F.3d 445, 455 (6th Cir. 2008) (no inference of deliberate indifference when the school took the affirmative steps of meeting with the students, communicating with parents, and disciplining the offending students), *and Doe v. Bellafonte Area Sch. Dist.*, 106 Fed. Appx.

The defendants' supposed reliance on the victim's failure to avail herself of offered forms of recourse as a justification for their actions is unavailing at this stage of the proceedings. There is evidence that suggests that victims of domestic abuse are reluctant to seek such recourse, which, if credited, could bolster the showing of inadequacy of the College's procedures to address peer-on-peer harassment and/or violence. Given the information known to Chardon State before the plaintiff's death, there is evidence that would support a conclusion that the College's response to the situation was clearly unreasonable. Viewed in the light favorable to the plaintiff, a reasonable juror could conclude that the College responded with deliberate indifference to actual notice of dating violence.

Further, the record shows issues of fact on whether the defendant's alleged deliberate indifference caused the injury at issue—deprivation of access to an educational opportunity or benefit. The defendant's challenge to causation is essentially a factual challenge. It first argues that Larios, not Gardner, was the physical aggressor in their relationship, arguing that the plaintiffs cannot establish that Larios suffered any physical violence, or was more vulnerable to violence after Chadron State talked to her, when Larios was the physically aggressive party in the relationship. It next argues that Chadron State cannot be held responsible under Title IX for any deprivation of benefits that flowed

---

798, 800 (3d Cir. 2004) (granting summary judgment in favor of school district when the school district responded to each complaint with actions designed to eliminate further harassment, and students were suspended, warned and counselled regarding the seriousness of harassment"), *and Gabrielle M. v. Park Forest–Chicago Heights*, 315 F.3d 817 (7th Cir. 2003) (response was not deliberately indifferent where school officials immediately suspended placed male elementary school student, conferred with his mother after first incident, and referred him for certain services and transferred him to another class after second incident).

from her decision to inflict self-harm because her suicide constitutes an efficient intervening cause under Nebraska law.

The Court finds these arguments unavailing. Chadron State has not shown as a matter of law that the plaintiff cannot succeed in proving causation. There are material factual disputes on the issue of proximate cause and the measure of damages. Whether the suicide could have been prevented if the College had taken meaningful action to stop the known dating violence is the subject of competing expert opinions, the validity of which is still under consideration. The question of the foreseeability of suicide as a response to domestic violence involves pending Daubert motions, questions of credibility and the weighing of evidence. The Court finds there are genuine issues of fact on matters connected to the nature and extent of the plaintiffs' remedies.

IT IS ORDERED:

1.      Defendants' motion for summary judgment (Filing No. 100) is denied.

2.      Defendants' motion for relief under FRCP 56(e) and NECivR 56(b)(1) (Filing No. 148) is denied.

Dated this 22nd day of August 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge
