IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LISSETTE LARIOS ROOHBAKHSH, as personal representative of the Estate of Fatima Lissette Larios and on behalf of next of kin; and NELSON LARIOS, as next of kin;<br><br>Plaintiffs,<br><br>vs.<br><br>BOARD OF TRUSTEES OF THE NEBRASKA STATE COLLEGES, and CHADRON STATE COLLEGE,<br><br>Defendants. | **8:17CV31**<br><br>**MEMORANDUM and ORDER** |

This matter is before the Court on the parties' motions to exclude testimony of experts under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), Filing Nos. 125, 128, 134, 137, and 144. This is an action for discrimination on the basis of sex in a federally funded educational program brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

Defendants Board of Trustees of the Nebraska State Colleges, and Chadron State College (collectively, "Chadron State," "the College," or "defendant") move to exclude testimony of the plaintiffs' expert witnesses Saundra K. Schuster, J.D., Filing No. 125, and Donna Peters, Psy.D, Filing No. 128. The plaintiffs, Lissette Larios Roohbakhsh, as personal representative of the Estate of Fatima Lissette Larios and next of kin, and Nelson Larios ("plaintiffs") move to exclude certain testimony and opinions of defendant's expert witnesses Peter Lake, J.D., Lisa Boesky, Ph.D., and Karl Williams, M.D.

1

The parties respectively disclosed Saundra K. Schuster and Peter Lake as experts on Title IX compliance and disclosed Dr. Peters and Dr. Boesky, both psychologists, as suicide/causation witnesses. Chadron State disclosed Dr. Williams, M.D., a Forensic Pathologist and the Chief Medical Examiner for Allegheny County, Pennsylvania, to testify regarding the condition of Fatima Larios's body at the time of post-mortem examination.

## I.    Title IX Experts

### A.    Law

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: "(1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003). "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (quoting *McKnight ex rel. Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir. 1994). Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Kudabeck*, 338 F.3d at 860.

When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert,* 509 U.S. at 589; *United States v. Merrell,* 842 F.3d 577, 582 (8th Cir. 2016). The proponent of expert testimony bears the burden of providing admissibility beyond a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir.

2001).  A witness who offers expert opinions on multiple topics may be qualified as an expert on one topic but not others.  *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001)

In the Eighth Circuit, "cases are legion that, correctly, under *Daubert*, call for the liberal admission of expert testimony."  *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (citations omitted).  "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset."  *Id.* (quoting *Daubert*, 509 U.S. at 590).  An expert's opinion should be excluded only if the "opinion is so fundamentally unsupported that it can offer no assistance to the jury."  *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).

A trial court must be given wide latitude in determining whether an expert's testimony is reliable.  *See Kumho Tire,* 526 U.S. at 152.  This analysis requires that the court make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology . . . can be [properly] applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.  "When the *application* of a scientific methodology is challenged as unreliable under *Daubert* and the methodology itself is sufficiently reliable, outright exclusion of the evidence is "warranted only if the methodology 'was so altered by a deficient application as to skew the methodology itself.'"  *United States v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993) (internal quotation marks and ellipses omitted).  Generally, deficiencies in application go to the weight of the evidence, not its admissibility.  *Id.*  District courts are "not to weigh or assess the correctness of competing expert opinions."  *Johnson,* 754 F.3d at 562.  The

jury, not the trial court, should be the one to 'decide among the conflicting views of different experts.'" *Kumho Tire*, 526 U.S. at 153.

An expert cannot testify as to matters of law, and legal conclusions are not a proper subject of expert testimony. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). "Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *Id.*; *see also Police Ret. Sys. of St. Louis v. Midwest Inv. Advisory Serv., Inc.*, 940 F.2d 351, 357 (8th Cir. 1991) ("Explaining the law is the judge's job"). Testimony regarding the requirements of law would give the jury the appearance that the Court is shifting the responsibility to decide the case to the expert. *See Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989).

Further, an expert cannot offer an opinion that defendant violated a statute. *Frye v. Hamilton Cty. Hosp.*, No. 18-CV-3031-CJW-MAR, 2019 WL 2404330, at *4 (N.D. Iowa June 7, 2019); *see also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (excluding expert's testimony "about the legal requirements of Title IX or about [the expert's] conclusions as to whether [defendant] complies with Title IX"); *Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 781 (D. Minn. 2016) (holding that an expert's testimony "may not extend to whether [defendant] or any of its employees actually violated [the statute at issue] because that would be an inadmissible legal conclusion"). However, "[a]n expert does not invade the court's authority by discoursing broadly over the entire range of the applicable law where the opinion is focused on a specific question of fact." *Camacho v. Nationwide Mut. Ins. Co.*, 13 F.Supp.3d 1343, 1366 (N.D. Ga. 2014).

Expert or fact testimony on industry practice or standards, however, is often relevant and admissible. *S. Pine Helicopters, Inc.*, 320 F.3d at 841. Testimony about industry standards, or policies adopted by other institutions to comply with applicable regulations, is not generally regarded as a legal opinion or conclusion. *See Portz*, 297 F. Supp. 3d at 953 (holding that expert could testify as to the history and purposes of Title IX and relevant industry practices or standards, but could not testify about the legal requirements of Title IX); *Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d at 781 (permitting plaintiffs' expert to testify "as to the existence of mandatory reporting statutes and the policies and procedures that other schools have implemented to comply with such statutes" but excluding testimony about whether defendant violated the mandatory reporting statute in question). Expert testimony regarding how schools effectively approach Title IX discrimination can be helpful to the jury. *Doe v. Wharton Indep. Sch. Dist.*, No. 2:16-CV-48, 2017 WL 932935, at *2 (S.D. Tex. Mar. 9, 2017)(stating that, without testifying as to ultimate facts or legal conclusions, educational experts can address these standards of care for remedying the problems that Title IX was formulated to address and allowing testimony regarding how schools effectively approach Title IX discrimination and how much notice is actual notice that triggers a duty to respond); *see also Doe by Watson v. Russell Cty. Sch. Bd.*, 292 F. Supp. 3d 690, 717–18 (W.D. Va. 2018); *S. Pine Helicopters*, 320 F.3d at 841. This expertise can help the jury determine whether a school's response is ineffective or inadequate under the circumstances. *See Doe v. Wharton*, 2017 WL 932935, at *2.

Generally, "an opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, "[o]pinions that 'merely tell the jury what result to reach' are not admissible." *Lee,* 616 F.3d at 809 (quoting Fed. R. Evid. 704 advisory

committee's note).   Determining whether a defendant has displayed deliberate indifference to a plaintiff's rights is distinctly the province of the fact-finder at trial.  *See Doe v. St. Francis Sch. Dist.*, 834 F. Supp. 2d 889, 892 (E.D. Wis. 2011), *aff'd*, 694 F.3d 869 (7th Cir. 2012).

"'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)).   However, expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). "If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate." *Id.* at 1056 (noting a theory "should not be admitted if it does not apply to the specific facts of the case"). *Id.* at 1056.  "An expert opinion cannot sustain a jury's verdict when it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable . . . .'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d at 1057 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

   B.   Saundra K. Schuster (Filing No. 125)

      1.   Background

Saundra K. Schuster is the plaintiffs' Title IX expert.  She will testify regarding the standard of care for educational institutions, Chadron State's policies and procedures relevant to Title IX, and its response to the dating violence allegedly experienced by

Fatima Larios.  Ms. Schuster's opinions are based on her review of the evidence, including all of the relevant depositions, and her extensive experience training school administrators on Title IX investigations and compliance.

Schuster is an attorney and consultant.  Filing No. 159-2, Ex. 2, Expert report at 3.  She has bachelor's degree in Education and a Master's degree in Counseling/ Higher Education from Miami University of Ohio.  *Id.* at 4.  She has completed coursework for a Ph.D. in Organizational Development at Ohio State University and has a J.D. from the Moritz College of Law at Ohio State University.  *Id.*  She is a partner at a higher education-specific law firm that serves as legal counsel to school systems, colleges, and universities throughout the United States.  *Id.* at 3.  She consults with two-year and four-year public and private educational institutions and is involved in policy development, drafting and reviewing faculty handbooks and employee manuals, and providing training for state and federal compliance, including training school administrators on Title IX compliance and how to perform Title IX investigations.  *Id.*  She has also conducted training for governmental and private agencies.  *Id.* at 3.  She has published numerous articles on Title IX matters and is founder, Board member and member of the Association of Title IX Administrators (ATIXA), which provides training of school administrators on Title IX compliance and investigations, including dating violence investigations on campus.  *Id.* at 4.  She has experience serving as general counsel for a university, and in college administration and teaching.  She has served as an expert witness on Title IX compliance, specifically the adequacy of a University's Title IX investigation and response, in other cases.  *Id.* at 5.

Schuster opines that Chadron State failed to provide a response to reports of dating/intimate partner violence that met the standard of care under Title IX and failed to train personnel consistent with industry standards on Title IX. *Id.* at 20-25.

The defendant argues that Schuster's testimony improperly invades the province of the Court and the jury by expressing opinions on legal standards. The College challenges her testimony about industry standards of care for colleges and universities with respect to victims of dating violence. They contend the facts of this case do not require the assistance of an expert.

In response, the plaintiffs argue that Shuster's opinions meet the requirements for admissibility set forth in the Federal Rules of Evidence and related case law. They contend her testimony will assist the jury in understanding what a college's obligations are with respect to investigating and responding to potential Title IX violations. Plaintiffs also argue Schuster's opinions are not legal conclusions and point out she applies the facts of the case in each opinion she holds. They contend that the fact that some of her opinions may embrace an ultimate issue does not require barring her testimony in its entirety. Further, they argue that Schuster's opinions, based on her lengthy career in the fields of higher education and Title IX training, delineate the proper standards of care for schools.

2.      Discussion

The Court finds that Shuster's opinions on whether Chadron State's conduct amounted to deliberate indifference is a question for the jury to determine and must be excluded. The parameters of deliberate indifference is a question of law and a matter for instruction by the Court. However, the Court finds Schuster is qualified to testify as an expert on industry standards for Title IX training, compliance, investigations, and

responses, as well as about the history and purposes of Title IX. Schuster's opinion will help the trier of fact determine if the College's responses and investigation comported with industry standards, and her opinion as to that issue is based on her education and experience as a college administrator and trainer. The Court will not, however, permit testimony that embraces an ultimate legal conclusion.

Whether the College was "deliberately indifferent" to the risk of harm to Larios is beyond the proper role of an expert witness and would supplant the jury's role in evaluating and determining the facts. However, the Court will not prohibit the experts from providing testimony that generally discusses Title IX. If any testimony at trial impermissibly interprets or applies Title IX, such evidence can be excluded pursuant to proper evidentiary objections. Accordingly, the defendant's motion will be granted in part and denied in part.

C.      Peter Lake (Filing No. 134)

1.      Background

Chadron State has proposed its own expert on these topics, Peter Francis Lake, also an attorney and consultant who conducts training on Title IX compliance. Peter Lake is a Professor at Stetson University College of Law, where he is also the Director of the Center for Excellence in Higher Education Law and Policy. Filing No. 152, Ex. A, Curriculum Vitae ("CV") at 2. He has been a professor since 1990. *Id.* He obtained his obtained his law degree from Harvard University and his undergraduate degree from Harvard College. *Id.* at 1. He served as the Interim Director of Title IX Compliance at Stetson University has written books and articles on Title IX compliance, including a primer designed to assist campuses in creating a robust and comprehensive Title IX

response system. *Id.* He has served as a Title IX consultant to numerous universities. *Id.* at 12, 14, 16, 17.

Peter Lake offers opinions regarding the defendant's Title IX compliance and other obligations. Filing No. 175-1, Ex. 1, Peter Lake Expert Report ("Lake Report"). His opinions are based on review of documents such as emails, incident reports, student observation reports, narratives, text messages, and the student handbook, although he concedes he did not review any of numerous depositions in this case. Filing No. 175-1, Ex. 1, Lake Report at 1-2; Filing No. 156-2, Deposition of Peter Lake ("Lake Dep.") at 51, 103. He also reviewed caselaw. Filing No. 175-1, Ex. 1, Lake Report at 3. He submitted rebuttal opinions critical of Ms. Schuster's opinions. *Id.* at 2-19. He also opines on the meaning and significance of an administrative closure letter from the United States Department of Education Office of Civil Rights (OCR) on a Title IX complaint filed by Larios's parents. He finds it significant that the OCR stated that it had not obtained "sufficient evidence to support either an individual or systemic finding" against the College. *Id.* at 19-20; *see* Filing No. 175-4, OCR letter dated September 26, 2017. Based on the OCR letter and an excerpt from a position statement that Chadron State submitted to the Department of Education in response to the OCR complaint, Lake opined "[i]f a nearly two-year investigation of an institution fails to uncover 'sufficient evidence' to support findings of non-compliance that would at least suggest that an institution of higher education would be in compliance under *Gebser* and *Davis* standards in civil court." *Id.* He also stated:

> Based upon my review I have no reason to disagree with OCR's conclusion that it did not obtain sufficient information to support a finding against Chadron State College. I have not reviewed any information that would lead me to believe that Chadron State College was "deliberately indifferent" under *Gebser* and *Davis* standards.

*Id.* at 20.

The letter at issue states that the OCR administratively closes a case when the same allegations have been filed in a state or federal court.  Filing No. 175-4, OCR Letter at 1.  Further, it provides that the OCR complaint may be refiled within 60 days of the termination of the court proceeding if there has been no decision on the merits, including a dismissal with prejudice,  or a settlement.  *Id.*  Lake also testified, that based on his review, he was unable to detect actual notice to Chadron State.  Filing No. 156-2, Lake Dep. at 86-87, 173.

The plaintiffs challenge Lake's testimony for some of the same reasons that Chardon State challenges Shuster's testimony.  They contend that most of Lake's opinions overstep the bounds of proper expert testimony because he opines on legal issues that are solely for the Court's determination.  The plaintiffs further argue that Mr. Lake's opinions should be barred because they lack analysis of the factual record in this case.  They argue that a crucial difference between Lake's and Schuster's opinions is that Schuster offers factual opinions, based on her review of the record in this case and her expertise and experience, whereas Lake offers purely legal opinions on the meaning of Supreme Court precedent and federal agency guidance on Title IX.  In particular, plaintiffs challenge Lake's opinion concerning the OCR administrative closure letter (Opinion 7).  They assert his opinions about OCR's Administrative Closure Letter are speculative, unreliable, outside his expertise, and beyond the scope of the defendant's expert disclosures.

In response, Chadron State contends that all of Lake's opinions other than Opinion 7 directly respond to Schuster's opinions.  It argues that if this Court allows Schuster to testify on the legal standards under Title IX, Lake's testimony is necessary

to refute her allegations. Further, it argues that Lake's opinions regarding the OCR letter is reliable as it is based on a tremendous amount of experience he has had observing OCR behavior and how they resolve matters.

2. Discussion

The Court finds Lake's opinions on the defendant's deliberate indifference is an impermissible legal conclusion and must be excluded. Generally, Lake's opinions are very close to the line of inadmissibility as improper testimony on matters of law. However, the Court finds Lake is generally qualified to testify as an expert on industry standards under Title IX and to generally describe the history and purposes of Title IX and that testimony could help the trier of fact determine if the College's responses and investigation were appropriate. To the extent his opinions are based on his experience in consulting and training on Title IX issues, the testimony may be reliable. The Court will not, however, permit testimony that embraces an ultimate legal conclusion. Whether the College was "deliberately indifferent" to the risk of harm to Larios is beyond the proper role of an expert witness and would supplant the jury's role in evaluating and determining the facts.

Further, Lake cannot testify to statutory or regulatory requirements or interpret and apply Title IX, pertinent regulations, or caselaw. Those are matters of law that the Court will instruct to the extent it is relevant. However, the Court will not prohibit Lake from providing testimony that generally discusses Title IX. If any testimony at trial impermissibly interprets or applies Title IX, such evidence can be excluded pursuant to proper evidentiary objections.

It is difficult to assess the admissibility of Lake's opinions that rebut Schuster's opinions, as limited by the Court in this order, in the context of a pretrial motion. At this

point, the Court is unable to state that Lake's testimony would not be helpful to the jury in determining if Chadron State's actions were reasonable. In discussing the decision-making process of student affairs professionals, Lake may provide general background information on Title IX, and the Department of Education Office of Civil Rights ("OCR") standards that colleges and universities generally follow. Because OCR standards are not necessarily coextensive with liability, a cautionary instruction may be necessary, but the court is unable to determine the parameters of such an instruction at this time. Lake will not be prohibited from providing testimony that broadly addresses Title IX standards. He will be permitted to specifically rebut Schuster's opinions, to the extent he does not opine on a legal conclusion, providing there is adequate foundation for the opinion.

The Court finds the plaintiffs' challenge to the reliability of Lake's non-legal opinions as "unsupported by the facts" goes more to the weight than to the admissibility of the opinions. Lake's lack of familiarity with the facts is properly the subject of foundation objections and cross-examination. Whether "indisputable record facts contradict or otherwise render [his] opinion unreasonable," in the context of the Court's exclusion of legal conclusions, can be addressed at trial, through objections or motions to strike.

In summary, the parties' motions to exclude will be granted with respect to the expert opinion testimony on deliberate indifference. The experts will be permitted to testify to industry standards and to the adequacy of College's investigation and its responses to the allegations of intimate relationship violence involving Larios. It is inadmissible, however, for the experts to apply the facts to the law and determine that the College's response was "deliberately indifferent" to the harassing conduct towards

Larios.  An expert can opine on the meaning of "notice" based on the training, standards, and a college's internal policies, as it pertains to the College's need to investigate and/or address a potential Title IX violation; however, it is not the role of an expert to tell the jury whether the actual notice standard has been met pursuant Supreme Court precedent.

The Court finds, however, that Lake's opinion based on the OCR's September 2017 administrative closure letter must be excluded.  The document shows on its face that it is not a final determination and was administratively closed because the plaintiffs pursued relief in this Court.  It was closed without prejudice to refiling.  The Court finds OCR made no substantive determination on the matters presently at issue before this court.  Even if it had, that determination would not be dispositive of issues pending in this court.  *See Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 561 (E.D. Tenn. 2018) (noting OCR's determination was not controlling).  Accordingly, the plaintiffs' motion to exclude the testimony of Peter Lake will be granted in part and denied in part, without prejudice to reassertion, as set forth herein.

## II.    Suicide/Causation Experts

### A.    Law

*Daubert* does not require that there be unanimous agreement among professionals in support of an opinion.  Instead, the testimony must only be reliable. *Daubert*, 509 U.S. at 597("General acceptance is not a necessary precondition to the admissibility of scientific evidence . . . an expert's testimony [must] rest [ ] on a reliable foundation and [be] relevant to the task at hand.").  *R.W. v. Bd. of Regents of the Univ. Sys. of Georgia*, 114 F. Supp. 3d 1260, 1274 (N.D. Ga. 2015)

The Eighth Circuit has held that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*."[1] *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003). Experts "are not required to rule out all possible causes when performing the differential etiology analysis." *Johnson*, 754 F.3d at 563 (citations omitted). Further, even if a differential diagnosis is based upon "less than full information," an expert's opinion can still be reliable. *Id*. at 564 (citation omitted).

The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, but a doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759 (3d Cir. 1994). A differential diagnosis may be reliable with less than all the types of information set out above. *See id.* at 759-60 (noting that when one thing is more likely to have been the cause of the injury than anything else that there is no need to examine alternatives). Moreover, the failure to perform a differential diagnosis does not operate as a *per se* bar to the admissibility of expert testimony on causation. *Matthews v. Hewlett-Packard Co.*, No. 15 CIV. 3922 (DAB), 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017); *see O'Loughlin v. USTA Player Dev. Inc.*, No. 14 CV 2194 (VB), 2016 WL 5416513, at *5-6 (S.D.N.Y. Sept. 28, 2016) (finding no differential diagnosis needed where, *inter alia*, the parties agreed that no single factor could be isolated as the cause of plaintiff's condition, the expert relied on literature, medical records, and interviews with plaintiff, and applicable law only required that the alleged

---

[1] A differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." Stedman's Medical Dictionary 492 (27th ed. 2000).

cause be a substantial factor in the resulting condition); *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003) (finding that a failure to rule out alternative causes would go only to the weight of the evidence where the expert had formed an otherwise reliable opinion based on, *inter alia*, the review of witness depositions, medical records, and peer-reviewed scientific literature, and where there was a strong temporal connection between the incident and injury). "[P]ersonal interviews, a medical record review, clinical rating scales, and background facts" are "the type of methodology employed to form a reliable psychiatric opinion." *Israel v. Spring Indus., Inc.*, No. 98 CV 5106(ENV)(RML), 2006 WL 3196956, at *10 (E.D.N.Y. Nov. 3, 2006).

Moreover, *Daubert* does not require an expert to identify a single cause of mental (and physical) conditions because the etiology of psychiatric illness is multi-factorial. *In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*, No. 114ML02570RLYTAB, 2018 WL 6047018, at *2 (S.D. Ind. Nov. 19, 2018); *see In re Neurontin Marketing Sales Practices & Prod. Liab. Litig.*, MDL No. 1629, 2009 WL 3756328, at *9 (Aug. 14, 2009); *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (noting courts are given broad discretion to determine the reliability of psychiatric, psychological, or other social science testimony); *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297-98 (8th Cir. 1997) (same). Because "Suicide is a multi-factorial phenomenon with factors which cannot be ruled out by a testable, established scientific method. *In re Neurontin*, MDL No. 1629, 2009 WL 3756328, at *1, *11, *15 (D. Ma. Aug. 14, 2009).

What is known as a psychological autopsy is a generally accepted methodology for determining the cause of a suicide. *Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1048, 1061 (S.D. Ill. 2007)(listing numerous cases). It is a diagnostic technique developed to

evaluate causation of individual suicides. *In re Neurontin*, 2009 WL 3756328, at *1, *11, *15 (D. Ma. Aug. 14, 2009) (noting the approach has been published in peer-reviewed scientific literature and has been described by numerous courts as a generally accepted methodology for analyzing what led to a suicide). "[A]a psychological autopsy is a 'reconstructi[on of] an individual's psychological life[,] particularly the person's lifestyle and those thoughts, feelings, and behaviors manifested during the weeks preceding death.'" *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 248 (D.D.C. 2018)(quoting *Giles*, 500 F. Supp. 2d at 1051); *see Bennett v. Forest Labs.*, No. 6-72, 2015 WL 1579404, at *5 (M.D. Fla. Apr. 9, 2015) (admitting testimony by an expert who relied on a psychological autopsy to determine that the drug Lexapro was a significant contributing factor in a suicide); *In re Neurontin*, 2009 WL 3756328, at *1, *11, *15 (admitting testimony by experts who used a psychological autopsy and differential diagnosis as the basis for their conclusions that the drug Neurontin caused a suicide); *Giles*, 500 F. Supp. 2d at 1061 (admitting testimony by experts who "used differential diagnoses and a psychological autopsy to determine that [the drug] Effexor caused [a] suicide"); *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118, 1132, 1135 (D. Ariz. 2001) (recognizing that "post-mortem [psychological] autopsies appear to be generally accepted"). "This approach will never produce the definite and testable results expected and demanded in many scientific inquiries; it is, however, the generally accepted methodology for analyzing the causes of a particular suicide and far from the 'junk science' that Daubert and Rule 702 are designed to exclude." *In Re Neurontin*, 2009 WL 3756328, at *9; *see Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009) ("Daubert attempts to strike a balance between a liberal admissibility

standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other").

Federal Rule of Evidence 702 permits a qualified expert to give opinion testimony if the expert's specialized knowledge would allow the jury to better understand the evidence or decide a fact in issue. *United States v. Arenal*, 768 F.2d 263, 269 (8th Cir. 1985). If the subject matter is of an expert's testimony is within the jury's knowledge or experience, however, the expert testimony remains subject to exclusion "because the testimony does not then meet the helpfulness criterion of Rule 702." *Lee*, 616 F.3d at 808-09. An expert may not opine on a factual matter on which the jurors are entirely capable of making a determination or opine on witness credibility. *See Lee*, 616 F.3d at 809; *Westcott v. Crinklaw*, 68 F.3d 1073, 1076–77 (8th Cir. 1995).

B.    Donna Peters (Filing No. 128)

1.    Background

Dr. Donna Peters is the plaintiffs' suicide/causation witness. She has Master's and Psy.D. degrees in Clinical Psychology from the University of Denver. Dr. Peters has over twenty years of experience as a clinical and forensic psychologist who routinely assesses victims of intimate partner violence and persons suffering from suicidal ideation. She has conducted thousands of psychological assessments, including psychological autopsies. She began her career working with victims of domestic violence in the U.S. Army and has continually worked in the area of domestic violence. Filing No. 155-1, Ex. 1, Deposition of Donna Peters, Psy.D, at 205. At least one third of the 4,000 trauma patients she has treated were victims of intimate partner violence or domestic abuse. *Id.* at 28. She has experience assessing victims of intimate partner violence and has been trained in "psychological assessment in suicide

and suicidality." *Id.* at 19. Over the last twenty years, Dr. Peters has routinely conducted psychological assessments for individuals experiencing suicidal ideation or who have attempted suicide. *Id.* at 18. While working at the VA Medical Center, Dr. Peters conducted about 900 psychological assessments, and in her current clinical practice, she conducts psychological assessments on a daily basis. *Id.* at 198. Dr. Peters's experience conducting psychological assessments includes several assessments—or psychological autopsies—of people who completed suicide. *Id.* at 18.

Dr. Peters testified she conducted a psychological autopsy of Fatima Larios. *Id.* at 84, 195. In conducting the psychological autopsy, she had a mental checklist of risk factors to consider, and analyzed ten categories of relevant information, including: identifying information, details of the death, Fatima Larios's personal and medical history, her personality and lifestyle, her typical pattern of reaction to stress, recent stressors in her life or anticipations of trouble, the role of alcohol and/or drugs in her lifestyle and her death, the nature of her interpersonal relationships, changes in her habits and routines leading up to her death, and assessment of her intention. Filing No. 156-2, Donna Peters Expert Report at 2; Filing No. 155-1, Peters Dep. at 196. She reviewed Larios's text messages in the weeks before her suicide, interviewed her parents, reviewed medical records, police records, and autopsy findings. Filing No. 156-2, Expert Report, App. B at 1-2. She read interviews with numerous witnesses and reviewed discovery materials and deposition exhibits. *Id.* She read depositions from Larios's family, friends, teammates and Chadron State University staff. *Id.* She also conducted in-depth scientific literature reviews and considered alternative explanations for Fatima Larios's suicide in formulating her opinions, spoke to parents, etc. Filing No. 156-2, Expert Report at 3.

Dr. Peters expresses the opinion that there is a link between being a victim of intimate partner violence and suicide and there is a strong association between intimate partner violence perpetration/victimization and substance use and abuse. *Id.* at 30-31. Dr. Peters also states that there is an association between alcohol use and suicide. *Id.* at 32. Dr. Peters states that professional intervention for intimate partner violence, suicidality, and problematic drinking behavior was available and would have been beneficial to Larios. *Id.* at 33-36.

Defendant, Chadron State, questions whether Dr. Peters has the training and qualifications to offer an opinion on whether intimate partner violence caused Fatima's suicide, or on whether a mental health or law enforcement intervention would have saved Fatima's life. It challenges the methodology of a psychological autopsy as reliable, and also challenges Dr. Peters's application of the methodology in this case. Chadron State contends Dr. Peters's opinion is flawed because her methodology was not as rigorous as other experts' purported psychological autopsies and because she did not rule out alternative causes of the suicide.

The plaintiffs respond that Dr. Peters's report is highly reliable because she had access to much more information than an ordinary psychologist in the field, including direct text messages from Fatima in the weeks before her suicide.

2.      Discussion

The Court finds the Chadron State's motion to exclude testimony by Dr. Peters should be denied. She is a well-educated, well-qualified expert and can testify to matters within the realm of psychological practice. Dr. Peters relies on the accepted, reliable methodologies of a differential diagnosis and psychological autopsy. The Court

finds Dr. Peters's expertise in domestic violence and suicide may be helpful to the jury in determining the causal connection at issue.

The Court finds Dr. Peters's methodology for diagnosis and causation is sufficiently reliable. The defendant's contention that her testimony is speculative, unsupported by sufficient facts, or contrary to the facts of the case can be addressed in cross-examination. Chadron State's arguments attack the credibility and weight that the expert's testimony and opinions should be given, but it has not demonstrated that she reached her conclusions in an unreliable manner or that her diagnosis and/or her opinions on causation are untrustworthy or unreliable. Generally, the defendant's arguments go to the weight of her testimony, not its admissibility. Accordingly, the motion to exclude will be denied.

C. Dr. Lisa Boesky (Filing No. 137)

1. Background

Lisa Boesky, Ph.D., is a licensed clinical psychologist. Chadron State retained Dr. Boesky to "review relevant discovery and other information, to render expert opinions, and to testify (if necessary) regarding Fatima Larios's suicide and the Plaintiffs' allegations regarding her suicide." Filing No. 139-1, Ex. 1, Defendants' Expert Disclosures, at 2; Filing No. 133-3, Ex. C, Lisa Boesky, Ph.D., Expert Report at 1. She has a Bachelor's degree in Psychology from the University of California, Santa Barbara, and a Ph.D./M.A. in Clinical Psychology from Wayne State University. Filing No. 133-3, Appendix ("App.") A, CV at 14. She develops and delivers keynote addresses and workshops focused on suicide-related issues at national and state conferences, and provides suicide prevention training programs to mental health, juvenile justice, education, medical, substance abuse, and social services professionals. Filing No. 133-

3, Ex. C, Expert Report at 3; *id.*, App. A at 29-39.  She conducts "Suicide Vulnerability Assessments" within 24/7 facility settings, consults on suicide prevention models and strategies, and provides expert witness analysis and opinions on legal cases involving individuals who have died by suicide.  *Id.*  She has written numerous publications related to adolescent mental health and suicide.  *Id.*; *see id.*, App. A, CV at 14-27.  She has over 25 years of clinical experience and has worked in psychiatric hospitals, juvenile justice settings, and outpatient mental health clinics.

Dr. Boesky was asked to provide an expert opinion regarding whether it is possible for a clinical psychologist or other health care professional to state with a reasonable degree of psychological or medical certainty that Fatima Larios's suicide was directly caused by her relationship with Brandon Gardner, to comment on the facts and circumstances surrounding Larios's suicide, and to critique Dr. Peter's report and opinions.  Filing No. 133-3, Ex. C, Expert Report at 3.  She reviewed depositions, investigation reports, text messages, incident reports, emails, medical and academic records, Facebook posts, records, photos from Gardner's and Larios's phones, and autopsy and toxicology reports.  *Id.* at 4-5.

Dr. Boesky opined, *inter alia*, that "Fatima Larios had a number of issues and behaviors that put her at increased risk for suicide, each of which likely contributed to her death, including:  Aggression, Problematic Behavior When Drinking Alcohol, Acute Alcohol Use, Romantic Relationship Problems, Latina Adolescent, Guilt, Negative Self-Image."  *Id.* at 6.  She also concluded that based on the documents, records and exhibits she reviewed, "there is no persuasive evidence that Fatima Larios was physically assaulted by Brandon Finona-Gardner" and "there was persuasive evidence that Brandon Finona-Gardner was assaulted by Fatima Larios."  *Id.* at 9-10 (Opinions 6

and 7).  She also states that Fatima had difficulty controlling her physically aggressive impulses.  *Id.* at 11.  With respect to Dr. Peters's report, she stated Dr. Peters's report and opinions did not adequately acknowledge the complexity of suicidal behavior and the multi-determined nature of suicide among young people; did not appear to consider any other factor in relation to Larios taking her own life other than psychological abuse by Gardner; relied heavily on the testimony of individuals who were unaware of major events and significant aspects of Larios's life; and minimized Larios's physical aggression toward others.  *Id.*

The plaintiffs first contend Dr. Boesky is unqualified to offer opinions on the relationship between intimate partner violence and suicide because she has no special knowledge of, or experience with, intimate partner violence.  They also contend Dr. Boesky's methodology is suspect because she developed her opinions solely for the purpose of litigation and failed to conduct any type of psychological autopsy or differential diagnosis.  Further, they challenge Dr. Boesky's qualifications, noting that she never evaluated suicidal patients who specifically were victims of intimate partner violence and her relevant clinical experience was twenty years ago.

The plaintiffs assert Dr. Boesky's opinions on who was the aggressor in the relationship invades the province of the finder of fact, arguing that it is not based on her expertise, but is directed at questions that the jury is capable of answering on its own.  They then argue that Dr. Boesky's opinion on the cause of Fatima's suicide—which fails to list domestic abuse as a risk factor—is not based on psychological expertise, but is based on her finding that Gardner did not abuse Larios—that is, on the purely case-specific, factual determination that intimate partner violence was not a factor in Larios's

suicide because it never happened.  Plaintiffs contend that determination is for a jury to make.

In response, defendant argues that Dr. Boesky is qualified to state her opinions and contend the plaintiffs' challenge to Dr. Boesky's arguable lack of experience in intimate partner violence goes to the weight rather than the admissibility of her opinions. Chadron State argues that the factual underpinnings of Dr. Boesky's opinion on who was the aggressor are sound.  It argues the jury is free to find the factual underpinnings are not sound but contends that is not a reason to exclude her testimony.

2. Discussion

The Court finds the defendant's motion to exclude testimony of Dr. Boesky should be granted in part and denied in part.  Dr. Boesky is clearly qualified, by education and experience, to testify to matters within the realm of psychological practice.  Dr. Boesky's opinions on risk factors for teen suicide and her opinion on which of them apply to Larios are appropriate subjects of expert testimony.

Dr. Boesky's methodology is somewhat problematic, but the Court cannot say at this time that her opinions on diagnosis and causation are "so fundamentally unsupported that [they] can offer no assistance to the jury." *Synergetics, Inc.*, 477 F.3d at 956.  The plaintiffs' criticisms of Dr. Boesky's testimony on these subjects go more to weight than credibility and can be pursued on cross-examination.

The plaintiffs' attacks on Dr. Boesky's experience, qualifications, and credibility go to the weight that her testimony and opinions should be given.  The plaintiffs have not shown that her opinions on suicide causation and risk factors in general are wholly unreliable or untrustworthy.  The plaintiffs' challenges are questions for a jury to

consider in crediting the expert's opinions and do do not provide a basis to exclude her testimony altogether.

The Court agrees with the plaintiffs that Dr. Boesky's opinion as to who was the aggressor in the Larios-Gardner relationship relates to a purely factual issue that can be determined by the jury. Her testimony on that topic would usurp the function of the jury and essentially would "merely tell the jury what result to reach" on a disputed issue of fact. *Lee*, 616 F.3d at 809 (quoting Fed. R. Evid. 704 advisory committee's note). To the extent her opinions on risk factors/diagnoses and/or causation are derived from her factual determination or hypothetical question, those topics can be explored on cross-examination and may require a cautionary instruction. At this time, the Court does not find that Dr. Boesky's improper factual determination provides a basis for exclusion of her testimony altogether.

The plaintiffs' motion to exclude Dr. Boesky's testimony will be granted in part and denied in part, as set forth in this Memorandum and Order.

D.    Dr. Karl Williams (Filing No. 144).

1.    Background

Karl Williams, M.D., was retained by the defendant to "review relevant discovery and other information, to render opinions, and to testify (if necessary) regarding the condition of Fatima Larios's body at the time of post-mortem examination and the Plaintiffs' allegations that she was the victim of physical domestic abuse." Filing No. 139-1, Ex. 1, Defendants' Expert Disclosures at 2. Dr. Williams is a licensed medical doctor, forensic pathologist, and the Chief Medical Examiner for Allegheny County, Pennsylvania. Filing No. 139-3, Ex. 3, Karl E. Williams, M.D., CV. He obtained his

Master's degree in Public Health and his M.D. from the University of Pittsburgh.  *Id.* at 102.  Dr. Williams has been practicing medicine for more than forty years.

Dr. Williams has been variously employed as a medical director, staff physician, pathologist, technical consultant, and hospital laboratories director.  *Id.* at 1-2.  He has twenty years of experience serving as the Consulting Forensic Pathologist to the elected coroners of several western Pennsylvania counties.  *Id.* at 5.  As a consulting forensic pathologist, his activities included scene investigation, toxicological evaluations, autopsies, and courtroom testimony.  *Id.*  He reviewed Fatima Larios's autopsy and toxicology reports and opined about the cause of her death and the bruises on her body.  Filing No. 142-2, Ex. 2, Dr. Williams Expert Report.  He states that "Larios died as a result of a suicidal ligature compression of the neck.  Furthermore, there is nothing in the report or ancillary material that would suggest any antecedent factors relating to an episode or episodes of domestic violence."  *Id.* at 3.

Plaintiffs move to exclude Dr. Williams's opinion in its entirety.  They first contend the testimony on cause of death is not relevant because there is no dispute that the cause of Fatima's death was suicide.  They next argue evidence of cause of death is cumulative and will cause undue prejudice.  They assert the testimony as to absence of signs of domestic violence should be barred as unreliable and speculative.  They contend Dr. Williams does not have the experience necessary to offer an opinion on whether Larios was the victim of intimate partner abuse at any point prior to her death.

The defendant argues that jurors would benefit from hearing from an expert who reviewed her autopsy, can confirm her acute cause of death, and can discuss the bruising on her body at the time of death.  It contends that Dr. Williams has a reliable

basis for his opinion regarding the source of Larios's bruises and that the opinion is not speculative.

2.      Discussion

The Court finds the plaintiffs' relevance objections should be denied at this time, without prejudice to reassertion at trial.   Whether the testimony will be cumulative depends on the other evidence presented at trial.   The Court generally finds that the danger of undue prejudice does not appear to outweigh the whatever marginal relevance the evidence may have.   The opinion regarding "domestic violence" is somewhat problematic in that it relies upon the expert's definition of domestic violence and violence in general.   A medical examiner's ability to make distinctions based on injury patterns will be subject to the usual objections at trial.   The plaintiffs' criticisms of Dr. Williams's credentials, experience, and methodology go more to the weight than to the admissibility of the evidence.   Any alleged shortcomings can properly be explored on cross-examination.   The plaintiffs' motion to exclude his testimony will be denied. Accordingly,

IT IS ORDERED:

1.      Defendants' motion to exclude the testimony of Saundra K. Schuster (Filing No. 125) is granted in part and denied in part, as set forth in this Memorandum and Order.

2.      Defendants' motion to exclude the testimony of Donna Peters, Psy.D. (Filing No. 128) is denied.

3.      Plaintiffs' motion to exclude the testimony of Peter Lake (Filing No. 134) is granted in part and denied in part, as set forth in this Memorandum and Order.

4.    Plaintiffs' motion to exclude the testimony of Lisa Boesky, Ph.D. (Filing No. 137) is granted in part and denied in part, as set forth in this Memorandum Opinion.

5.    Plaintiffs' motion to exclude the testimony of Karl Williams, M.D. (Filing No. 144) is denied.

DATED this 31st  day of October, 2019.


BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge